**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE STATE OF NEW YORK EX REL VINOD KHURANA and THE CITY OF NEW YORK EX REL VINOD KHURANA, <br><br> Plaintiffs, <br><br> v. <br><br> SPHERION CORP. (N/K/A SFN GROUP, INC.), <br><br> Defendant. | Case No. 15-cv-06605-JFK |

**DECLARATION OF VINOD KHURANA IN SUPPORT OF RELATOR'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

1.      I, VINOD KHURANA, make this declaration in opposition to Defendant's Motion to Dismiss the Second Amended Complaint.

2.      I was hired by Spherion in July 2004 as a quality assurance automation tester and later as load performance tester.

3.      In November of 2004, I communicated verbally and via email to Scott Berger who worked for MS Creative, a sub-contractor of Spherion, that the load tests I had run determined that the software application could only support 20 concurrent users, a far cry from the 2,000 that was goal for the pilot and the ultimate 160,000 concurrent users that was contemplated for a fully effective system.  At that time, I verbally expressed to Berger that the woefully inadequate performance results so many years into the project indicated a waste of resources.

4.      In December 2004, I communicated my grave concerns to my superiors. I continued to communicate with Scott Berger about the same.   Additionally, in a

1

conversation outside of Berger's office, I alerted Howard Cohen, the Spherion account manager handling CityTime who reported to Tom Roach, Spherion Executive Vice President, that the performance of the application was extremely poor and that this project was not worth the time and resources that had been spent to date. I told Cohen that the development team had done a lousy job and that the project should be "scrapped."

5.      Also in December 2004, I communicated my concerns regarding the projects viability and wastefulness and the performance results to FISA ("Financial Information Services Agency [for New York City]) employees, Sue Amodeo and Rajeev Mantry, who had come to my office to discuss the load test results.

6.      In early 2005, I attended a meeting in the Development area meeting room with Berger, SAIC Project Manager, Mike Fayerman, OPA senior manager, Sarah Gujal, Mark Mazer and Joel Bondy, the Executive Director of the City's Office of Payroll Administration (OPA). I reiterated these concerns to them. After this meeting, Mazer, Berger, and Bondy had me remain behind for a closed door meeting. They told me not to mention my concerns to anybody at FISA again. They directed me to discuss future load performance results only with Berger. It was at this meeting that they candidly told me that they knew the project was going to fail.

7.      During late 2004 and early 2005, I continued to notify Amodeo and Mantry about the problems with the load test results and my continued belief that the project was a failure. These discussions occurred when Amodeo and Mantry would come to my office. They did so on a roughly biweekly basis. We would relocate to where that we could speak openly, usually an empty area of the cafeteria. I told them repeatedly that the

program would crash after approximately 20 users logged on.  At one of these meetings, I told Amodeo and Mantry that Berger and Mazer, with Bondy present, had told me that they knew the CityTime project was going to fail.

8.      Throughout 2004, 2005 and 2006, I continued to discuss with Cohen that there were serious problems with the CityTime program.  On several occasions, Cohen would verbally ask me "what is going on here?"  My words might have differed slightly at different times when we spoke, but I always conveyed the same basic information: the project was not performing anywhere near up to standard, the software would fail over 20 users, and the project should be scrapped.

9.      At meetings, one in May 2005 and one in June or July 2005, Cohen expressed to me that he was concerned about the slow progress of CityTime.  In the first meeting I told Cohen that Mazer, Berger and Bondy did not know what they were doing.  In the second, I told him I thought that something was not right.

10.     In August 2005, Amodeo and I met again.  At this meeting, she told me she was frustrated by an email that we had received from Berger that he had also copied to other officials involved in the CityTime project.  In the email, Berger had represented that load performance testing was being done by another performance tester and me in accordance with a plan approved by FISA.  She told me that she did not know of any plan being approved by FISA and that she did not believe there was one. She expressed to me that if there was any such plan, she would have known about it because part of her job duties would have been to be a part of the approval process.  She asked if I knew about any plan like the one he described that was being implemented.  I told her that I did not.  I was not informed of any such plan during my time at Spherion and I certainly had not been

implementing any such plan.

11.     In March of 2006 on the 6th floor of the new building near the QA (Quality Assurance) area, a Spherion SME who was from the Dominican Republic, but whose name I do not recall, openly and loudly told Cohen in front of me that CityTime was a joke.  I agreed and said that the project should be shelved.

12.     Shortly thereafter, also in March 2006 on the 6th floor of the building near the QA area, in a meeting with SME Arthur Donnelly, Spherion's most senior SME ("Subject Matter Expert") consultant and Cohen, Cohen asked what my thoughts were on CityTime and I again told him that management should scrap the project. I said that Mazer was not the right person to head the project and that he along with Berger and SAIC management were doing this only to pocket the money for themselves by extending the contract for as long as possible knowing it was a failure.

13.     In a later July 2006 meeting on the 6th floor of the building near the QA area with SME Donnelly and Cohen, Cohen said he did not like how the project was progressing. At this time, I told them that I thought this project was continuing just to put money in the pockets of Mazer, Berger, and SAIC.  Donnelly was disgusted and fed up and said he was going to talk to Joel Bondy.  I found out Donnelly was fired a few days later.

14.     Between March 2006 and March 2007, I had 6 to 12 conversations with Berger about how to seek reimbursement for my expenses for travel, food, and for items like flash drives purchased for work.  Berger told me to charge these things as overtime.  This seemed like an abuse of funds to me.  But, he made suggestions to bill for instance, one to two hours of overtime for the taxi ride home and half-an-hour of overtime for food.

15.     Around January 2007 on the 6th floor near the QA area, I told Berger that the two

performance testers they had recently hired were not qualified to do all aspects of the performance testing and were not properly performing their jobs.  I also reported that information to my supervisor, Spherion consultant, Ed Rambali.  Ed Rambali responded that I "talk too much."

16.     In January 2007, I told DA Solutions consultants Rekha Basu and Audry (last name unknown) that I thought Berger and Mazer were "up to no good" and "pocketing City funds for themselves."  Rekha looked angry and said I should not repeat my suspicions about Berger to anybody else.

17.     The reason I believed that Mazer was engaging in fraud was because Michael Fayerman, an employee with SAIC, had told me that the contractor DA solutions was owned by Mazer's wife.  Others at Spherion were aware of this information as well since Fayerman would not solely talk with me about these matters.  In reality, the connection between Mazer and DA solutions was an "open secret" among the consultants.

18.     In May 2007, the Monday after my termination from Spherion, I told Cohen that I was wrongfully fired because Berger, Mazer, and SAIC management were afraid that I knew too much about the problems with the project.  Cohen told me not to sue Spherion because the company could lose valuable contracts with the City.

19.     After I was terminated, Jeff Boldia told me that the SAIC management had instructed him to manipulate the CityTime load testing reports to make the data that was subsequently presented to the committee – consisting of Bondy and representatives from Spherion, SAIC, OPA, FISA – appear significantly better than the reality. Boldia admitted that he actually produced two reports – one that was accurate and another that fudged the numbers – and that this data was stored on an external server.  Boldia told me

that the true results of subsequent load tests continued to be abysmal, even into mid-2005 and beyond, the CityTime software could not handle more than 50 parallel users at a time.

20.     At this point, I decided to take additional action to stop this ongoing fraud.  I e-mailed a report to the New York City Department of Investigation ("DOI"), which the DOI acknowledged receiving on March 11, 2009.  I posted the same report as an "iReport" on CNN's website.  In 2010, I also spoke with a Daily News reporter Juan Gonzalez who was investigating CityTime matters.  In December 2010 and thereafter, I informed DOI of all of the information itemized above, in audiotaped meetings with investigators and emails and the results of load tests from my time at Spherion.  I also provided the names and contact information of potential witnesses working for Spherion and its subcontractors.  Some of these witnesses contacted DOI at my behest.

21.     In these meeting with DOI, I also informed them of my conversation with SAIC's project manager, Mike Fayerman in which he told me that DA Solutions was owned by Mazer's wife.

22.     I further informed DOI that Spherion was billing its consultants' overtime to CityTime, as well as two-week severance packages for its terminated consultants.

23.     In meetings with DOI in December 2010, I informed them of another Spherion load performance engineer named Sanjay Arya who was terminated after informing Farhana Lokhandwala of OPA that the CityTime software application was performing poorly.  This was when I came to understand that Spherion was engaged in a systemic practice of eliminating any employees who questioned the functionality of the CityTime project.

24.    I gave all the above information to DOI prior to filing my *qui tam* case under the New York City FCA, I gave all the above information to the New York State Attorney General prior to filing my *qui tam* cases under the New York FCA.

I declare under penalty of perjury that the foregoing is true and correct.

_Vinod Khurana_
Vinod Khurana

Dated: November 23rd, 2015

7