USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  11/10/2016

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------X

THE STATE OF NEW YORK <u>EX REL</u>     :
VINOD KHURANA and THE CITY OF         :
NEW YORK <u>EX REL</u> VINOD KHURANA,   :
                                      :
                    <u>Plaintiffs</u>,   :
                                      :        No. 15 Civ. 6605 (JFK)
    -against-                         :
                                      :        **OPINION & ORDER**
SPHERION CORP. (N/K/A SFN GROUP,      :
INC.)                                 :
                                      :
                    <u>Defendant</u>.   :

------------------------------------X

<u>APPEARANCES</u>

FOR PLAINTIFF/RELATOR VINOD KHURANA:
    David Kovel, Esq.
    David Bishop, Esq.
    KIRBY McINERNEY LLP

    John R. Newcomer, Jr., Esq.
    Jillian Estes, Esq.
    JAMES, HOYER, NEWCOMER AND SMILJANICH, P.A.

FOR DEFENDANT SPHERION CORP.:
    Mark J. Hyland, Esq.
    Rita M. Glavin, Esq.
    Thomas Ross Hooper, Esq.
    SEWARD & KISSEL LLP

**JOHN F. KEENAN, United States District Judge:**

On March 31, 2011, Plaintiff Vinod Khurana brought this

action in New York State Supreme Court.  Plaintiff amended his

complaint twice, and Defendant Spherion Corp. ("Spherion")

removed the case to this Court in August 2015.  Spherion now

moves to dismiss the Second Amended Complaint (the "complaint")

pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of

Civil Procedure for failure to state a claim and failure to plead fraud with particularity.

The complaint asserts two types of claims.  First, Plaintiff brings qui tam claims on behalf of the City of New York (the "City") and State of New York (the "State"), alleging that Spherion is liable under the New York False Claims Act ("NYS FCA") and the New York City False Claims Act ("NYC FCA") for the submission of false claims to the City.  Plaintiff also brings retaliation claims under the NYS FCA and NYC FCA, alleging that Spherion terminated and otherwise retaliated against him after he raised concerns about Spherion's alleged misconduct.

For the reasons set forth below, Spherion's motion to dismiss is granted as to Plaintiff's qui tam claims and denied as to Plaintiff's retaliation claims.

## I. False Claims

### A. Background

### 1. The Parties

Plaintiff is a resident of California and a former employee of Spherion. (Compl. ¶ 9.)  He has over 20 years of experience as a computer systems analyst, including over 10 years of experience as a load performance engineer. (Id.)  In July 2004, Spherion hired Plaintiff as a consultant on the CityTime project, where he worked until his termination from Spherion in

May 2007. (Id.)  Spherion is a Delaware corporation
headquartered in Ft. Lauderdale, Florida. (Id. ¶ 12.)[1]

## 2. CityTime

In 1998, the City, through the Office of Payroll
Administration (the "OPA"), launched the CityTime project to
automate time-keeping and payroll functions for approximately
180,000 City employees by 2010. (Id. ¶ 13.)  Official oversight
of the project rested with a three-person panel consisting of
the Mayoral Board Budget Director, a representative of the
Comptroller's office, and the executive director of the OPA.
(Id.)

Several contractors were hired to work on CityTime.  By
2002, Science Applications International Corporation ("SAIC")
officially took over as the prime contractor. (Id. ¶ 14.)  At
that time, the project had a budget of approximately $78
million. (Id.)  SAIC hired a company called Technodyne as the
prime subcontractor. (Id.)  In 2001, the OPA brought Spherion on
for a contract worth $3.4 million to provide quality assurance
over the CityTime project. (Id. ¶ 15.)  Spherion was engaged "to
validate [SAIC's] recommended infrastructure, methods, and

---

[1] On February 23, 2011, Spherion changed its name to SFN Group,
Inc. and now operates under the name Spherion Staffing, LLC
(Compl. ¶ 12.)  Because the company was known as Spherion Corp.
during the time period relevant to this case, the Court refers
to the company as "Spherion" throughout this Opinion.

procedures, to certify [SAIC's] deliverables and project phases, to assess risks and recommend mitigation strategies, to track the project, and to review past and future work products and Change Orders." (Id. ¶ 22; Aff. of Mark J. Hyland Ex. 5.)

Spherion's contract with the OPA contained a detailed "Scope of Work" section setting forth Spherion's quality assurance obligations under the contract. (Compl. ¶ 23.)  A sub-section titled "Objective" provided, in part:

> One of the OPA's express purposes in entering into this Agreement with Spherion is to benefit from Spherion's Quality Assurance expertise. It is the responsibility of Spherion, therefore, in its provision of QA Services, to perform all work and services necessary and required to be performed, prepared, and/or furnished to help ensure the timely and successful completion of the CityTime project. Spherion shall advise OPA of significant requirements that the Developer knows or reasonably should have known should be addressed or included in Deliverables. It is understood that Spherion shall use its expertise in the performance of the QA Services specified in this Agreement. It also is understood that it is Spherion's responsibility to provide OPA with advice and recommendations based upon its expert analysis and that final decisions regarding CityTime shall be made by the City.

(Compl. ¶ 23 (emphasis added in complaint); see also Hyland Aff. Ex. 5.)

The contract also included eight appendices, one of which (Appendix A) set forth general provisions for contractors. (Compl. ¶ 24.)  The 20-page Appendix A contained the following provision related to conflicts of interest:

**Article 2, Representations and Warranties**

**Section 2.2, Conflict of Interest**: The Contractor represents and warrants that <u>neither it nor any of</u> <u>its directors, officers, partners or employees, has</u> <u>any interest nor shall they acquire any interest,</u> <u>directly or indirectly, which would or may conflict</u> <u>in any manner or degree with the performance or</u> <u>rendering of the services provided herein. The</u> <u>Contractor further represents and warrants that in</u> <u>the performance of this Agreement no person having</u> <u>such interest or possible interest shall be</u> <u>employed by it.</u> No elected official or other officer or employee of the City or Department, nor any person whose salary is payable, in whole or in part, from the City Treasury, shall participate in any decision relating to this Agreement which affects his or her personal interest or the interest of any corporation, partnership or association in which he is, directly or indirectly, interest [sic]; nor shall any such person have any interest, direct or indirect, in this Agreement or in the proceeds thereof.

(<u>Id.</u> (emphasis added in complaint); <u>see</u> <u>also</u> Hyland Aff. Ex. 5.)

### 3. Alleged Fraud of Spherion Consultants

#### a. Plaintiff's Allegations

According to the complaint, Spherion hired Mark Mazer and Scott Berger as consultants on CityTime, and they began work on the project by 2005. (Compl. ¶¶ 3, 31.)  In 2006, SAIC's prime contract was amended from a fixed-price contract, which placed the burden for cost-effectiveness on the contractor, to a fixed-price level-of-effort contract, which allowed the contractor to recover for the number of hours worked. (<u>Id.</u> ¶ 18.)  The amendment significantly increased the amount of compensable consulting staffing on the project. (<u>Id.</u>)  From the end of 2005

5

to the end of 2007, the number of consultants on the project increased from 100 to more than 300. (Id.)

Plaintiff alleges that, with access to additional consultant funding, Mazer used his position on CityTime to award lucrative contracts to companies controlled by friends or family members in exchange for kickbacks. (Id. ¶ 19.)  According to the complaint, in his role as a Spherion consultant, Mazer hired two companies—DA Solutions and PrimeView—as subcontractors of Technodyne for contracts worth more than $76 million. (Id.)  DA Solutions was owned by Mazer's uncle, Dimitry Aronshtein, and PrimeView was owned by Victor Natanzon, whose relationship to Mazer is not alleged. (Id.)  Together, the companies collected more than $75 million from CityTime, with nearly $25 million kicked back to Mazer through shell companies in his wife's and mother's names. (Id.)

### b. Public Scrutiny & Criminal Charges

The New York news media began publishing articles discussing problems with CityTime in 2004, with increased frequency in 2009 and 2010. (See Hyland Aff. Ex. 9.)  The project also received scrutiny from public officials.  On May 8, 2008, a committee of the New York City Council held a public meeting at which they questioned the OPA's Executive Director, Joel Bondy, about the "constant change" on CityTime and the fact that "upwards of a quarter of a billion dollars [had been]

6

spent" with "no end" in sight. (Hyland Aff. Ex. 20 at 91, 93.)
One councilmember noted that the constant change raised a "red
flag" and suggested that an audit of the program was needed.
(Id. at 91-92.)

On September 28, 2010, the Office of the Comptroller of the
City of New York released a 16-page public audit report
addressing OPA's monitoring of Spherion's oversight role on the
project (the "Audit Report"). (Hyland Aff. Ex. 22.)  The Audit
Report discussed, among other things, Spherion's contractual
obligations to the City, its performance under the agreement,
and the City's management of the contract. (Id.)

Less than two months later, on December 15, 2010, the U.S.
Attorney's Office for the Southern District of New York and the
New York City Department of Investigation ("NYC-DOI") jointly
unsealed a 35-page criminal complaint (the "Criminal Complaint")
and announced charges against six individuals connected to
CityTime:  Mark Mazer, Scott Berger, Dimitry Aronshtein, Victor
Natanzon, Svetlana Mazer (Mazer's wife), and Larisa Medzon
(Mazer's mother). (See Hyland Aff. Exs. 7, 8.)

The Criminal Complaint alleged, among other things, the
following:

In or about 2005 and 2006, the OPA began approving work
orders for additional work purportedly required to be performed
by SAIC in order to enable the successful completion of the

7

CityTime project. (Criminal Compl. ¶ 22(b).)  Amendments to the
contract between SAIC and the City authorized the expenditure of
more than $100 million in additional City funds. (Id.)  Mazer
was involved in shaping the scope and requirements of the
additional work orders and contract amendments in 2005 and 2006.
(Id. ¶ 22(f).)

Mazer abused his position of authority at the OPA and his
contractual obligations to covertly steer over $76 million in
City funds to two subcontractors—DA Solutions, Inc. and
PrimeView, Inc.—that were connected to Mazer through family
members or through corrupt financial arrangements. (Id.
¶ 26(a).)  Mazer and his family members received kickbacks of at
least $25 million out of the $76 million steered to the
subcontractors. (Id. ¶ 26(b).)  Berger accepted over $400,000 in
payments from DA Solutions. (Id. ¶ 26(d).)  Mazer, Berger, and
two co-defendants also engaged in "blatant fraud" in connection
with timesheets submitted for work purportedly done on CityTime.
(Id. ¶ 33.)

The Criminal Complaint also alleges that, in 2001, the OPA
contracted with a national consulting firm, identified in the
Criminal Complaint as the "QA Vendor," to provide quality
assurance services for the CityTime project. (Id. ¶ 13.)  The
intended purpose of the contract was for the QA Vendor to
supervise the Lead Software Developer's performance and to

ensure that the ultimate product created by the Lead Software Developer would meet the City's needs. (Id.)  The contract was initially worth approximately $3.4 million. (Id.)  Since 2001, there were eleven amendments to the contract and the payments to the QA Vendor had exceeded $49 million. (Id. ¶ 14.)  Soon after the QA Vendor entered into the contract, the contract was amended to permit the OPA to retain the services of subject matter experts ("SMEs") though the QA Vendor. (Id.)

The QA Vendor billed for work performed by Mazer and Berger as SMEs. (Id. ¶ 19.)  Mazer and Berger were paid by the QA Vendor, not as employees of the QA Vendor, but through a company called MS Creative Technologies, Inc. ("MS Creative"). (Id. ¶ 20.)  Mazer listed himself as the president of MS Creative on documents filed with the City. (Id.)  Mazer and Berger, although not employed by the OPA, exercised significant actual authority over the CityTime project. (Id. ¶ 21.)  This authority included identifying additional work that needed to be performed, approving contract amendments and work orders, and certifying the accuracy of timesheets submitted by consultants for payment by the City. (Id.)

According to Plaintiff's complaint in this case, Berger died of a heart attack on January 19, 2011. (Compl. at 2 n.1.)  On February 10, 2011, an indictment was filed against five of the six other defendants named in the Criminal Complaint:  Mark

Mazer, Dimitry Aronshtein, Svetlana Mazer, Larisa Medzon, and Anna Makovetskaya.  The sixth defendant, Victor Natanzon, waived indictment and pleaded guilty to an information on February 8, 2011.  The criminal cases were assigned to the Honorable George B. Daniels of this Court.

On June 15, 2011, a federal grand jury issued a superseding indictment against Mark Mazer, Gerard Denault, Padma Allen, Reddy Allen, Technodyne LLC, Dimitry Aronshtein, Svetlana Mazer, Larisa Medzon, and Anna Makovetskaya. (Hyland Aff. Ex. 13.)  On March 8, 2012, SAIC signed a deferred prosecution agreement with the U.S. Department of Justice in which SAIC admitted to having defrauded the City and agreed to pay more than $500 million in settlement. (Id. ¶ 20; Hyland Aff. Exs. 18, 19.)

During October and November of 2013, Mark Mazer and co-defendants Dimitry Aronshtein and Gerard Denault were tried in the Southern District of New York with Judge Daniels presiding. On November 22, 2013, the jury returned a verdict finding each defendant guilty on multiple counts.  Mazer was convicted on charges related to wire fraud conspiracy, wire fraud, bribery conspiracy, bribery, Travel Act conspiracy, and money laundering conspiracy.  On April 24, 2014, Judge Daniels sentenced Mazer to concurrent terms of imprisonment totaling 20 years.  Aronshtein and Denault also each received 20-year sentences.  The three

defendants were ordered to forfeit over $40 million as illegal
proceeds.

### 4. Plaintiff's Conduct

Plaintiff claims that in his position as a load performance
tester, he began noticing performance problems with the CityTime
software in late 2004. (Compl. ¶ 29.)  During a pilot stage of
the program, load performance tests involving one City agency—
the Financial Information Services Agency ("FISA")—demonstrated
that CityTime was capable of handling only a small percentage of
the number of users contemplated at that stage, which itself was
a small percentage of the anticipated number of total users.
(Id.)

According to the complaint, in December 2004, Plaintiff
began voicing his concerns about the software's problems to
individuals at FISA, OPA, SAIC, and Spherion. (Id. ¶ 30.)  After
one meeting at which Plaintiff raised concerns about the
software's performance issues, Mazer, Berger, and Bondy stayed
behind to speak with Plaintiff and told him that they knew that
"this project is going to fail." (Id. ¶ 31.)  Berger directed
Plaintiff not to mention his concerns to anyone at FISA again
and to discuss any future load performance issues directly with
Berger. (Id.)

During this time period, Plaintiff alleges that he
developed a relationship of trust with FISA's Sue Amodeo and

Rajeev Mantry. (Id. ¶ 32.)  On multiple occasions, Plaintiff told Amodeo and Mantry that the program would not support the number of users required and that it would crash after about 20 users. (Id.)  He also told Amodeo and Mantry that Mazer and Berger had told him that they knew the project was going to fail. (Id.)

On August 26, 2005, Berger sent an e-mail to multiple recipients at the City, SAIC, and FISA, indicating that Spherion's performance test process was being implemented pursuant to an approved plan. (Id. ¶ 33.)  After Amodeo and Mantry approached Plaintiff about the e-mail, Plaintiff confirmed that no such plan had been implemented. (Id.)

Plaintiff claims that "on numerous occasions during late 2004 and early 2005," he also told other Spherion representatives, including Spherion's account manager, Howard Cohen, about "serious problems" with CityTime. (Id. ¶ 34.)  In response to inquiries from Cohen about the project's performance issues, Plaintiff alleges that he told Cohen "the project was not performing to standards, that the software would fail with over 20 users, and that given the time and money already invested in the project, it should be scrapped." (Id.)  As a result, Plaintiff claims that it was "no later than late 2004 or early 2005 that Spherion was aware that the project was going to fail and knew or should have known that it was being run by

12

Spherion employees who were intentionally sabotaging the
implementation." (Id. ¶ 35.)  According to the complaint,
Spherion "continued with the project as if those problems did
not exist" and continued billing the City without taking any
action to remove Mazer and Berger from their positions. (Id.
¶ 36.)

Plaintiff alleges several other instances in which he told
CityTime consultants about problems with the project.  He claims
that he told Edward Rambali, a Spherion consultant brought in to
manage the load performance group, that "Berger and Mazer were
not concerned about the project [sic] success and had hired
unskilled workers to perform the job of load performance
testing." (Id. ¶ 41.)  Also, in a March 2006 meeting, Plaintiff
allegedly told Cohen and another Spherion employee, Arthur
Donnelly, that "Mazer was not the right person to head the
project," that Mazer, Berger, and SAIC management "were doing
this only to pocket the money for themselves by extending the
contract for as long as possible knowing it was a failure," and
that "management should scrap the project." (Id. ¶ 42.)
Plaintiff claims that he again told Cohen and Donnelly in July
2006 that "he thought the CityTime project was continuing just
to put money in the pockets of Mazer, Berger, and SAIC." (Id.
¶ 43.)  According to the complaint, Donnelly "appeared
disgusted" and told Plaintiff and Cohen that he was going to

talk to OPA's Executive Director, Joel Bondy. (Id.)  Plaintiff learned a few days later that Donnelly had been fired. (Id.)

Further, Plaintiff alleges that he "personally witnessed or developed knowledge of various other examples of suspicious or outright fraudulent conduct." (Id. ¶ 45.)  This included "[b]illing the CityTime contract for two-week severance packages paid to terminated Spherion consultants"; "[b]illing the CityTime contract for over-time hours incurred by Spherion consultants despite an express prohibition of overtime expenditures in the contract between CityTime and OPA"; "[b]illing the CityTime contract for travel and expenses related to Berger's frequent trips to Florida to check on a vacation home he was building there"; and "[e]nabling SAIC to bill the CityTime contract for work spent developing similar time-keeping software for other clients." (Id.)

As discussed in greater detail below, Plaintiff claims that he was retaliated against and ultimately terminated in May 2007 for communicating to Spherion and FISA that performance was poor and the project was failing. (Id. ¶ 58.)  Following his termination, Plaintiff alleges that he maintained relationships with several Spherion contractors who kept him updated on the continued failure of the project to produce functioning software. (Id. ¶ 62.)

In early 2009, Plaintiff drafted a "detailed complaint
memorializing his direct knowledge of the fraud," mailed it to
the New York City Department of Investigations, and posted it
online as a CNN "iReport." (Id. ¶ 62.)  On March 11, 2009, the
DOI acknowledged receipt of Plaintiff's letter. (Id.)  The DOI
complaint is incorporated by reference in Plaintiff's complaint,
attached as an exhibit to an affidavit submitted by Spherion's
counsel, and cited by both parties.  It is reproduced below
without correction:

> Several year ago, I was hired as a consultant for the
> City of New York Payroll department under the
> administration of Joel Bondy, Executive Director.
>
> The project: a 10 year, $200 million budget to develop
> the City's Payroll system ("CityTime") spearheaded by
> SAIC Corp.- a leading supppller of contractors for
> the government.
>
> In Year 7, it was very clear to most of us that the
> project was a waste of taxpayers money and was not
> accomplishing the goal of automating all 80+ City of
> New York agencies. In year 9 – 10, between 8 – 15
> agencies have been automated at a cost of $200 million
> with well over 70 to go.
>
> The THREE culprits behind this sceme are:
>
> 1. Senior consultant manager, Spherion Corp. Mark
> Mazer- the most crooked person on the team. 50 years
> old. Bill rate: $175/hr
>
> 2. Senior Manager, Spherion Corp.: Scott berger A
> sheep who listens ONLY to Mark Mazer and does not rock
> the boat. Is building his house in Florida at
> taxpayers expense. 60 years old. Bill rate: $175/hr
>
> 3. Senior software developer manager, SAIC: nickname:
> "jellybean". 55 years old. Bill rate: $175/hr.

In all, these three men have EVERY objective to continue the project into 2010 and beyond with a budget of $15- $25 mlllion/yr + and in the process rake in hundreds of 000's $ for themselves and produce little in return except a faltering system.

The project is a total waste and will NOT accomplish the goal to automate all 80+ agencies.

I would suggest that the media contact the NYC Payroll department and obtain more information on CityTime. You will be surprised to discover what lies beneath the covers.

Briefly:
1. Over 100 external consultants from SAIC, Spherion and other agencies billing minimum of $50/hr. The highest is $175/hr.

2. The project in its 5th year was a failure and should have been canned but Joel Bondy for some reason or another (blindsighted) decided it must go on for another 5 yrs. I observed how nervous he loooked in some meetings.

3. No doubt this was the BIGGEST lottery landing a job here but as time went on, I along with others started realizing there was nothing really coming of this. Mark Mazer and Scott had ONLY one main intent... to pocket the $/hr for themselves for as long as possible @ taxpayers expense.

4. We were told specifically when other City officials visited us NOT to "bad" mouth the project... we all along with management KNEW very well this was going to be a complete failure.

5. The project is housed between 6th and 7th on 31st street on the 8th - 10th floor. It has the "City of New York Payroll department" sign outside the front door.

I have always wanted to tell this story but stopped from doing so. I suppose when I was there, it was greed that prevented me. Now happily employed by a Wall Street firm...

> Someone from your organization should investigate
> "CityTime" and its purpose.

(Hyland Aff. Ex. 12 at 1 (ellipses in original).)

Plaintiff claims that after sending the DOI complaint he "went on an extensive campaign to call as much public attention as possible to the fraud," which included posting an "extensive series of comments on articles on the New York Daily News website that exposed the inner-workings of the CityTime contract in great detail." (Id. ¶ 63.)

Plaintiff alleges that he met with DOI investigators in "December 2010 and thereafter" but does not specify whether his first meeting with investigators occurred before or after the Criminal Complaint was unsealed on December 15, 2010. (Id. ¶ 64.)  During the meetings, he claims he provided DOI with "a full accounting of his knowledge and experiences on the CityTime project." (Id.)  He also gave the investigators a "flash drive containing relevant emails and load test results from Dec. 2004 through Feb. 2005, which illustrated the project's performance failures." (Id.)  Plaintiff alleges that this information was not available in any public source at the time this case was filed. (Id.)

## 5. Plaintiff's FCA Claims

Plaintiff alleges that "[b]ut for Spherion's failure to execute the responsibilities inherent in its contract with the

17

OPA, Mazer and Berger would not have been able to perpetuate their fraudulent kickback schemes." (Id. ¶ 67.)  "As a result of this failure to satisfy its contractual obligation," Plaintiff asserts that "every claim for reimbursement pursuant to the quality assurance contract with the City of New York," which totals an estimated $48 million, "was a false or fraudulent claim." (Id.)  Plaintiff alleges that the City is therefore entitled to recover treble damages and civil penalties under the NYS FCA and NYC FCA. (Id. ¶¶ 69, 73.)

In opposition to Spherion's motion to dismiss, Plaintiff advances four theories on which he claims Spherion is liable under the NYS FCA and NYC FCA for the submission of false or fraudulent requests for payment.

First, Plaintiff contends that Spherion is vicariously liable for Mazer and Berger's acts in "steering billable work to their own entities then inflating and falsifying timesheets" (the "vicarious liability claims"), because they acted with actual or apparent authority from Spherion and because Spherion's contract with the OPA made Spherion liable for the acts of its agents, employees, and subcontractors. (Pl.'s Mem. at 10.)

Second, Plaintiff argues that Spherion submitted false claims to the City because it "failed to provide quality assurance services" (the "quality assurance claims"). (Id. at

18

11.)  According to the complaint, Spherion had an obligation under its contract with the OPA to perform "all work and services necessary . . . to help ensure the timely and successful completion of the CityTime project," as well as a duty to provide advice "based upon its expert analysis." (Id. at 12 (quoting Compl. ¶ 23.).)  Plaintiff argues that Spherion breached these duties by "failing to disclose the abysmal lack of progress in development of CityTime as a general matter." (Id.)

Third, Plaintiff asserts that Spherion is liable for false claims because it violated the conflict of interest provision of its contract with the OPA by employing Mazer and Berger (the "conflict of interest claims"). (Id. at 13.)

Fourth, Plaintiff argues that Spherion is liable for engaging in certain false billing practices, such as billing the CityTime contract for two-week severance packages paid to terminated Spherion consultants (the "false billing claims"). (Id. at 14-15.)

### 6. Spherion's Motion to Dismiss

Spherion seeks to dismiss Plaintiff's FCA claims on three grounds:  (1) that the "public disclosure bars" of the NYS FCA and NYC FCA require dismissal; (2) that Plaintiff fails to plausibly allege an FCA violation; and (3) that the complaint does not plead fraud with particularity.

19

## B. Motion to Dismiss Standard

To survive a motion to dismiss under Rule 12(b)(6), the complaint must "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In considering the motion, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Id.  However, a complaint that offers only "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555).  Nor will a complaint that contains "'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557).

Further, as discussed in greater detail below, because FCA claims "fall within the express scope of Rule 9(b)," Gold v. Morrison-Knudsen Co., 68 F.3d 1475, 1476-77 (2d Cir. 1995), a plaintiff asserting a claim under the NYS FCA or NYC FCA must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

## C. The FCAs and Public Disclosure Bars

The federal False Claims Act, 31 U.S.C. § 3729, et seq., was enacted during the Civil War in response to widespread fraud in wartime defense contracts. See Bishop v. Wells Fargo & Co.,

823 F.3d 35, 43 (2d Cir. 2016).  Plaintiff's claims here are
brought under the federal FCA's state and local counterparts,
the NYS FCA and NYC FCA.

The New York State legislature enacted the NYS FCA on
April 1, 2007.  N.Y. STATE FIN. LAW § 187, et seq.  The Act was
amended in 2010, and the New York Court of Appeals has held that
the Act and its amendments apply retroactively. People ex rel.
Schneiderman v. Sprint Nextel Corp., 42 N.E.3d 655, 662 (N.Y.
2015), cert. denied sub nom. Sprint Nextel Corp. v. New York,
136 S. Ct. 2387 (2016).

In 2005, New York City adopted the NYC FCA, codified at
N.Y.C. ADMIN. CODE. § 7-801, et seq.  The Act was amended in 2012,
and the current version applies retroactively. See N.Y.C. Local
Law 34 (2012) ("This local law shall take effect immediately
upon enactment and shall apply to claims filed or presented
prior to, on or after such enactment date.").

Both the NYS FCA and NYC FCA are modeled on the federal
FCA; accordingly, courts regularly look to federal law when
interpreting the NYS FCA and NYC FCA. See, e.g., United States
v. N. Adult Daily Health Care Ctr., No. 13-CV-4933 (MKB), 2016
WL 4703653, at *3 (E.D.N.Y. Sept. 7, 2016); Ping Chen ex rel.
U.S. v. EMSL Analytical, Inc., 966 F. Supp. 2d 282, 305
(S.D.N.Y. 2013).

The NYS FCA imposes liability on "any person who . . .
knowingly presents, or causes to be presented a false or
fraudulent claim for payment or approval" to the state or a
local government, or "who knowingly makes, uses, or causes to be
made or used, a false record or statement material to a false or
fraudulent claim." N.Y. STATE FIN. LAW § 189(1).  The NYC FCA
contains nearly identical provisions covering claims submitted
to the City of New York. See N.Y.C. ADMIN. CODE § 7-803(a)(1)-(2)
("Any person who . . . knowingly presents, or causes to be
presented, to any city officer or employee, a false claim for
payment or approval by the city . . . [or] knowingly makes, uses,
or causes to be made or used, a false record or statement to get a
false claim paid or approved by the city . . . shall be liable to
the city . . . ."); see also id. § 7-802(4) (defining "false
claim" to mean "any claim, or information relating to a claim,
which is false or fraudulent").

A claim under either Act requires proof that the defendant:
(1) made a claim, (2) to the government, (3) that is false or
fraudulent, (4) knowing of its falsity, and (5) seeking payment
or approval. See N. Adult Daily, 2016 WL 4703653, at *4 (citing
Bishop, 823 F.3d at 43).  The knowledge requirement is satisfied
by actual knowledge, deliberate ignorance, or reckless disregard
of the falsity of information provided. See N.Y. STATE FIN. LAW
§ 188(3)(a); N.Y.C. ADMIN. CODE § 7-801(5).  Violators are subject

to treble damages and a civil penalty. See N.Y. STATE FIN. LAW § 189(1)(h); N.Y.C. ADMIN. CODE § 7-803(a)(7).

The NYS FCA and NYC FCA both offer incentives for whistleblowers to provide information to the government. Pursuant to the qui tam provisions of the NYS FCA, a private person may bring suit on behalf of the government for violations of the Act and collect a portion of the recovery if the action is successful. N.Y. STATE FIN. LAW § 190(2), (6). The state may supersede or intervene in the qui tam action or grant permission to a local government that may have sustained damages authority to do the same. Id. § 190(2)(b). Where, as here, the state and local governments decline to supersede or intervene in the action, the NYS FCA allows the qui tam plaintiff to continue its claims on behalf of the government and entitles the plaintiff to receive between 25 percent and 30 percent of the amount recovered if the action is successful. Id. § 190(6)(b). Likewise, under the NYC FCA, a person may submit a proposed complaint to the City alleging violations of the Act and may obtain a portion of the recovery if the action is pursued. N.Y.C. ADMIN. CODE. § 7-804(b)(1), (i).[2]

---

[2] In contrast to the NYS FCA, the NYC FCA provides that only the City's Corporation Counsel or a person designated by the Corporation Counsel as its representative may bring suit under the Act. See N.Y.C. Admin. Code. § 7-804(b), (e). The Court notes that Plaintiff does not allege that he has been authorized by the City to sue under the NYC FCA. One court in this

To proceed, however, a <u>qui tam</u> action must overcome the public disclosure bars of the NYS FCA and NYC FCA, which mirror the public disclosure provisions of the federal FCA.  The purpose of public disclosure bars is "to bar 'parasitic lawsuits' based upon publicly disclosed information in which would-be relators 'seek remuneration although they contributed nothing to the exposure of the fraud.'" <u>U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.</u>, 985 F.2d 1148, 1157 (2d Cir. 1993); <u>see also</u> <u>In re Natural Gas Royalties</u>, 562 F.3d 1032, 1038-39 (10th Cir. 2009) (recognizing that through the federal FCA's <u>qui tam</u> provisions, Congress has sought to achieve the "golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own" (quoting <u>United States ex rel. Fine v. Sandia Corp.</u>, 70 F.3d 568, 571 (10th Cir. 1995)).

Consistent with this purpose, the NYS FCA's public disclosure bar provides:

> The court shall dismiss a qui tam action under this
> article, unless opposed by the state or an
> applicable local government, or unless the qui tam

---

district has found that a failure to plead authorization from the Corporation Counsel is sufficient to warrant dismissal of <u>qui tam</u> claims brought under the NYC FCA. <u>Chen</u>, 966 F. Supp. 2d at 305.  Because Spherion does not raise the issue and dismissal is warranted on independent grounds, the Court declines to address whether Plaintiff's failure to allege authorization from the Corporation Counsel also requires dismissal.

plaintiff is an original source of the information, if substantially the same allegations or transactions as alleged in the action were publicly disclosed:

(i) in a state or local government criminal, civil, or administrative hearing in which the state or a local government or its agent is a party;

(ii) in a federal, New York state or New York local government report, hearing, audit, or investigation that is made on the public record or disseminated broadly to the general public . . . ; [or]

(iii) in the news media, provided that such allegations or transactions are not "publicly disclosed" in the "news media" merely because information of allegations or transactions have been posted on the internet or on a computer network.

N.Y. STATE FIN. LAW § 190(9)(b). The NYC FCA's public disclosure bar is the same in all respects material to this case. See N.Y.C. ADMIN. CODE § 7-804(a).[3]

_____

[3] The NYC FCA provides:

This section shall not apply to claims, records, or statements made pursuant to federal, state or local tax law nor to any proposed civil complaints . . . if substantially the same allegations or transactions as alleged in the proposed complaint were publicly disclosed

(i) in a criminal, civil or administrative hearing;

(ii) in a legislative or administrative report, hearing, audit or investigation; or

(iii) by the news media and likely to be seen by the city officials responsible for addressing false claims; unless the person who submitted the proposed

25

These standards establish a two-part test. See Chen, 966 F. Supp. 2d at 296-97.  A court must first determine if "substantially the same" allegations or transactions as alleged in the action were publicly disclosed through one of the prescribed categories of sources.  If that is the case, the action must be dismissed unless the plaintiff qualifies as an "original source."

### D. Dismissal Under the Public Disclosure Bars

#### 1. Standard of Review

The parties dispute whether the public disclosure bars provide a basis for dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction or instead Rule 12(b)(6) for failure to state a claim.  Before 2010, the federal FCA's public disclosure bar was explicitly jurisdictional; it provided that "no court shall have jurisdiction over an action" where the bar applied. 31 U.S.C. § 3730(e)(4) (2006); see also Rockwell Int'l Corp. v. United States, 549 U.S. 457, 467-68 (2007) (finding the pre-2010 federal bar to withdraw subject matter jurisdiction). The enactment of the Patient Protection and Affordable Care Act in 2010 amended the federal FCA and eliminated the

---

complaint is an original source of the information. The corporation counsel may, in his or her absolute discretion, waive the application of this paragraph.

N.Y.C. ADMIN CODE § 7-804(d).

jurisdictional language. See Pub. L. 111-148, § 10104(j)(2), 124
Stat. 119 (Mar. 23, 2010).   The federal FCA now provides that
"the court shall dismiss an action or claim" where the
requirements of the bar are met. 31 U.S.C. § 3730(e)(4).

Although the Second Circuit has not yet addressed the
issue, courts have predominantly found that, under the amended
federal FCA, the public disclosure bar goes to whether a
plaintiff has stated a claim, not whether the Court has
jurisdiction. See Chen, 966 F. Supp. 2d at 294; see also U.S. ex
rel. Moore & Co. v. Majestic Blue Fisheries, LLC, 812 F.3d 294,
299-300 (3d Cir. 2016); U.S. ex rel. Osheroff v. Humana Inc.,
776 F.3d 805, 810 (11th Cir. 2015); U.S. ex rel. May v. Purdue
Pharma L.P., 737 F.3d 908, 916 (4th Cir. 2013). But see U.S. ex
rel. Kester v. Novartis Pharm. Corp., 43 F. Supp. 3d 332, 345-47
(S.D.N.Y. 2014) (holding that under the amended federal FCA the
public disclosure bar remains jurisdictional).   As with the
amended federal FCA, the public disclosure provisions of the NYS
FCA and NYC FCA do not mention jurisdiction.   As a result, this
Court joins the weight of authority interpreting the federal FCA
and holds that the public disclosure provisions of the NYS FCA
and NYC FCA provide a basis for dismissal for under Rule
12(b)(6), not Rule 12(b)(1).

Accordingly, the burden does not rest with the plaintiff as
it would on a motion challenging the Court's jurisdiction, and

27

the Court generally may not consider affidavits and other matters outside the pleadings. See Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  The Court may, however, take judicial notice of the fact that press coverage and judicially noticeable public records contained certain information, without regard to the truth of their contents. Chen, 966 F. Supp. 2d at 294 (citing Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 425 (2d Cir. 2008)).  The Court may also consider documents incorporated by reference in the complaint and documents that are "integral" to the complaint because the plaintiff "relies heavily upon [their] terms and effect." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).

### 2. Analysis

The Court holds that Plaintiff's vicarious liability claims are barred by the public disclosure bars of the NYS FCA and NYC FCA.  The Court assumes, without deciding, that Plaintiff's remaining claims are not precluded because, as explained later in this Opinion, those claims are not adequately alleged in any event.

### a. Substantially the Same Allegations Were Publicly Disclosed

In arguing for dismissal under the public disclosure bars, Spherion relies on, among other things, the Criminal Complaint, the Audit Report, and news articles published before Plaintiff's

complaint was filed.  As an initial matter, there is no dispute
as to these documents' authenticity, or that they qualify as
public disclosures under the NYS FCA or NYC FCA.  The Criminal
Complaint and Audit Report qualify under the NYS FCA because
they were publicly disclosed "in a federal, New York state or
New York local government report, hearing, audit, or
investigation." N.Y. STATE FIN. LAW § 190(9)(b)(ii).  The Criminal
Complaint qualifies under the NYC FCA because it was publicly
disclosed "in a criminal, civil or administrative hearing," N.Y.C.
ADMIN. CODE § 7-804(d)(3)(i), and the contents of the Audit Report
were made public "in a legislative or administrative report,
hearing, audit or investigation." Id. § 7-804(d)(3)(ii).  The news
articles were disclosed "by the news media," id. § 7-
804(d)(3)(iii), and "in the news media." N.Y. STATE FIN. LAW
§ 190(9)(b)(iii).

Further, the relevant public disclosures were made before
this suit was filed on March 31, 2011.  The Audit Report was
issued on September 28, 2010. (Hyland Aff. Ex. 22.)  The
Criminal Complaint was unsealed on December 15, 2010. (Hyland
Aff. Exs. 7, 8.)  And the relevant news articles were published
between June 2004 and December 2010. (Hyland Aff. Ex. 9.)

Thus, the Court turns to whether the allegations or
transactions in support of Plaintiff's vicarious liability
claims are "substantially the same" as these public disclosures.

The standard for determining whether a qui tam plaintiff's allegations are "substantially the same" as prior public disclosures is whether the disclosures exposed "all the essential elements of the alleged fraud." U.S. ex rel. Kirk v. Schindler Elevator Corp., 437 F. App'x 13, 17 (2d Cir. 2011). The bar applies to claims against a particular defendant if the information disclosed was sufficient to "set the government squarely upon the trail" of the defendant's participation in the alleged fraud. Chen, 966 F. Supp. 2d at 298 (quoting Natural Gas Royalties, 562 F.3d at 1041).

Here, the Criminal Complaint set forth in detail all the essential elements of Plaintiff's vicarious liability claims. Among other things, the Criminal Complaint disclosed:  (1) the amendments to SAIC's contract that allowed additional consultant staffing; (2) Mazer's execution of the kickback scheme involving DA Solutions and PrimeView; (3) Berger's receipt of over $400,000 in connection with the scheme; and (4) an additional "blatant fraud" in connection with timesheets approved by Mazer and Berger for work purportedly done on CityTime. (Criminal Compl. ¶¶ 22, 26, 33.)  Indeed, Plaintiff's complaint essentially summarizes in two paragraphs the substantially more detailed allegations in the 35-page Criminal Complaint. (Compare Compl. ¶¶ 18-19, with Hyland Aff. Ex. 7.)

Further, while Spherion was not charged, the Criminal Complaint, pre-complaint news reports, and the Audit Report revealed sufficient information to set the government squarely on the trail of Spherion's potential vicarious liability for Mazer and Berger's fraudulent activity.  The Criminal Complaint disclosed that Spherion billed the City for work performed by Mazer and Berger as consultants. (See Criminal Compl. ¶ 19.) The Criminal Complaint further alleged that Mazer and Berger were paid for their work on CityTime by Spherion and exercised significant actual authority over the project. (Id. ¶¶ 20-21.) Although the Criminal Complaint referred to Spherion as the "QA Vendor," Spherion's identity was readily apparent from news media reports discussing Spherion's role as the quality assurance contractor on CityTime, as well as the Audit Report, which examined Spherion's obligations and performance under the quality assurance contract. (See Hyland Decl. Exs. 9, 22.) Accordingly, the Court finds that the allegations in support of Plaintiff's vicarious liability claims are "substantially the same" as those publicly disclosed before Plaintiff brought this suit.

### b. Plaintiff Does Not Qualify As An Original Source

Under the NYS FCA and NYC FCA, a Plaintiff can qualify as an original source in two ways.  First, the plaintiff is an original source if, prior to a qualifying public disclosure, he

"voluntarily disclosed to the state or a local government the information on which allegations or transactions in a cause of action are based." N.Y. STATE FIN. LAW § 188(7); see also N.Y.C. ADMIN. CODE § 7-802(6).  Second, the plaintiff is an original source if he has knowledge that is "independent of" and "materially adds to" the publicly disclosed allegations or transactions, and has provided such information to the state or local government. N.Y. STATE FIN. LAW § 188(7); see also N.Y.C. ADMIN. CODE § 7-802(6).  The NYS FCA includes an additional requirement that the information must have been provided before or at the time that the plaintiff filed suit. N.Y. STATE FIN. LAW § 188(7).

Plaintiff does not qualify as an original source of his vicarious liability claims under the first method.  "[T]he 'information on which the allegations are based' means the information underlying or supporting the fraud allegations contained in the plaintiff's qui tam complaint." United States ex rel. King v. Hillcrest Health Ctr., Inc., 264 F.3d 1271, 1280 (10th Cir. 2001).  While Plaintiff alleges that he provided information to the government, he does not plausibly allege that the information he provided is the information on which his vicarious liability claims are based.

Plaintiff claims that he made disclosures of "potential fraud" to FISA, OPA, SAIC and Spherion in or about November

2004. (Compl. ¶ 61.)  However, according to the complaint, those
disclosures "relat[ed] to his load test discovery of the
CityTime software's inability to support more than 20 parallel
users at a time," not to Mazer and Berger's fraudulent kickback
and overbilling scheme. (Id.)  Indeed, that scheme did not begin
until 2005 or 2006 according to the complaint, (id. ¶¶ 18-19),
so Plaintiff's alleged disclosures in 2004 could not have
provided the information supporting his allegations.

   Plaintiff's complaint to DOI in early 2009, which is quoted
in full above, also does not qualify him as an original source.
To the extent that it provided any allegations relating to Mazer
and Berger, the information was primarily vague or conclusory.
(See Hyland Aff. Ex. 12 ("The THREE culprits behind this sceme
are:  1. Senior consultant manager, Spherion Corp. Mark Mazer–
the most crooked person on the team. 50 years old. Bill rate:
$175/hr 2. Senior Manager, Spherion Corp:  Scott berger A sheep
who listens ONLY to Mark Mazer and does not rock the boat. Is
building his house in Florida at taxpayers expense. 60 years
old.  Bill rate: $175/hr.")  Absent from the DOI complaint was
any information regarding the alleged kickback and false billing
scheme on which Plaintiff's vicarious liability claims are
based.

   Finally, Plaintiff's allegations regarding his meetings
with DOI in "December 2010 and thereafter" fail to establish him

as an original source.  Even drawing an inference in Plaintiff's favor that the first meeting occurred before the Criminal Complaint was unsealed on December 15, 2010, Plaintiff alleges that he disclosed to DOI "relevant emails and load test results from Dec. 2004 through Feb. 2005, which illustrated the project's performance failures." (Compl. ¶ 64.)  He does not allege that he provided the information supporting his vicarious liability claims.

The second method by which a plaintiff qualifies as an original source is if he has knowledge that is "independent of" and "materially adds to" the publicly disclosed allegations and transactions.  Plaintiff also fails to qualify as an original source of his vicarious liability claims under this method.  As already discussed, the Criminal Complaint disclosed detailed allegations regarding Mazer and Berger's fraud before Plaintiff brought this suit.  There was ample information publicly disclosed to allow the government to investigate Spherion's potential vicarious liability.  Nothing in the complaint or the documents incorporated by reference demonstrates that Plaintiff has knowledge that adds in a material way to the publicly disclosed allegations and transactions.  As a result, the Court finds that Plaintiff does not qualify as an original source.

Accordingly, Plaintiff's vicarious liability claims must be dismissed.

### E. Plausibility of Plaintiff's Remaining
### FCA Theories of Liability

To state a claim under the NYS FCA or NYC FCA, a Plaintiff must plausibly allege that the defendant submitted a claim to the government was "false or fraudulent." N.Y. STATE FIN. LAW § 189(1); N.Y.C. ADMIN. CODE §§ 7-802(4), 7-803(a)(1)-(2); N. Adult Daily, 2016 WL 4703653, at *4 (citing Bishop, 823 F.3d at 43). The Second Circuit has recognized three cognizable theories under which a claim may be false or fraudulent. See Bishop, 823 F.3d at 43-44. The archetypal FCA claim involves a request for payment that is "factually false." Id. at 43. A factually false claim "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." Mikes v. Straus, 274 F.3d 687, 697 (2d Cir. 2001), abrogated on other grounds by Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989 (2016). This occurs, for example, "when a contractor delivers a box of sawdust to the military but bills for a shipment of guns." Bishop, 823 F.3d at 43-44.

There are also two cognizable theories of "legally false" FCA liability:  express false certification and implied false certification. These theories apply where, in connection with a request for payment, a defendant falsely certifies its compliance with a federal statute, regulation, or contractual

35

provision containing a material condition for government payment. Universal Health, 136 S. Ct. at 1999; Mikes, 274 F.3d at 698.  As the name suggests, an express false certification involves a defendant's express representation of compliance when it is actually not compliant. Mikes, 274 F.3d at 698.  The implied false certification theory is based on the idea that a contractor may impliedly certify compliance with material statutory, regulatory, or contractual conditions for government payment when requesting reimbursement. Universal Health, 136 S. Ct. at 1995; Mikes, 274 F.3d at 699.  Recently, the U.S. Supreme Court held that the implied false certification theory is viable where two conditions are met:  (1) "the claim does not merely request payment, but also makes specific representations about the goods or services provided;" and (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." Universal Health, 136 S. Ct. at 2001.

## 1. Quality Assurance Claims

Plaintiff first contends that Spherion submitted false claims to the City because it "failed to provide quality assurance services." (Pl.'s Mem. at 11.)  Plaintiff alleges that Spherion had an obligation under its contract with the OPA to perform "all work and services necessary . . . to help ensure

36

the timely and successful completion of the CityTime project,"
as well as a duty to provide advice "based upon its expert
analysis." (Compl. ¶ 23.)  Plaintiff argues that Spherion
breached these duties by "failing to disclose the abysmal lack
of progress in development of CityTime as a general matter."
(Pl.'s Mem. at 12.)  This violation was knowing, according to
Plaintiff, because Plaintiff told Spherion consultants that the
project was not meeting standards and should be "scrapped."
(Id.; Compl. ¶¶ 34-35.)

      In opposition, Plaintiff characterizes this theory of
liability as one of factual falsity. (See Pl.'s Mem. at 11 n.8
("Spherion's requests for payment are the most common type of
false claim under the FCA, as it [sic] involves 'an incorrect
description of goods or services provided or a request for
reimbursement for goods or services never provided.'" (quoting
Mikes, 274 F.3d at 697.))  This argument is misplaced.
Plaintiff does not allege that Spherion actually failed to
provide the quality assurance services for which it claimed
reimbursement, or that it provided an incorrect description of
those services.  The factually false theory of liability
therefore does not apply.

      Plaintiff's theory might be more accurately characterized
as one of implied false certification, but even construed as
such, it is not adequately alleged.  As noted above, the

37

<u>Universal</u> <u>Health</u> Court set forth two conditions for establishing a viable implied certification theory: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." <u>Universal</u> <u>Health</u>, 136 S. Ct. at 2001.  Here, Plaintiff neither alleges that Spherion made any "specific representations about the goods or services provided," nor explains how any such representation was rendered a misleading half-truth by Spherion's alleged noncompliance.  Further, Plaintiff offers no explanation for how, even if Plaintiff had breached the quality assurance agreement by failing to disclose the lack of progress on the CityTime project, such a breach would constitute the knowing submission of a false claim where the lack of progress was a widely publicized fact. (<u>See</u> Hyland Aff. Ex. 9.)  As a result, Plaintiff does not state a claim under an implied false certification theory.

### 2. <u>Conflict of Interest Claims</u>

Plaintiff separately argues that Spherion is liable for false claims because it breached the conflict of interest provisions in its contract with the City by employing Mazer and Berger. (Pl.'s Mem. at 13; Compl. ¶ 24.)  Plaintiff claims that

this violation of the contract was knowing because Mazer's
knowledge, as Spherion's agent, is imputable to Spherion.
Further, Plaintiff contends that, even if Spherion did not have
actual knowledge of Mazer and Berger's conflicts, it was the
result of deliberate ignorance.

In a footnote in his opposition papers, Plaintiff suggests
that these allegations support an express false certification
theory. (See Pl.'s Mem. at 11 n.9. ("Spherion's requests for
payment, despite Berger and Mazer's conflicts of interest,
rendered their contractual representations that no such
conflicts existed an expressly false legal certification, a
well-recognized type of FCA violation (citing Mikes, 274 F.3d at
698).)  This argument is also unavailing.  The express false
certification theory applies not to a breach of a contractual
provision itself, but instead to a false certification of
contractual, statutory, or regulatory compliance made in
connection with a claim submission. See Bishop, 823 F.3d at 43.
Plaintiff does not allege that Spherion expressly certified
compliance with any provision of its contract with the OPA in
connection with a claim.  Further, the complaint does not set
forth any specific representation made in connection with a
claim that was rendered materially misleading by Spherion's
alleged contractual breach.  Accordingly, Plaintiff has not
alleged a viable express or implied false certification theory.

### 3. False Billing Claims

Plaintiff next seeks to hold Spherion liable for certain alleged "false billing practices."  According to the complaint, Plaintiff "personally witnessed or developed knowledge of various other examples of suspicious or outright fraudulent conduct," such as: "[b]illing the CityTime contract for two-week severance packages paid to terminated Spherion consultants"; "[b]illing the CityTime contract for over-time hours incurred by Spherion consultants despite an express prohibition of overtime expenditures in the contract between CityTime and OPA"; "[b]illing the CityTime contract for travel and expenses related to Berger's frequent trips to Florida to check on a vacation home he was building there"; and "[e]nabling SAIC to bill the CityTime contract for work spent developing similar time-keeping software for other clients." (Compl. ¶ 45.)

Liberally construed, these allegations raise a plausible theory of factual falsity.  The crux of Plaintiff's false billing claims is that Spherion billed for certain services it did not actually provide.  However, for Plaintiff's false billing claims to survive, his allegations must also satisfy the heightened pleading requirement of Rule 9(b).

### F. Rule 9(b)'s Heightened Pleading Standard

A plaintiff alleging false claims under the NYS FCA or the NYC FCA must plead with particularity the circumstances

40

constituting fraud in accordance with Rule 9(b) of the Federal
Rules of Civil Procedure. <u>See</u> <u>Gold</u>, 68 F.3d at 1476-77.  The
purpose of this requirement is "to provide a defendant with fair
notice of a plaintiff's claim, to safeguard a defendant's
reputation from improvident charges of wrongdoing, . . . to
protect a defendant against the institution of a strike suit,
[and] . . . . to discourage the filing of complaints as a
pretext for discovery of unknown wrongs." <u>Wood ex rel. U.S. v.
Applied Research Assocs., Inc.</u>, 328 F. App'x 744, 747 (2d Cir.
2009).

    To satisfy Rule 9(b), "a complaint must '(1) specify the
statements that the plaintiff contends were fraudulent, (2)
identify the speaker, (3) state where and when the statements
were made, and (4) explain why the statements were fraudulent.'"
<u>Id.</u> (quoting <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124,
1128 (2d Cir. 1994)).  "In other words, Rule 9(b) requires that
a plaintiff set forth the who, what, when, where and how of the
alleged fraud." <u>U.S. ex rel. Polansky v. Pfizer, Inc.</u>, No. 04-
cv-0704 (ERK), 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009)
(internal quotation marks omitted).

    In addition to adequately explaining why the claims were
fraudulent, to comply with Rule 9(b), a plaintiff must also
plead the submission of false claims with a high enough degree
of particularity that the defendant can reasonably identify the

claims at issue. See U.S. ex rel. Kester v. Novartis Pharm.
Corp., 23 F. Supp. 3d 242, 257 (S.D.N.Y. 2014) (collecting
cases). "In cases with extensive schemes, plaintiffs can
satisfy this requirement in two ways: (1) providing
sufficient identifying information about all the false
claims, or (2) providing example false claims." Id. at 258.
Examples of the kind of identifying information a plaintiff
can provide to satisfy Rule 9(b) include: dates of claims,
contents of claims, identification numbers, reimbursement
amounts, goods or services provided, and individuals
involved in the billing. Id.

Here, Plaintiff fails to meet Rule 9(b)'s heightened
pleading standard with respect to his false billing claims.
First, Plaintiff's allegations fail to set forth the "who, what,
when, where and how of the alleged fraud" because they leave
unclear who was involved in submitting the claims, what the
claims requested payment for, or when they were submitted. (See
Compl. ¶ 45.). Further, Plaintiff fails to either provide
identifying information about the claims that were submitted or
provide example false claims. Accordingly, Plaintiff's false
billing claims are dismissed for failure to comply with Rule
9(b).

## II. Retaliation Claims

Spherion also moves to dismiss Plaintiff's NYS FCA and NYC FCA retaliation clams under Rule 12(b)(6).  For the reasons stated below, the motion is denied as to Plaintiff's retaliation claims.

### A. Background

Plaintiff alleges that he made various attempts in late 2004 and early 2005 "to warn OPA, Spherion, FISA and others about the load failures with the CityTime software." (Compl. ¶ 54.)  Within five months of these efforts, Plaintiff claims that Bondy, Mazer, and Berger retaliated against him by "stripping him of approximately 2/3 of his load-performance engineering responsibilities." (Id.)

After he was removed from these responsibilities, Plaintiff alleges that "SAIC produced load test results that either revealed the continued failure of the CityTime software to [sic] acceptable standards or showed SAIC's attempt to cover up unacceptable results." (Id. ¶ 55.)  For example, according to the complaint, on January 6, 2006, "SAIC produced only hand-written test results, which deliberately excluded critical information that would have exposed the system's failures." (Id.)  Plaintiff avers that he "attempted to document and/or warn his superiors about the problem." (Id.)

43

In March of 2006, according to the complaint, Plaintiff met with Cohen and Donnelly and told them that "management should scrap the project," that "Mazer was not the right person to head the project[,] and that he, along with Berger and SAIC management, were doing this only to pocket the money for themselves by extending the contract for as long as possible knowing it was a failure." (Id. ¶ 42.)  In July of 2006, Plaintiff alleges that he again told Cohen and Donnelly that he "thought the CityTime project was continuing just to put money in the pockets of Mazer, Berger and SAIC." (Id. ¶ 43.)

In May of 2007, Plaintiff allegedly "confided in" two DA Solutions consultants, Rekha Basu and Audry (whose last name is not alleged), that "he believed Berger and Mazer were involved in fraud, were 'up to no good' and 'pocketing City funds for themselves.'" (Id. ¶ 56.)  According to the complaint, Plaintiff later learned that Rekha had a close relationship with Berger. (Id.)

Plaintiff alleges that on a Saturday in May 2007, he discovered he could not log on to his work system. (Id. ¶ 57.) He spoke with Cohen the following Monday, and Cohen asked Plaintiff what happened. (Id. ¶ 58.)  Plaintiff "told Cohen that he was being fired because he had communicated to Spherion and FISA that performance was poor and that the project was failing." (Id.)  According to the complaint, Plaintiff also told

44

Cohen that "something bad was occurring at the project." (Id.)
Cohen told Plaintiff that "the City was Spherion's largest
client and Spherion could lose the client, and asked [Plaintiff]
not to make waves." (Id.)  Plaintiff claims that "Cohen
acquiesced to [his] termination . . . to remain on good terms
with Mazer and Berger and so that Spherion could continue to
bill the project." (Id.)

## B. Elements

To state a retaliation claim under the NYS FCA or NYC FCA,
a plaintiff must allege:  (1) that he engaged in conduct
protected under the statute; (2) that the defendant was aware of
the plaintiff's conduct; and (3) that the plaintiff was
retaliated against for that conduct. See N.Y. STATE FIN. LAW
§ 191(1); N.Y.C. ADMIN. CODE § 7-805(a)(3); N. Adult Daily, 2016
WL 4703653, at *13.  "Rule 9(b)'s heightened pleading standard
does not apply to [a] plaintiff's FCA retaliation claim since no
showing of fraud is required." United States v. Empire Educ.
Corp., 959 F. Supp. 2d 248, 259 n.2 (N.D.N.Y. 2013) (quoting
U.S. ex rel. Mooney v. Americare, Inc., No. 06-CV-1806 FB VVP,
2013 WL 1346022, at *8 (E.D.N.Y. Apr. 3, 2013)).  Notably, a
plaintiff need not prevail on his underlying FCA claims to
sustain a claim for retaliation. See N. Adult Daily, 2016 WL
4703653, at *13; Empire Educ., 959 F. Supp. 2d at 256.

Protected conduct under the NYS FCA "is interpreted broadly
and encompasses 'two kind[s] of conduct:  (1) lawful acts done
by the employee, contractor, agent, or associated others in
furtherance of an action under the FCA, and (2) other efforts to
stop one or more violations of the FCA.'" Swanson v. Battery
Park City Auth., No. 15-CV-6938 (JPO), 2016 WL 3198309, at *3
(S.D.N.Y. June 8, 2016) (internal citation and quotation marks
omitted) (quoting Malanga v. NYU Langone Med. Ctr., No. 14-CV-
9681, 2015 WL 7019819, at *2 (S.D.N.Y. Nov. 12, 2015)).[4]
"[C]ourts have generally concluded that conduct in furtherance
of an action under [the FCA] will be interpreted as conduct that
was calculated to, or reasonably could lead to a viable FCA
action." Krause v. Eihab Human Servs., Inc., No. 10 CV 898 RJD
SMG, 2015 WL 4645210, at *6 (E.D.N.Y. Aug. 4, 2015) (emphasis in
original) (quoting U.S. ex rel. Smith v. Yale Univ., 415 F.
Supp. 2d 58, 103 (D. Conn. 2006)).  "[A] plaintiff must at least
demonstrate that . . . her investigation . . . w[as] conducted
with the purpose of exposing a 'fraud upon the government.'"
Smith, 415 F. Supp. 2d at 103 (quoting Moor-Jankowski v. Bd. of

---

[4] The NYS FCA's retaliation provisions were expanded through
amendments that became effective on August 27, 2010, to include
the second category of protected conduct. See Swanson, 2016 WL
3198309, at *3 n.2.  As with the other 2010 amendments to the
NYS FCA, the amendment applies retroactively to Plaintiff's
claims. See People ex rel. Schneiderman, N.E.3d at 662; Kane ex
rel. U.S. v. Healthfirst, Inc., 120 F. Supp. 3d 370, 397
(S.D.N.Y. 2015).

Trustees of N.Y. Univ., No. 96 CIV. 5997 (JFK), 1998 WL 474084, at *10 (S.D.N.Y. Aug. 10, 1998)).

Under the second category of conduct protected by the NYS FCA, "a retaliation claim can be stated so long as the employee was engaged in efforts to stop an FCA violation, even if the employee's actions were not necessarily in furtherance of an FCA claim." Swanson, 2016 WL 3198309, at *3 (quoting Malanga, 2015 WL 7019819, at *2).

Although the parties do not cite to, and the Court has not found, any case interpreting or applying the NYC FCA's retaliation provision, the plain language of the provision indicates that the scope of protected conduct is narrower than under the NYS FCA. The NYC FCA protects employees who are retaliated against "because of lawful acts of [the] employee in furtherance of a civil enforcement action brought under [the NYC FCA], including the investigation, initiation, testimony, or assistance in connection with, a civil enforcement action commenced or to be commenced under [the NYC FCA]." N.Y.C. ADMIN CODE § 7-805(a)(3). Thus, at least by its terms, the provision does not extend to "other efforts" to stop an FCA violation, as the NYS FCA does.

## C. Analysis

The Court finds that Plaintiff's March 2006 and July 2006 statements to Cohen and Donnelly constitute conduct "in furtherance

of" an FCA claim, as that standard has been construed.  According to the complaint, Plaintiff told Cohen and Donnelly in March 2006 that Mazer, Berger, and SAIC management "were doing this only to pocket the money for themselves by extending the contract for as long as possible knowing it was a failure." (Compl. ¶ 42.)  He also claims to have told Cohen and Donnelly in July 2006 that the project "was continuing just to put money in the pockets of Mazer, Berger and SAIC." (Id. ¶ 43.)  Accepting these allegations as true, and drawing all reasonable inferences in Plaintiff's favor, it is plausible that by raising his suspicions regarding Mazer, Berger, and SAIC, Plaintiff was attempting to "expos[e] a fraud on the government," Smith, 415 F. Supp. 2d at 103 (internal quotations omitted), or was otherwise investigating matters that were calculated to, or reasonably could have led to, an FCA action. See Empire Educ., 959 F. Supp. 2d at 256.

Plaintiff has also plausibly alleged that Spherion was aware of his protected conduct.  Plaintiff allegedly made his protected statements to Cohen, Spherion's account manager for CityTime. Thus, through Cohen, Spherion allegedly had knowledge of the protected conduct.

Finally, drawing all reasonable inferences in Plaintiff's favor, the complaint also adequately alleges that Plaintiff was terminated in retaliation for this conduct.  According to the complaint, when Plaintiff met with Cohen around the time of his termination in May 2007, Cohen told Plaintiff "that the City was

48

Spherion's largest client," that "Spherion could lose the client," and asked Plaintiff "not to make waves." (Compl. ¶ 58.)  Plaintiff claims that Cohen then "acquiesced" to Plaintiff's termination. (Id.)  While eight months had elapsed since Plaintiff's most recent protected conduct, Cohen's alleged statements to Plaintiff near the time of his termination give rise to a plausible inference that he was being terminated for "mak[ing] waves" through his earlier statements.

Accordingly, Spherion's motion to dismiss is denied as to Plaintiff's retaliation claims.

### III. Leave to Amend

Spherion seeks dismissal of Plaintiff's claims with prejudice. Plaintiff does not request leave to amend the complaint in its opposition.  Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to amend "when justice so requires." FED. R. CIV. P. 15(a)(2).  However, amendment "is not warranted absent some indication as to what [a plaintiff] might add to [its] complaint in order to make it viable." Shemian v. Research In Motion Ltd., 570 Fed. App'x 32, 37 (2d Cir. 2014).  The Court is mindful that this is Plaintiff's third complaint and that this case was filed over five years ago.  It therefore will not grant leave to amend unless Plaintiff demonstrates that he is capable of curing the deficiencies in his qui tam claims and that justice requires granting leave to amend.  Should Plaintiff wish to amend the complaint, such motion demonstrating how he will cure the

49

deficiencies in his qui tam claims shall be filed within 30 days of the date of this Opinion.

## CONCLUSION

For the reasons stated above, Spherion's motion to dismiss is GRANTED as to Plaintiff's qui tam claims and DENIED as to Plaintiff's retaliation claims.  Plaintiff's first and second causes of action (his qui tam claims) are dismissed without prejudice.

If Plaintiff wishes to amend the complaint, he shall move this Court to do so no later than 30 days from the date of this Opinion.  Otherwise, the Court will enter an order dismissing Plaintiff's qui tam claims with prejudice, and Spherion shall file its answer to Plaintiff's remaining claims no later than 14 days from the date of that order.

If Plaintiff moves to amend the complaint, Spherion's time to answer will be adjourned pending the Court's decision on Plaintiff's motion to amend the complaint.

**SO ORDERED.**

Dated:   New York, New York
        November 10 , 2016

_____
JOHN F. KEENAN
United States District Judge