UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE STATE OF NEW YORK *EX REL* VINOD KHURANA and THE CITY OF NEW YORK *EX REL* VINOD KHURANA,<br><br>      Plaintiffs,<br><br>  v.<br><br>SPHERION CORP. (N/K/A SFN GROUP, INC.),<br><br>      Defendant. | Case No. 15-cv-06605-JFK |

**PLAINTIFF-RELATOR'S STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE IN SUPPORT OF HIS MOTION FOR
PARTIAL SUMMARY JUDGMENT**

Plaintiff-Relator Vinod Khurana ("Relator"), by its undersigned counsel, respectfully submits the following Statement of Material Facts Not in Dispute in Support of His Motion for Partial Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1(a) of the Local Rules for the United States District Courts for the Southern and Eastern Districts of New York. All citations to exhibits below refer the exhibits annexed to the accompanying Declaration of Andrew M. McNeela dated May 17, 2019.

## I.     The Parties

1.  Spherion Corp. ("Spherion"), now known as Spherion Staffing, LLC, is a Florida Corporation, with its principal place of business in Georgia.[1]

2.  Spherion is a recruiting and staffing company.[2]

3.  In 2001, the New York City Office of Payroll Administration ("OPA") retained Spherion to oversee quality assurance on the CityTime project.[3]

4.  Spherion was responsible for hiring personnel capable of, *inter alia*, performing quality assurance testing.[4]

5.  Howard Cohen was the Spherion account manager assigned to the CityTime project, and his supervisor was Thomas Roach, who was one of Spherion's managing directors.[5]

---

[1] Ex. 1 (printout from Florida Division of Corporations official website).

[2] Ex. 2 (printout from Spherion's website).

[3] Ex. 3 (Spherion's contract with New York City ("QA Contract")); Ex. 4 at 25:3-15, 26:7-28:7 (Transcript of the December 14, 2015 Deposition of Howard Cohen ("Cohen Tr.")).

[4] Ex. 4 at 18:24-20:13, 26:7-28:7 (Cohen Tr.).

[5] Ex. 5 at ¶ 4 (November 23, 2015 Declaration of Vinod Khurana ("Khurana Decl."); Ex. 6 at 12:18-24, 31:18-19 (Transcript of December 20, 2018 Deposition of Thomas Roach ("Roach Tr.")).

6. Among other compensation, Cohen received commissions proportional to the number of Spherion employees assigned to the CityTime project, earning him approximately $600,000 annually.[6]

7. Relator graduated from the University of Toronto in 1986 with a degree in Computer Science and Mathematics.[7]

8. Prior to joining the CityTime project in 2004, Relator had extensive experience as a computer programmer and automation tester, as well approximately 10 years of experience as a "load tester."[8]

9. Spherion hired Relator in July 2004 as a quality assurance automation tester for the City Time Project.[9]

10. By November 2004, Relator had been reassigned to do load performance testing, based on, *inter alia*, the strength of a presentation he had made to the OPA.[10]

11. Load performance testing involves the evaluation of how a computer application operates under certain "loads," *i.e.*, a certain number of concurrent users.[11]

12. Relator was the only load tester working on the CityTime project between November 2004 and April 2005.[12]

---

[6] Ex. 6 at 14:15-15:16 (Roach Tr.); Ex. 4 at 22:19-23:10 (Cohen Tr.).

[7] Ex. 7 at 18:24-19:3 (Transcript of the January 8, 2019 Deposition of Vinod Khurana ("Khurana Tr.")).

[8] Ex. 7 at 18:5-36:7 (Khurana Tr.).

[9] Ex. 5 at ¶ 2 (Khurana Decl.); Ex.7 at 42:24-43:2 (Khurana Tr.).

[10] Ex. 5 at ¶ 2 (Khurana Decl.); Ex.7 at 78:25-79:13 (Khurana Tr.).

[11] Ex. 7 at 24:3-25:2 (Khurana Tr.).

[12] Ex. 7 at 89:25-90:5 (Khurana Tr.).

13. Spherion terminated Relator in June 2007.[13]

14. At all times during his tenure with Spherion, Relator was a "payrolled employee" of Spherion.[14]

## II. The CityTime Project, Relevant Non-Parties and the Related Scandal

15. In or about 1998, New York City commenced a software development project to automate the City's payroll and timekeeping functions across all 84 City agencies, boards, and commission, which encompassed approximately 180,000 City employees.[15]

16. This project, known as CityTime, originally budgeted approximately $63 million for software development, but ended up spending over $600 million.[16]

17. The OPA was the agency responsible for overseeing CityTime.[17]

18. Starting in 2004, Joel Bondy ("Bondy") served as the OPA's Executive Director and was a member of CityTime's steering committee.[18]

19. The New York City Financial Information Services Agency ("FISA") was one of the initial agencies to participate in the CityTime project during its pilot phase.[19]

---

[13] Ex. 7 at 42:24-43:9 (Khurana Tr.).

[14] Ex. 6 at 40:10-41:5 (Roach Tr.); Ex. 4 at 58:8-9, 83:10-13 (Cohen Tr.).

[15] Ex. 8 at ¶ 12 (Criminal Complaint, *United States of America v. Mazer, et al.*, 11 Cr. 00121 (S.D.N.Y.)) ("Criminal Complaint").

[16] Ex. 8 at ¶ 15 (Criminal Complaint).

[17] Ex. 6 at 77:9-12 (Roach Tr.); Ex. 4 at 12:6-10, 25:815, 27:25-28:4, 105:10-11, 249:14-16 (Cohen Tr.).

[18] Ex. 4 at 38:18-39:5, 63:12-15 (Cohen Tr.); Ex. 6 at 21:12-20 (Roach Tr.).

[19] Ex. 7 at 112:10-13 (Khurana Tr.).

20. Susan Amodeo ("Amodeo") and Rajeev Mantry ("Mantry") were FISA personnel who oversaw the CityTime project on behalf of that agency.[20]

21. At all times relevant to the Complaint, Science Applications International Corporation ("SAIC") was CityTime's prime contractor and was responsible for, *inter alia*, developing the program's computer applications.[21]

22. Spherion, in its quality assurance role, was required to, *inter alia*, "validate [SAIC's] recommended infrastructure, methods, and procedures, to certify [SAIC's] deliverables and project phases, to assess risks and recommend mitigation strategies to track the project, and to review past and future work products and Change Orders."[22]

23. Spherion's role included identifying conflicts of interest and other waste such as incompetent staff.[23]

24. In 2004, at Bondy's request, Spherion hired Mazer as a subject matter expert ("SME") on the CityTime project.[24]

25. Bondy and Mazer had a prior relationship, having previously worked together at the New York City Administration for Children's Services.[25]

---

[20] Ex. 7 at 112:10-113:2 (Khurana Tr.).

[21] Ex. 6 at 32:15-19 (Roach Tr.).

[22] Ex. 3 (QA Contract).

[23] Ex. 6 at 29:23-30:7 (Roach Tr.)

[24] Ex. 4 at 11:20-12:5, 63:12-22 (Cohen Tr.).

[25] Ex. 4 at 65:7-9 (Cohen Tr.).

26. Soon after being hired by Spherion, Mazer assumed and exercised extensive authority and control over the CityTime project, including hiring and firing decisions.[26]

27. Scott Berger ("Berger"), another CityTime SME employed by Spherion, reported directly to Mazer.[27]

28. Berger was Relator's supervisor between November 2004 and January 2007.[28]

29. On December 15, 2010, the United States Attorney's Office for the Southern District of New York unsealed a Criminal Complaint against several individuals involved with the City Time Project, including Mazer and Berger.[29]

30. The Criminal Complaint alleged that Mazer used his influence over the CityTime project to award lucrative contracts to companies controlled by Mazer's family or friends – specifically, DA Solution and PrimeView – who then paid kickbacks to Mazer that totaled approximately $25 million dollars during the scheme (the "CityTime kickback scheme").[30]

31. DA Solutions was run by one of Mazer's relatives and owned by Mazer's wife.[31]

---

[26] Ex. 4 at 64:12-17 (Cohen Tr.); Ex. 7 at 75:18-25 (Khurana Tr.); Ex. 9 at 16:14-17:3 (Transcript of the August 21, 2018 Deposition of Mahesh Sharma ("Sharma Tr.")).

[27] Ex. 7 at 76:18-25, 77:17-78:5 (Khurana Tr.); Ex. 9 at 18:9-22 (Sharma Tr.); Ex. 6 at 59:4-6 (Roach Tr.).

[28] Ex. 7 at 74:22-75:7 (Khurana Tr.).

[29] Ex. 8 (Criminal Complaint).

[30] Ex. 8 at ¶ 11(a)-(f) (Criminal Complaint).

[31] Ex. 8 at ¶ 11(b) (Criminal Complaint); Ex. 5 at ¶ 17 (Khurana Decl.).

32. Berger was alleged to have generated and approved for payment fraudulent timesheets for consultants who were paid by the City through the contractors/companies associated with the CityTime kickback scheme.[32]

33. In return for his involvement, Berger was allegedly paid $1.3 million from firms associated with Mazer.[33]

34. On or about June 15, 2011, the USAO filed a Superseding Indictment against Mazer, among other individuals, charging him with various money laundering and bribery offenses relating to CityTime kickback scheme.[34]

35. After a jury trial, Mazer was convicted of: (i) wire fraud conspiracy in violation of 18 U.S.C. § 1349; (ii) wire fraud, in violation of 18 U.S.C. § 1343; (iii) bribery conspiracy, in violation of 18 U.S.C. § 371; (iv) bribery in violation of 18 U.S.C. § 661(a)(1)(B); (v) Travel Act conspiracy, in violation of 18 U.S.C. § 371; and (vi) money laundering conspiracy in violation of 18 U.S.C. 1956(h).[35]

36. For his crimes, Mazer was sentenced to concurrent terms of imprisonment totaling 20 years.[36]

---

[32] Ex. 8 at ¶ 11(c) (Criminal Complaint).

[33] Ex. 8 at ¶ 11(f)(iv) (Criminal Complaint).

[34] Ex. 10 (Superseding Indictment in *United States of America v. Mazer, et al.*, 11 Cr. 00121 (S.D.N.Y.) ("Superseding Indictment").

[35] Ex. 11 (Criminal Judgment against Mark Mazer in *United States of America v. Mazer, et al.*, 11 Cr. 00121 (S.D.N.Y.) ("Criminal Judgment")).

[36] Ex. 11 (Criminal Judgment).

37. SAIC entered into a deferred prosecution agreement with the United States pursuant to which it agreed to forfeit roughly *half a billion dollars* in payments that it received in connection with the CityTime project.[37]

### III.  Relator's Protected Activity and Spherion's Retaliatory Actions

#### 1. The Events Leading to Relator's Reduced Responsibilities

38. In November 2004, Relator's initial performance load tests revealed that CityTime's software application could support only 20 concurrent users prior to crashing, far below the 2,000 concurrent users that was the goal for FISA alone as the pilot agency, let alone the tens of thousands of concurrent users that was the project's ultimate goal when fully implemented.[38]

39. Alarmed at the startling lack of progress that had been made, despite several years of development and the expenditure of tens of millions of dollars, Relator informed Berger – his immediate supervisor at that time – that he believed that the project was a waste of the City's resources.[39]

40. During the following month, Relator continued to voice his concerns. Relator told Cohen that SAIC's development team had done an extremely poor job and that the project should be scrapped.[40]

---

[37] Ex. 12 (S.D.N.Y. USAO Announcement of Deferred Prosecution Agreement with SAIC).

[38] Ex. 5 at ¶ 3(Khurana Decl.).

[39] Ex. 5 at ¶ 3 (Khurana Decl.); Ex 7 at 90:3-5, 92:9-93:2, 97:10-98:4 (Khurana Tr.).

[40] Ex. 5 at ¶ 4 (Khurana Decl.).

41. At that time, Relator also communicated his concerns regarding the project's viability and wastefulness to FISA employees Amodeo and Mantry during their discussion of the load test results.[41]

42. Relator continued to express his concerns to Amodeo and Mantry in early 2005, at which time they visited Relator's office on roughly a biweekly basis to discuss the project in secret.[42]

43. In or around March 2005, Relator learned from Mike Fayerman, a SAIC development manager on the CityTime project, that Mazer's wife ran that DA Solutions.[43]

44. Relator believed that this relationship created a conflict of interest and immediately relayed this information to Cohen and Amodeo.[44]

45. In early 2005, Relator also attended a development meeting with Berger, Mazer, Bondy, OPA Senior Manager Sarah Gujal, and SAIC Project Manager, Mike Fayerman, at which time he reiterated his concerns with the project's progress and viability.[45]

46. At the meeting's conclusion, Mazer and Bondy had Relator remain for a private discussion, at which time Mazer got face-to-face with Relator and ordered him not to voice his concerns to anyone from FISA again, and not to discuss his load performance results with anyone other than Berger.[46]

---

[41] Ex. 5 at ¶ 5 (Khurana Decl.).

[42] Ex. 5 at ¶ 7 (Khurana Decl.); Ex. 7 at 288:7-21 (Khurana Tr.).

[43] Ex. 7 at 319:12-23 (Khurana Tr.); Ex. 5 at ¶ 17 (Khurana Decl.).

[44] Ex. 7 at 364:24-367:22; 378:2-16 (Khurana Tr.).

[45] Ex. 7 at 92:9-93:4 (Khurana Tr.); Ex. 5 at ¶ 6 (Khurana Decl.).

[46] Ex. 5 at ¶ 6 (Khurana Decl.); Ex. 7 at 99:20-100:16 (Khurana Tr.).

47.     During their private discussion, Mazer informed Relator that he was well aware that the CityTime project was going to fail.[47]

48.     Despite Mazer's attempt to intimidate him, Relator nonetheless reported his conversation with Mazer to Amodeo and Mantry.[48]

49.     Notably, before that meeting, but after Relator had raised red flags regarding his load performance test results, Cohen informed Relator that Spherion would be terminating his contract.[49]

50.     When Relator confronted Berger about his impending termination, Berger responded that he would "talk to Mazer and get back to [him]."[50]

51.     In April of 2005, Mazer and Berger reassigned the bulk of Relator's load performance responsibilities – *i.e.*, those relating to testing and analysis – to Jeff Boldia, a SAIC consultant, leaving Relator with only the program-writing aspects of his position.[51]

52.     Until this time, Relator had been the only load tester working on the CityTime project.[52]

53.     Berger and Mazer also blocked Relator's access to the load testing software and results.[53]

---

[47] Ex. 5 at ¶ 6 (Khurana Decl.); Ex. 7 at 99:20-100:16 (Khurana Tr.).

[48] Ex. 5 at ¶ 7 (Khurana Decl.); Ex. 7 at 124:7-126:12, 128:13-12 (Khurana Tr.).

[49] Ex. 7 at 105:3-107:17 (Khurana Tr.).

[50] Ex. 7 at 106:20-107:17 (Khurana Tr.).

[51] Ex. 7 at 113:6-114:6 (Khurana Tr.).

[52] Ex. 7 at 87:18-22, 89:25-90:5 (Khurana Tr.).

[53] Ex. 7 at 126:15-127:8, 145:16-21, 299:3-4 (Khurana Tr.).

54. Around this same time, the Relator was pulled into a stairwell by a SAIC project manager named Sherif Sirageldin ("Sirageldin), who – like Mazer and Berger before him – told Relator not to share load test results with FISA.[54]

55. Thereafter, in a May 16, 2005 email, Sirageldin complained to Berger that Relator "provides information to a client in particular which I personally, would not have provided as the information *would typically lead nowhere good*."[55]

56. Sirageldin recommended that Relator's "face-time with various agencies be limited in terms of providing status" reports, and, in a draft of that email, recounted that Berger had told Relator that "any further communication with FISA without prior authorization would not be tolerated."[56]

57. Notably, in contrast to Relator's forthright statements regarding CityTime project, Sirageldin admitted that "when I met with OPA management, *I indicated that things were okay and were on target even though they were not*."[57]

**2.    The Events Leading to Relator's Demotion/Transfer**

58. Throughout 2005, despite having been had been stripped of most of his load testing responsibilities, Relator informed representatives of OPA and FISA, as well as Cohen, that he believed that the load test results that Boldia reported to those agencies were inaccurate.[58]

---

[54] Ex. 7 at 207:2-208:2 (Khurana Tr.).

[55] Ex. 13 (May 16, 2005 E-mail Chain between Berger and Sirageldin, NYC_CT00001744-45) (emphasis added).

[56] Ex. 13 (May 16, 2005 E-Mail Chain between Berger and Sirageldin, NYC_CT00001744-45).

[57] Ex. 14 (Draft E-mail from Sirageldin to Berger, NYC_CT00001746-47) (emphasis added).

[58] Ex. 7 at 228:24-230:3 (Khurana Tr.).

59. For example, in April 2005, Amodeo contacted Relator and stated that she "[w]ould love a confidential chat about the perf[romance] test plan."[59]

60. Thereafter, Relator met with Amodeo and her supervisor at FISA, Robert Townshead, to discuss SAIC's misleading load testing results.[60]

61. At that meeting, Relator also reported that the CityTime project was a "waste" of the City's funds and that the project should be scrapped.[61]

62. And in August 2005, Relator told Amodeo that Berger had lied to her about FISA approving a plan to have load testing performance by another individual in addition to Relator.[62]

63. Notably, after the Relator's termination, Boldia admitted that he reported inaccurate results and that he had been instructed by SAIC to "fudge" the load performance data to make them appear more positive than they were.[63]

64. In March 2006, Relator met with Cohen and Arthur Donnelly, Spherion's senior most SME on the CityTime project.[64]

65. According to Relator, Cohen and Donnelly were the only Spherion employees with whom he felt he could report his "concern . . . that Mark Mazer and Scott Berger were up to no good."[65]

---

[59] Ex. 15 (April 14, 2005 E-mail from Amodeo to Khurana, NYC_CT00000038).

[60] Ex. 7 at 228:20-229:11, 288:7-291:8; 395:3-396:16 (Khurana Tr.).

[61] Ex. 7 at 290:8-24 (Khurana Tr.).

[62] Ex. 5 at ¶ 10 (Khurana Decl.).

[63] Ex. 5 at ¶ 19 (Khurana Decl.); Ex. 7 at 103:19-104:8; 228:7-23 (Khurana Tr.).

[64] Ex. 5 at ¶ 12 (Khurana Decl.).

[65] Ex. 7 at 278:14-279:7 (Khurana Decl.).

66. Relator told them that he believed that the CityTime project should be scrapped, and that Mazer, Berger and SAIC management did not care that the project was a failure, but instead were concerned about extending their contracts for as long as possible in order to enrich themselves as much as possible.[66]

67. Relator again met with Cohen and Donnelly in July 2006, at which time he repeated his concern that the CityTime project become simply a means to put money in the pockets of Mazer, Berger and SAIC.[67]

68. At that time, Donnelly stated that he was going to raise Relator's concerns to Bondy. Donnelly was fired a few days later.[68]

69. Around August 2006, when Boldia left the CityTime project, Berger hired two load performance testers – one from DA Solutions and one from PrimeView – as replacements, and asked Relator to train them.[69]

70. Almost immediately after meeting the new load performance testers, Relator realized that they were incompetent and doing personal business while billing the project.[70]

71. He ultimately informed Berger of his concerns towards the later part of 2006.[71]

72. Around that time, Relator also informed Edward Rambali ("Rambali"), a Spherion consultant responsible for managing the load performance test group, that the new load testers

---

[66] Ex. 5 at ¶ 12 (Khurana Decl.).

[67] Ex. 5 at ¶ 13 (Khurana Decl.).

[68] Ex. 5 at ¶ 13 (Khurana Decl.).

[69] Ex. 7 at 158:4-158:16, 369:9-22 (Khurana Tr.).

[70] Ex. 7 at 158:4-159:14, 369:9-373:10 (Khurana Tr.).

[71] Ex. 7 at 158:4-159:14, 369:9-373:10 (Khurana Tr.).

were unqualified, and that Mazer and Berger did not care about whether the project actually succeeded. In response, Rambali admonished Relator that he "talked too much."[72]

73. As a direct result of his criticisms, Spherion considered firing Relator. Specifically, in a November 26, 2006 email, Cohen informed Patricia Priola – the recruiter that recommended Relator as a candidate for the CityTime project – that "he had been informed by Mazer" that OPA had approved of replacing Relator due to his "lack of political sensitivity" and his being "critical of other team members."[73]

74. In response to Priola's comment that "this is the first I am hearing about any problems," Cohen responded that "I have had numerous conversations with [Relator] and the client while he has been there, *especially about him being sensitive to the politics (SAIC, FISA, OPA) and not ruffling feathers*."[74]

75. Ultimately, Relator was not terminated at that time, but instead was demoted.[75]

76. Specifically, in a December 26, 2006, email, Cohen informed Roach that Relator "is being moved out of performance testing and will be doing automation testing."[76]

77. Cohen further relayed that "Mark [Mazer] asked that I have a *very direct conversation* with Vinod about *having the right attitude and being a team player*."[77]

---

[72] Ex. 5 at ¶ 15.

[73] Ex. 16 (November 26, 2006 E-Mail from Cohen, RS000491).

[74] Ex. 17 (November 27, 2006 E-Mail Chain with Cohen, RS000499-501) (emphasis added).

[75] Ex. 18 (December 26, 2006 E-mail exchange between Cohen and Roach, RS000509).

[76] Ex. 18 (December 26, 2006 E-mail exchange between Cohen and Roach, RS000509).

[77] Ex. 18 (December 26, 2006 E-mail exchange between Cohen and Roach, RS000509) (emphasis added).

78. In discussing the move with Mazer, Berger explained "if [Relator] doesn't cut it *or creates problems we can get rid of him*."[78]

79. Automation testers generally do not command the same pay as load performance testers in the market for such services, and automation testing is not considered to be as prestigious performance testing.[79]

80. Relator's replacement on the load performance team was Sanjay Arya ("Arya"), who started working on the CityTime project in or around January 2007.[80]

81. Arya reported directly to Berger and Mazer.[81]

82. Arya testified that, after he replaced Relator, he learned that Spherion reassigned Relator to do automation testing because Relator informed FISA that the CityTime application was performing poorly contrary to SAIC's reports.[82]

---

[78] Ex. 19 (December 15, 2006 E-Mail from Berger to Mazer, NYC_CT00001743) (emphasis added).

[79] Ex. 7 at 148:21-149:11; 373:2-10; 414:23-415:7; Ex. 20 at Tr. 69:7, 144:20-24 (Transcript of November 27, 2018 Deposition of Sanjay Arya ("Arya Tr.)) (testifying that Relator "was a performance guy," and that as a load tester Arya would not want to do automation testing).

[80] Ex. 20 at 20:7-15 (Arya Tr.).

[81] Ex. 20 at 20:7-15 (Arya Tr.).

[82] Ex. 20 at 22:16-23:25, 24:16-23, 25:15-26:12 (Arya Tr.).

### 3. The Events Leading to Relator's Termination

83. After Khurana was demoted to the automation testing group, his direct supervisor was Mahesh Sharma ("Sharma") and the team lead was Rekha Basu ("Basu"), an employee of DA Solutions.[83]

84. Soon after joining that team, Relator told Basu that he believed Berger and Mazer were "up to no good" and "pocketing City funds for themselves." In response, Basu told Relator not to repeat his suspicions to anyone else.[84]

85. Relator also told Basu and Sharma that he believed that the "glowing" automation testing reports that they provided to the OPA were inaccurate, because they failed to account for false positives and their methodology had a high failure rate.[85]

86. In May 2007, Relator repeated his concerns that the CityTime project was an exercise in "waste" and "abuse" to Basu.[86]

87. Later that month, on May 30, 2007, Vinod sent an e-mail exposing a serious flaw in the CityTime software that City personnel associated with the project viewed as raising "a valid question[]."[87]

88. Relator was terminated less than 30-days later, on June 22, 2007.[88]

---

[83] Ex. 7 at 81:11-82:19, 146:14-25 (Khurana Tr.); Ex. 21 at 13:11-18, 14:19-21 (Transcript of the November 12, 2018 Deposition of Lakshmanarekha Basu ("Basu Tr.")); Ex. 19 (NYC_CT00001743).

[84] Ex. 5 at ¶ 16 (Khurana Decl.).

[85] Ex. 7 at 150:14-155:4 (Khurana Tr.).

[86] Ex. 7 at Tr. 276:13-18; 277:17-278:13 (Khurana Tr.).

[87] Ex. 22 (May 30, 2007 E-Mail Chain, NYC_CT00002549-52).

[88] Ex. 23 (June 21, 2007 E-Mail Chain with Cohen, RS000642).

89. According to Cohen, Relator was to be told only that OPA "no longer require[d] his services," but that the actual reason for his termination was Mazer's claim that Relator had "attendance [issues] and issues of his ability to work with others."[89]

90. In a July 2007 email, wherein Cohen recounted the circumstances surrounding Relator's termination, Cohen explained that "it appears Mahesh [Sharma] did finally make the recommendation to Mark Mazer that [Relator] had to go."[90]

91. Notably, Sharma testified under oath that he did not, in fact, recommend Relator's termination, and that it was Mazer and Berger who made the decision to fire Vinod.[91]

92. In fact, Sharma testified that he believed Relator was a "good worker" with "programming skills" and that he had no recollection of Relator creating any problems.[92]

93. Similarly, Basu testified that she believed Relator was a "pretty good" employee and a "good guy," that she does not remember anything bad about Relator, she did not recall any attendance issues, did not say anything negative about Relator to Sharma or anyone else.[93]

94. Arya, Vinod's load testing replacement, testified that Relator was a "good performance engineer" and "very knowledgeable."[94]

---

[89] Ex. 23 (June 21, 2007 E-Mail Chain with Cohen, RS000642).

[90] Ex. 24 (July 15, 2007 E-Mail from Cohen, RS000686-88).

[91] Ex. 9 at 29:16-20, 61:3-16, 67:11-16 (Sharma Tr.).

[92] Ex. 9 at 38:13-19, 51:22-25 (Sharma Tr.).

[93] Ex. 21 at 46:15-21, 54:23-55:3, 55:4-14, 65:3-4, 66:16-67:2, 67:11-21, 69:23-70:2 (Basu Tr.).

[94] Ex. 20 at 70:13-14, 144:2-6 (Arya Tr.).

95. Mazer invoked his Fifth Amendment right against self-incrimination in response to questions concerning his involvement in Relator's termination.[95]

## CONCLUSION

96. Throughout his tenure with Spherion, Relator raised concerns with the City, outside of his chain of command, despite being warned not to do so, because he believed that "Mark Mazer and Scott Berger were up to no good" and sought to expose what he believed was "waste" and an "abuse" of government funds aimed at enriching Mazer, Berger and SAIC.[96]

Dated: May 17, 2019
New York, New York

Respectfully submitted,

**KIRBY McINERNEY LLP**

/s/ *David E. Kovel*
David E. Kovel
Andrew M. McNeela
Seth M. Shapiro
250 Park Avenue, Suite 820
New York, New York 10177
Tel: (212) 371-6600
Email: dkovel@kmllp.com
amcneela@kmllp.com
sshapiro@kmllp.com

*Counsel for Relator*

---

[95] Ex. 25 at 4:23-5:7, 13:25-14, 17:7-12, 19:5-12, 23:16-23 (Transcript of the December 18, 2018 Deposition of Mark Mazer ("Maser Tr.")).

[96] Ex. 7 at 277:17-79:7, 290:8-291:9, 321:2-16 (Khurana Tr.); Ex. 5 at ¶¶ 3-18 (Khurana Decl.).