## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

THE STATE OF NEW YORK *EX REL* VINOD
KHURANA and THE CITY OF NEW YORK
*EX REL* VINOD KHURANA,

                  Plaintiffs,

        v.

SPHERION CORP. (N/K/A SFN GROUP,
INC.),

                Defendant.

Case No. 15-cv-06605-JMF

## PLAINTIFF-RELATOR'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT: DEFENDANT'S ARGUMENTS ARE MERITLESS .......................................... 2

I.      Defendant Is Incorrect That the Court May Simply Disregard Relator's
        Uncontradicted Declaration Absent *Additional* Corroborating Evidence ......................... 2

II.     Defendant Fails to Identify Any Genuine Disputes of Material Fact ................................. 6

        A.      The Protected Conduct Element ............................................................. 6

        B.      The Notice Element ............................................................................... 8

        C.      The Retaliation and Adverse Action Element .......................................... 9

III.    Relator Is Entitled to an Adverse Inference Based on Mazer's Invocation of His
        Fifth Amendment Right ....................................................................................... 10

CONCLUSION ................................................................................................................ 10

ADDENDUM A ............................................................................................................ A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*BellSouth Telecomm.,*
  *Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603 (2d Cir. 1996) ........................................... 2

*Butler v. Raytel Med. Corp.*,
  150 Fed. App'x 44 (2d Cir. 2005)................................................................................... 3

*Dhaliwal v. Salix Pharm., Ltd.*,
  752 F. App'x 99 (2d Cir. 2019) ..................................................................................... 8

*Dist. Attorney of N.Y. Cty. v. Republic of the Phil.*,
  307 F. Supp. 3d 171 (S.D.N.Y. 2018)................................................................................ 8

*In re Einhorn*,
  29 B.R. 966 (Bankr. E.D.N.Y. 1983)................................................................................ 10

*Gottlieb v. Cty. of Orange*,
  84 F.3d 511 (2d Cir. 1996).............................................................................................. 6

*Kirschenbaum v. 650 Fifth Ave.*,
  257 F. Supp. 3d 463 (S.D.N.Y. 2017)................................................................................ 10

*Krause v. Eihab Human Servs., Inc.*,
  No. 10 Civ. 898, 2015 WL 4645210 (E.D.N.Y. Aug. 4, 2015)....................................... 7

*Nadel v. Shinseki*,
  57 F. Supp. 3d 288 (S.D.N.Y. 2014)............................................................................ 3, 4

*Peters v. Molly Coll. of Rockville Ctr.*,
  No. 07 Civ. 2553, 2010 WL 3170528 (E.D.N.Y. Aug. 10, 2010)..................................... 4

*Potash v. Fla. Union Free Sch. Dist.*,
  972 F. Supp. 2d 557 (S.D.N.Y. 2013)............................................................................ 3

*Rockwood Comput. Corp. v. Morris*,
  94 F.R.D. 64 (E.D.N.Y. 1982) ....................................................................................... 10

*S.E.C. v. Kern*,
  425 F.3d 143 (2d Cir. 2005)........................................................................................... 9

*Simmons v. Woodycrest Ctr. for Human Dev., Inc.*,
  No. 10 Civ. 5193, 2011 WL 855942 (S.D.N.Y. Mar. 9, 2011) ....................................... 3

*Smith v. Ward Leonard Elec. Co.*,
  No. 00 Civ. 3703, 2004 WL 1661098 (S.D.N.Y. July 23, 2004) ....................................... 5

ii

*Swanson v. Battery Park City Auth.*,
No. 15 Civ. 6938, 2016 WL 3198309 (S.D.N.Y. June 8, 2016)........................................7

*U.S. ex rel. Smith v. Yale Univ.*,
415 F. Supp. 2d 58 (D. Conn. 2006)....................................................................................7

*U.S. ex rel. Yesudian v. Howard Univ.*,
153 F.3d 731 (D.C. Cir. 1998).............................................................................................7

*Yu v. N.Y. Hous. Dev. Corp. (HDC)*,
No. 07 Civ. 5541, 2011 WL 2326892 (S.D.N.Y. Mar. 16, 2011) ..................................4, 5

*Zigmund v. Foster*,
106 F. Supp. 2d 352 (D. Conn. 2000)...................................................................................5

**Rules:**

Fed. R. Civ. P. 56(c) .....................................................................................................................2, 6

## PRELIMINARY STATEMENT

Defendant's arguments in opposition to Relator's motion for partial summary judgment are meritless at best and should be rejected.  For example, Defendant argues that the Court can ignore factual assertions in Plaintiff-Relator's Statement of Material Facts Not in Dispute in Support of His Motion for Partial Summary Judgment ("Relator's 56.1 Statement" or "PSOF"), ECF No. 146, that are premised on his declaration ("Relator's Declaration"), absent other corroborating evidence.  This novel requirement, however, appears nowhere in the annals of the law.  Rather, the cases that Defendant cites stand for the pedestrian rule that a party *opposing* summary judgment may not raise a triable issue of fact by submitting a declaration that contradicts *prior* deposition testimony.  Here, conversely, Relator's Declaration, which was submitted at the dismissal phase, *predates* his motion for partial summary judgment as well as his deposition testimony *by several years*, and Defendant fails to identify a *single inconsistency* between the two.  In essence, Defendant asks the Court to ignore admissible evidence that it has been unable to controvert.

The remainder of Defendant's arguments fare no better and primarily "respond" to arguments that Relator did not make.  For example, on the retaliation and adverse action element, Defendant tilts at the issue of whether it had a retaliatory motive.  However, Relator did not move for summary judgment on that issue.  Rather, Relator sought partial summary judgment *only* on the issue of whether Relator being stripped of his responsibilities, demoted, and terminated each rises to the level of cognizable adverse action under the FCA.  In this connection, Relator noted that he, unlike Defendant in its motion for summary judgment, was not going to waste the Court's time by seeking judgment on the intensely factual and vigorously disputed issue of retaliatory motive prior to trial.

For these reasons and for the other reasons stated herein, the Court, respectfully, should grant Relator's motion for partial summary judgment.

## ARGUMENT

## DEFENDANT'S ARGUMENTS ARE MERITLESS

**I.     Defendant Is Incorrect That the Court May Simply Disregard Relator's Uncontradicted Declaration Absent *Additional* Corroborating Evidence**

Defendant first makes the remarkable argument that the Court cannot consider factual assertions in Relator's 56.1 Statement that are supported by his Declaration absent other corroborating evidence. *See* Def.'s Mem. of Law in Opp. to Pl.'s Mot. for Partial Summ. J. ("Def. Opp. Br."), ECF No. 148, at 5-8.[1]   However, Defendant's manufactured requirement – which would preclude a court's consideration of a party's declaration unless it is *entirely redundant* of other record evidence – is neither supported by the Federal Rules of Civil Procedure nor the cases that Defendant cites.

Rule 56 makes clear that a movant may support a summary judgment motion with citations to "affidavits or declarations." Fed. R. Civ. P. 56(c)(1)(A).  The only limitation placed on a court's consideration of such materials is that they must be based on "personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* 56(c)(4).

Here, the paragraphs of Relator's 56.1 Statement that Defendant challenges as being "supported only by" Relator's Declaration easily satisfy Rule 56.  *See* Def. Opp. Br. at 6 (citing

---

[1] Defendant's citation to *BellSouth Telecomm., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) for the proposition that this Court "can ignore[]" paragraphs in Relator's 56.1 Statement that are "*only* supported by" his Declaration, Def. Opp. Br. at 5 (emphasis added), is borderline sanctionable. *BellSouth* in no way held, or even intimated, that a court can choose to ignore facts asserted in a declaration unless they are buttressed by citations to other record evidence.  Rather, in *BellSouth*, the Second Circuit held that a district court may properly ignore a declaration that recites "conclusions of law" because "it is not sufficient merely to assert a conclusion *without supplying* supporting arguments or *facts*."  77 F.3d at 615 (internal quotation marks omitted) (emphasis added).  Notably, Defendant does not contend that *any* of the challenged paragraphs in Relator's 56.1 Statement contain naked legal conclusions, rendering its citation to *BellSouth* even more egregious.  *See* Def. Opp. Br. at 5-8.

PSOF ¶¶ 40, 62, 66, 67, 68, 96).[2]  Indeed, each of the factual assertions at issue concern matters that Relator *personally observed* or conversations *involving* the Relator.  *See id.*  For this reason, Defendant does not and cannot claim that Relator is not competent to testify about, or lacks personal knowledge of, those matters or that his testimony on those matters would be inadmissible at trial.  *See* Def. Opp. Br. at 5-8.

Faced with this fact, Defendant cobbles together a hodgepodge of inapt decisions, none of which support its radical position.  *See id.*  To the contrary, those cases concern completely pedestrian evidentiary issues with declarations that, e.g.: (i) contradict the party's earlier deposition testimony;[3] (ii) sought to introduce new facts that the party conspicuously omitted in response to deposition questions that were directly on point;[4] (iii) was not based on personal knowledge;[5] or (iv) were conclusory, i.e., asserted legal conclusions *instead of facts* supporting a legal conclusion

---

[2] Defendant does not assert that challenged factual assertions in Relator's 56.1 Statement are not supported by the Relator's Declaration.  *See* Def. Opp. Br. at 6.  Rather, Defendant's complaint is merely that those paragraphs of Relator's 56.1 Statement do not cite other evidence in addition to the Relator's Declaration.

[3] *See, e.g.*, *Simmons v. Woodycrest Ctr. for Human Dev., Inc.*, No. 10 Civ. 5193, 2011 WL 855942, at *1 n.1 (S.D.N.Y. Mar. 9, 2011) (rejecting affidavit submitted in opposition to summary judgment that raised new factual allegations and that contradicted prior deposition testimony); *Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014) (rejecting allegations that "made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts [his] own prior testimony") (internal quotation marks and citations omitted) (alterations in *Nadel*).

[4] *See, e.g.*, *Butler v. Raytel Med. Corp.*, 150 Fed. App'x 44, 45 (2d Cir. 2005) (discussing "sham affidavit" rule whereby a court can disregard a declaration submitted after a party's deposition where the declaration either contradicts the party's earlier testimony or includes new facts that were "conspicuously omitted during repeated questioning"); *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 564 n.1 (S.D.N.Y. 2013) (declining to consider sham affidavit that postdated party's deposition testimony and introduced new facts that were "omitted from her responses to related questions during her deposition").

[5] *See, e.g.*, *Lachira v. Sutton*, No. 05 Civ. 1585, 2007 WL 1346913, at *1-2 (D. Conn. May 7, 2007) (striking portions of declaration based on "information which could not be attributed to plaintiff's personal knowledge").

or involved subjective interpretations of other record evidence.[6]  It is readily apparent, however, that none of these issues is remotely applicable here.

*First*, all of the cases that Defendant cites concerning declarations that either contradict or introduce new "conspicuously omitted" facts from *prior* deposition testimony are inapt for the simple reason that Relator's Declaration *predates* his deposition testimony by *more than three years*.  Even if one were to reverse the flow of time, Defendant still failed to identify: (i) a single inconsistency between the paragraphs of his Declaration cited in his 56.1 Statement and his deposition testimony;[7] or (ii) a single fact from Relator's Declaration that Relator purportedly omitted from his deposition testimony in response to related questions.  *See* Def. Opp. Br. at 5-8. To the contrary, each factual assertion from Relator's Declaration that Defendant challenges is corroborated by, and consistent with, Relator's testimony.  *See* Addendum A hereto.

 *Second*, as noted above, all of the factual assertions at issue are based on the Relator's personal knowledge.  For example, with respect to paragraph 96 of Relator's 56.1 Statement, Relator recounted that he reported outside of his chain of command despite Mazer specifically instructing him not to speak directly with City personnel.  These factual assertions concern Relator's knowledge of *his* supervisors, *his* conversations, and *his* actions.

*Third*, none of the factual assertions at issue are legal conclusions or concern "self-serving" interpretations of other record evidence.  Indeed, the substance of Relator's conversations

---

[6] *See, e.g.*, *Yu v. N.Y. Hous. Dev. Corp. (HDC)*, No. 07 Civ. 5541, 2011 WL 2326892, at *2 (S.D.N.Y. Mar. 16, 2011) (rejecting declaration's legal conclusions); *Nadel*, 57 F. Supp. 3d at 293 n.6 ("I do not credit the legal conclusions[.]"); *Peters v. Molly Coll. of Rockville Ctr.*, No. 07 Civ. 2553, 2010 WL 3170528, at *3 (E.D.N.Y. Aug. 10, 2010) (holding that court need not accept declarant's subjective interpretation of documentary evidence or other witnesses' deposition testimony).

[7] Defendant's failure in this regard is particularly notable considering that Defendant's counsel deposed Relator at length and had every opportunity to address Relator's Declaration paragraph by paragraph but unearthed nary an inconsistency.

manifestly is not a legal conclusion, and Relator did not attempt to interpret his interlocutors' statements but merely recounted what was said. *See* Def. Opp. Br. at 5-6.

Moreover, to the extent that Defendant uses the term "conclusory" to mean devoid of specific facts, the paragraphs of Relator's 56.1 Statement that Defendant quotes easily refute that contention. Those paragraphs – like the portions of Relator's Declaration cited in support thereof – provide the approximate time frame, participants, and content of the conversations at issue. *See* Def. Opp. Br. at 6 (quoting PSOF ¶¶ 40, 62, 66, 67, 68, 96).[8]

*Fourth*, Defendant is wrong that the Court need not credit Relator's factual assertions because they are "'based solely on his *ipse dixit*.'" Def. Opp. Br. at 6 (quoting *Yu*, 2011 WL 2326892, at *2). Defendant ignores that the *ipse dixits* at issue in *Yu* were *legal conclusions*.[9] Neither *Yu* nor any of the cases that Defendant cites stand for the novel proposition that *a fact* magically transforms into excludable *ipse dixit* simply because the cited evidence is a party's declaration. *See* Def. Opp. Br. at 6-8.[10]

---

[8] *Cf. Smith v. Ward Leonard Elec. Co.*, No. 00 Civ. 3703, 2004 WL 1661098, at *3 (S.D.N.Y. July 23, 2004) (rejecting plaintiff's assertion that he performed same functions as supervisor where his declaration simply claimed that he "filled in" for and "covered for" his supervisor and was otherwise "devoid of evidentiary support").

[9] Specifically, the challenged portions of plaintiff's affidavit consisted of the following legal conclusions: "[Defendant] had conducted unlawful discriminatory practices again[st] me," "[Defendant] violated my constitutional, federal projected [sic] rights under color of state law," and "[Defendant] unlawfully retaliated against, terminated me [sic]." *Yu*, 2011 WL 2326892, at *2 (internal quotation marks omitted) (second, fourth, and seventh alterations in *Yu*).

[10] Relatedly, Defendant is wrong that the Court can disregard the portions of Relator's Declaration that allegedly "parrot[] the allegations of the complaint." Def. Opp. Br. at 7 & n.3 (citing *Zigmund v. Foster*, 106 F. Supp. 2d 352, 356 (D. Conn. 2000)). As an initial matter, it would be an odd rule that permits a court to disregard a party's declaration – which is otherwise uncontradicted – because it is *too consistent* with the complaint's factual assertions. In any event, the case that Defendant cites stands for the mundane proposition that a plaintiff may not turn a legal conclusion – such as, for example, the naked assertion that his termination was retaliatory – into admissible evidence at the summary judgment phase by repeating the same conclusory statement in a sworn declaration. *See Zigmund*, 106 F. Supp. 2d at 356 (holding that affidavit that merely repeated complaint's "conclusory allegations" is inadmissible because it "would amount to permitting the plaintiff to keep [his] case in court merely by swearing that [he] has a case") (internal quotation marks and citation omitted) (alterations in *Zigmund*).

*Finally*, even if each of the challenged factual allegations in Relator's 56.1 Statement had to be supported by evidence *in addition to* his Declaration, Addendum A to this brief provides a table showing that *all* of the factual assertions at issue are supported by Relator's subsequent deposition testimony and further, that several of those assertions are supported by other record evidence, such as Defendant's own documents. *See* Fed. R. Civ. P. 56(c)(3) (stating that the court "may consider other materials in the record" not specifically cited in support of a particular factual assertion).[11]

At bottom, Defendant simply laments the fact that it is unable to adduce any evidence contradicting the portions of Relator's 56.1 Statement that are premised on his Declaration. Defendant's failure, however, is not a basis for exclusion but rather is the precise scenario in which summary judgment is appropriate. Accordingly, each paragraph of Relator's 56.1 Statement that Defendant opposed on the specious ground that it was supported by only Relator's Declaration should be deemed admitted.

## II.    Defendant Fails to Identify Any Genuine Disputes of Material Fact

### A.    The Protected Conduct Element

Defendant's arguments regarding Relator's protected conduct are based on either misstatements of the law or distortions of the factual record and, therefore, are insufficient to raise a triable issue of material fact. *First*, Defendant spends three pages of its brief concluding that Relator's conduct did not constitute protected activity without addressing *any of the specific*

---

[11] Defendant miscites *Reeves* for the proposition that a court weighing a summary judgement motion "'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" Def. Opp. Br. at 7-8 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000)). *Reeves* concerned the standard applicable to a Rule 50 motion for judgment as a matter of law *notwithstanding an adverse jury verdict*, not summary judgment. *See id.* In fact, it is well established that credibility is not valid ground for refusing to consider otherwise unchallenged witness testimony at summary judgment. *See Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (holding that party cannot defeat motion for summary judgment "on mere assertions that affidavits supporting the motion are not credible").

*instances* of the protected conduct that Relator identified in his brief and 56.1 Statement. *See* Def. Opp. Br. at 8-11. Defendant excuses its failure on the ground that because Relator did not use the terms "fraud" or "false claim" when reporting his concerns, he could not have engaged in protected activity. *See id.* That is nonsense. There is no "magic words" requirement to allege cognizable protected conduct.[12] Moreover, Defendant does not and cannot dispute that Relator's reporting activity concerned the waste of City and taxpayer funds on a severely delayed and overstaffed project that limped along for the purpose of lining Mazer's pockets: *the same conduct for which Mazer was convicted and SAIC agreed to disgorge over half a billion dollars*. *See* Pl.-Relator's Mem. of Law in Supp. of Mot. for Partial Summ. J. ("Rel. Br."), ECF No. 144, at 5-6, 15-16.[13]

*Second*, Defendant's argument that Relator's reporting activities cannot be protected activity because they purportedly were "within [his] job responsibilities," Def. Opp. Br. at 10-12, is doubly wrong: (i) Defendant has already conceded that Relator exceeded his job responsibilities by reporting outside of his chain of command directly to City personnel;[14] and (ii) Relator's reporting activities went far beyond merely sharing test results, *see* Rel. Br. at 15-17.

---

[12] "[A] plaintiff does not need to know that her investigation could lead to a *qui tam* suit" for her actions to constitute protected conduct. *Krause v. Eihab Human Servs., Inc.*, No. 10 Civ. 898, 2015 WL 4645210, at *6 (E.D.N.Y. Aug. 4, 2015). Rather, "even an investigation conducted without contemplation of – or knowledge of the legal possibility of – a False Claims Act suit can end up being 'in furtherance' of such an action." *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 103 (D. Conn. 2006) (citing *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 741 (D.C. Cir. 1998)); *Swanson v. Battery Park City Auth.*, No. 15 Civ. 6938, 2016 WL 3198309, at *3 (S.D.N.Y. June 8, 2016) ("It is not necessary for [the plaintiff] to know that the investigation he was pursuing could lead to a False Claims Act suit.") (internal quotation marks omitted) (alterations in *Swanson*).

[13] Defendant's argument that Relator did not engage in protectivity during his tenure at Spherion because he did not "report an actual false claim filed with the government" is a patently erroneous misstatement of the law. A relator need not have instituted an FCA action in order to have engaged in protected conduct. *See supra* note 2.

[14] *See* Def. Opp. Br. at 15 ("[T]he undisputed, material evidence only proves . . . that [Relator] was reporting the progress and performance of the City Time application in an . . . unapproved manner to FISA."); Def. Mem. of Law in Supp. of Mot. for Summ. J., ECF No. 136, at 17 ("[E]ven after being told by Berger in May 2005 that he should not have unauthorized communications with FISA, [Relator] claims he continued to do so through 2006."); Def. Pre-Mot. Ltr., ECF No. 130, at 3 ("[Relator] spoke with City employees at

*Third*, Defendant's contention that if "a plaintiff's conduct is not related to *the reporting of an actual false claim filed with the government*, the conduct is not protected," is literally the opposite of the law. Def. Opp. Br. at 10 (emphasis added). Rather, as the Second Circuit has made clear, FCA retaliation claims are "*not* [limited to] only those who actually file a qui tam action." *Dhaliwal v. Salix Pharm., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) (emphasis added).

*Finally*, Defendant is flat wrong that Relator purportedly admitted that he did not engage in protected activity while at Spherion based on his statement in his 2010 complaint to the NYC DOI that he had "always wanted to tell this story but stopped from doing so." Def. Opp. Br. at 12. Clearly, Relator simply was explaining why he did not reach out to the DOI during his tenure at Spherion. Indeed, the record unequivocally establishes that Relator reported the same facts to Spherion and City personnel during his tenure on the CityTime project that he reported to the DOI in 2010, utterly disproving Defendant's attempted spin. *See* PSOF ¶¶ 38-88; *see also Dist. Attorney of N.Y. Cty. v. Republic of the Phil.*, 307 F. Supp. 3d 171, 188 (S.D.N.Y. 2018) (citation omitted) ("[T]he court should not accord the non-moving party the benefit of 'unreasonable inferences, or inferences at war with undisputed facts.'").

## B.  The Notice Element

Turning to the notice element, Defendant's arguments fail to make contact with Relator's motion, which seeks only partial summary judgment on this issue. Specifically, Relator moved on the narrow ground that Defendant was *aware* of the conduct that Relator claims constituted protected activity, irrespective of whether such conduct was, in fact, protected activity. *See* Rel. Br. at 18 (emphasis in original) ("[E]ven if . . . the issue of . . . protected conduct should go [to]

---

both FISA and OPA" when he "did not have the authority to do so."); *see also* PSOF ¶¶ 48, 56, 58-59 (stating that Mazer and Berger ordered Relator not to report to FISA and asserting Relator's continued reporting activity).

the jury, . . . the issue of whether [] Defendant was aware of those actions *should not*.").  For this reason, Defendant's arguments about the scope of Relator's duties or his failure to use the word "fraud" when expressing his concerns simply swing at strawmen.  *See* Def. Opp. Br. at 13-15.

In fact, Defendant has admitted that it was necessarily aware of Relator's reporting activities because it disciplined him for it: "[t]he undisputed, material evidence only proves that Spherion was aware that [Relator] was reporting the progress and performance of the City Time application in an unsolicited and unapproved manner to FISA."  Def. Opp. Br. at 15.[15]  Thus, Defendant has conceded the limited issue under the notice element for which Relator seeks summary judgment.

### C.      The Retaliation and Adverse Action Element

Turning to the retaliation element, Defendant again fails to make contact with Relator's motion.  *See* Def. Opp. Br. at 15-22.  To satisfy this element, a plaintiff must show that the defendant (i) engaged in conduct that rises to the level of a cognizable adverse action, and (ii) that it did so because the plaintiff engaged in protected activity.

Here, Relator sought summary judgment only on the first issue: whether Relator being stripped of his responsibilities, demoted, and ultimately terminated each constitutes conduct cognizable under the FCA.  Yet, Defendant's entire seven-page argument addresses the issue of retaliatory motive (in what appears to be a regurgitation of the arguments that it made in support of its motion for summary judgment).  *See* Def. Opp. Br. at 15-21.  As such, Defendant has conceded that its employment actions against Relator are cognizable adverse acts under the FCA. *See* Rel. Br. at 19-20; *S.E.C. v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005).

---

[15] This admission also decimates Defendant's oft-repeated argument that Relator did not take any actions outside the scope of his duties.

### III.     Relator Is Entitled to an Adverse Inference Based on Mazer's Invocation of His Fifth Amendment Right

Finally, in keeping with its theme of responding to arguments that Relator did not make, Defendant asserts that this Court cannot grant Relator's motion for partial summary judgment *based solely* on Mazer's invocation of the Fifth Amendment.  *See* Def. Opp. Br. at 21-22 (citing *Rockwood Comput. Corp. v. Morris*, 94 F.R.D. 64, 67 (E.D.N.Y. 1982) (holding that summary judgment cannot be granted against defendant "solely on the basis of his having invoked the privilege against self-incrimination"); *accord In re Einhorn*, 29 B.R. 966, 970 (Bankr. E.D.N.Y. 1983).

 Defendant's strawman aside, Relator merely asserted that the adverse inference arising from Mazer's invocation of the Fifth Amendment to questions about Relator's termination buttresses *the other record evidence* that entitles Relator to summary judgment.  This argument is entirely consistent with the cases that Defendant cites.  *See, e.g.*, *Einhorn*, 29 B.R. at 970 ("However, judgment can be entered if there is substantial evidence in addition to the party's unsupported refusal to testify."); *see also Kirschenbaum v. 650 Fifth Ave.*, 257 F. Supp. 3d 463, 508 (S.D.N.Y. 2017) ("[T]here is no doubt that a non-party witness's invocation of his or her Fifth Amendment right not to testify may constitute admissible, competent evidence in a civil case.").

### CONCLUSION

For the foregoing reasons, Relator respectfully requests that the Court grant partial summary judgment in his favor with respect to the issues discussed herein.

Dated: July 26, 2019
      New York, New York

Respectfully submitted,

**KIRBY McINERNEY LLP**

 /s/ *David E. Kovel*
David E. Kovel
Andrew M. McNeela
Seth M. Shapiro
250 Park Avenue, Suite 820
New York, New York 10177
Tel.: (212) 371-6600
Email:  dkovel@kmllp.com
       amcneela@kmllp.com
       sshapiro@kmllp.com

*Counsel for Plaintiff-Relator*

# ADDENDUM A

All citations to "Ex. _" are references to an exhibit attached to the Declaration of Andrew M. McNeela in Support of Plaintiff-Relator's Motion for Partial Summary Judgment, ECF No. 145.

| Paragraph in Relator's Rule 56.1 Statement | Supporting Evidence |
|---|---|
| ¶ 38.   In November 2004, Relator's initial performance load tests revealed that CityTime's software application could support only 20 concurrent users prior to crashing, far below the 2,000 concurrent users that was the goal for FISA alone as the pilot agency, let alone the tens of thousands of concurrent users that was the project's ultimate goal when fully implemented. | Ex. 7 (Khurana Tr.) at 89:20-90:2 (testifying that he was "the only person" "doing the load testing" "[f]rom November 2004 until April of 2005"), 91:16-17 ("The system crashed on 20 concurrent users."), 97:13-20 ("[T]he application, after four and a half years of development, having cost over $200 million in my estimate, was crashing at 20 users.  It was designed to support up to 160,000 users for the City of New York and 2,000 users for the FISA pilot site."). |
| ¶ 40.   During the following month, Relator continued to voice his concerns. Relator told Cohen that SAIC's development team had done an extremely poor job and that the project should be scrapped. | Ex. 7 (Khurana Tr.) at 92:9-23 (testifying that he "communicate[d] that crashing in the system of 20 users to . . . many individuals.  Starting in around November 2004, initially with Scott Berger. . . . Scott Berger called a meeting for me to discuss those results in front of the senior management, including Joel Bondy, Mark Mazer, Scott Berger, Sarah Gurjal, Mike Furman, who was a development manager from SAIC."), 97:24-98:4 ("I [] notified Scott [Berger] . . . .  He organized a meeting for -- with the other levels of management.  I presented those findings."), 98:5-9 (testifying that "the people in those meetings included people from . . . Spherion, OPA, and SAIC"), 124:20-25 ("I told the FISA individuals, Sue Amodeo, the manager, 'This is what was told to me in that meeting.'"), 125:18-126:14 (testifying that "right after that meeting [in 2004,] . . . separate people at OPA . . . came to my desk, and they asked me, 'What's going on?'  And I was being very transparent and honest. I had nothing to hide, and I told them what occurred during that meeting, what Mark Mazer told me."), 128:13-129:4 (testifying that "between November of 2004 and April of 2005," Relator "made statements that the performance of this application was not ready to be rolled out into production . . . and that it was crashing on 20 users.  I did notify Howard |

| | |
|---|---|
| | Cohen and Sue Amodeo about the pep talk that Mark Mazer gave me, which is, 'We know this application is going to fail. We don't want you talking about these results with anyone.'"); Ex. 15 (Apr. 14, 2005 e-mail from Amodeo to Relator) ("Would love a confidential chat about the perf[ormance] test plan if you can call or stop by some time."); Ex. 13 (May 16, 2005 e-mail from Sherif Sirageldin to Berger) (acknowledging bugs in the application and stating, "Vinod provides information to a client in particular which I, personally, would have not provided as the information would typically lead no-where good"); Ex. 14 (attachment to May 16, 2005 e-mail from Berger to Sirageldin) ("At a meeting today Monday, May 16, 2005, that was attended by Vinod, Scott and myself, Scott . . . indicated that any further communication with FISA without prior authorization would not be tolerated."); Exs. 16-18 (e-mails from Cohen) (explaining that Relator's "lack of political sensitivity," "ruffling feathers" and need to "hav[e] the right attitude and be[] a team player" were the bases for deciding to terminate him, which was ultimately changed to a demotion). |
| ¶ 41.    At that time, Relator also communicated his concerns regarding the project's viability and wastefulness to FISA employees Amodeo and Mantry during their discussion of the load test results. | Ex. 7 (Khurana Tr.) at 112:10-113:2 ("Sue Amodeo, and her technical guru, Rajeev Mantry, [] approached me in the early part of . . . 2005 -- . . . asking me if there were concerns about the performance of this application, whether it was ready for a rollout to their side, because they were the pilot, whether it would support the 2,000 employees in their agency. And my response was, 'No, it cannot support 2,000 concurrent users.'"), 124:20-25 ("I told the FISA individuals, Sue Amodeo, the manager, 'This is what was told to me in that meeting.'"), 128:13-129:4 (testifying that "between November of 2004 and April of 2005," Relator "made statements that the performance of this application was not ready to be rolled out into production . . . and that it was crashing on 20 users. I did notify Howard Cohen and Sue Amodeo about the pep talk that Mark Mazer gave me, which is, 'We know this application is going to fail. We don't want you talking about these results with anyone.'"); Ex. 15 (Apr. 14, 2005 e-mail from Amodeo to Relator) ("Would love a confidential chat about the perf[ormance] test plan if you can call or stop by |

| | |
|---|---|
| | some time."); Ex. 13 (May 16, 2005 e-mail from Sherif Sirageldin to Scott Berger) (acknowledging bugs in the project and stating, "Vinod provides information to a client in particular which I, personally, would have not provided as the information would typically lead no-where good"); Ex. 14 (attachment to May 16, 2005 e-mail from Berger to Sirageldin) ("[W]hen I met with OPA management, I indicated that things were okay and we were on target even though they were not. . . . At a meeting today Monday, May 16, 2005, that was attended by Vinod, Scott and myself, Scott . . . indicated that any further communication with FISA without prior authorization would not be tolerated."); Exs. 16-18 (e-mails from Cohen) (explaining that Relator's "lack of political sensitivity," "ruffling feathers" and need to "hav[e] the right attitude and be[] a team player" were the bases for deciding to terminate him, which was ultimately changed to a demotion). |
| ¶ 62.  And in August 2005, Relator told Amodeo that Berger had lied to her about FISA approving a plan to have load testing performance by another individual in addition to Relator. | Ex. 7 (Khurana Tr.) at 143:3-16 ("The e-mail that Scott Berger sent out to almost every person in SAIC and in Spherion mentioning that there was a meeting that took place in which FISA was involved, and it was agreed upon that this is the process that performance engineering would undertake going forward.  Sue Amodeo approached me right after that e-mail had gone out, and she said, 'What meeting is he talking about?'  I said there was no such meeting. And Scott Berger is making up this story."), 144:22-23 ("That happened in August of 2005."); Ex. 15 (Apr. 14, 2005 e-mail from Amodeo to Relator) ("Would love a confidential chat about the perf[ormance] test plan if you can call or stop by some time."); Ex. 13 (May 16, 2005 e-mail from Sherif Sirageldin to Scott Berger) ("Vinod provides information to a client in particular which I, personally, would have not provided as the information would typically lead no-where good"); Ex. 14 (attachment to May 16, 2005 e-mail from Berger to Sirageldin) ("[W]hen I met with OPA management, I indicated that things were okay and we were on target even though they were not. . . . At a meeting today Monday, May 16, 2005, that was attended by Vinod, Scott and myself, Scott . . . |

| | |
|---|---|
| | indicated that any further communication with FISA without prior authorization would not be tolerated."). |
| ¶ 64.  In March 2006, Relator met with Cohen and Arthur Donnelly, Spherion's senior most SME on the CityTime project. | Ex. 7 (Khurana Tr.) at 156:5-17 ("There was another two individuals from Spherion, Art Donnelly and another one person by the name of Jacques -- I don't recall his last name.  But they were considered subject matter experts brought in by Spherion to improve on the processes of the QA group, and they expressed their frustration.  And I did express it to them, what happened during the load testing two and a half years I was there, as well as what was now happening in the test automation world."), 279:2-7 ("Howard Cohen is one person that I would have told because he was my liaison from Spherion.  There was no other person I could contact at Spherion except Howard Cohen and Art Donnelly."); Exs. 16-18 (e-mails from Cohen) (explaining that Relator's "lack of political sensitivity," "ruffling feathers" and need to "hav[e] the right attitude and be[] a team player" were the bases for deciding to terminate him, which was ultimately changed to a demotion); Ex. 19 (Dec. 15, 2006 e-mail from Berger to Mazer) (stating, regarding the decision to demote Relator, "If he doesn't cut it or creates problems we can get rid of him."). |
| ¶ 66.  Relator told them that he believed that the CityTime project should be scrapped, and that Mazer, Berger and SAIC management did not care that the project was a failure, but instead were concerned about extending their contracts for as long as possible in order to enrich themselves as much as possible. | Ex. 7 (Khurana Tr.) at 228:7-229:19 ("SAIC was lying [] to FISA, to OPA, presenting them with a glowing report that was intentionally created by Jeff Boldia.  He created two reports, a bad report, which was only shared within SAIC, and a good report, which was 'fudging the information,' it's called.  He told me it was lipstick service that he was applying to the report . . . . FISA-OPA came to my desk and they specifically said they don't trust what is coming out in those meetings. . . . And I made it very clear, from my results, that what they were indicating on their reports was too good to be true and it was false.  And I relayed that information to Howard Cohen.  I said, 'I need somebody to come forward -- everybody is coming to me, and I don't have the authority to stop what's happening.  Somebody needs to stop this, and this project needs to be scrapped.'"); Ex. 14 (attachment to May 16, 2005 e-mail from Berger to Sirageldin) ("[W]hen I met with OPA management, I indicated that things were okay and we were on target |

| | |
|---|---|
| | even though they were not. . . . At a meeting today Monday, May 16, 2005, that was attended by Vinod, Scott and myself, Scott . . . indicated that any further communication with FISA without prior authorization would not be tolerated."); Ex. 13 (May 16, 2005 e-mail from Sherif Sirageldin to Berger) (acknowledging bugs in the application and stating, "Vinod provides information to a client in particular which I, personally, would have not provided as the information would typically lead no-where good"); Exs. 16-18 (e-mails from Cohen) (explaining that Relator's "lack of political sensitivity," "ruffling feathers" and need to "hav[e] the right attitude and be[] a team player" were the bases for deciding to terminate him, which was ultimately changed to a demotion); Ex. 19 (Dec. 15, 2006 e-mail from Berger to Mazer) (stating, regarding the decision to demote Relator, "If he doesn't cut it or creates problems we can get rid of him."). |
| ¶ 67.  Relator again met with Cohen and Donnelly in July 2006, at which time he repeated his concern that the CityTime project become simply a means to put money in the pockets of Mazer, Berger and SAIC. | Ex. 7 (Khurana Tr.) at 287:21-288:15 ("There was something wrong on this project, and the management were committing something by lying to the client, lying to each other in order to prolong this project.  And it was very easy to see when you are on the inside. . . . There is money changing under the table. . . . A I indicated something similar of fraud, whether it was to Howard Cohen.  He was my liaison.  I expressed things to him."); Exs. 16-18 (e-mails from Cohen) (explaining that Relator's "lack of political sensitivity," "ruffling feathers" and need to "hav[e] the right attitude and be[] a team player" were the bases for deciding to terminate him, which was ultimately changed to a demotion); Ex. 19 (Dec. 15, 2006 e-mail from Berger to Mazer) (stating, regarding the decision to demote Relator, "If he doesn't cut it or creates problems we can get rid of him."). |
| ¶ 68.  At that time, Donnelly stated that he was going to raise Relator's concerns to Bondy.  Donnelly was fired a few days later. | Ex. 7 (Khurana Tr.) at 156:5-17 ("There was another two individuals from Spherion, Art Donnelly and another one person by the name of Jacques -- I don't recall his last name.  But they were considered subject matter experts brought in by Spherion to improve on the processes of the QA group, and they expressed their frustration. And I did express it to them, what happened during the load testing two and a half years |

|   | I was there, as well as what was now happening in the test automation world."), 274:2-11 ("Mark Mazer and Scott Berger . . . needed those people who spoke up, including myself, Mike Secker, which was a Spherion consultant, Art Donnelly, Jacques, and Sanjay Arya. The people who spoke up about this project, about its issues, were terminated."), 377:16-19 ("Art Donnelly, who replaced Jacques.  He was also fired for complaining about the project."); Exs. 16-18 (e-mails from Cohen) (citing "lack of political sensitivity," "ruffling feathers" and need to "hav[e] the right attitude and be[] a team player" as grounds for termination); Ex. 19 (Dec. 15, 2006 e-mail from Berger to Mazer) (stating, regarding the decision to demote Relator, "If he doesn't cut it or creates problems we can get rid of him."). |
|---|---|
| ¶ 84.   Soon after joining that team, Relator told Basu that he believed Berger and Mazer were "up to no good" and "pocketing City funds for themselves."  In response, Basu told Relator not to repeat his suspicions to anyone else. | Ex. 7 (Khurana Tr.) at 277:23-288:19 (A: "Without using th[]e word[] ['fraud'], I used the words 'waste' and 'abuse,' which, I think, can be interpreted as fraud.  Howard Cohen was notified.  Rekha Basu was notified.  Audrey, who was present with Rekha, was aware of my concerns."  Q: "You say 'aware.'  How was she aware?  Did you actually have a discussion and specifically used those words with her?"  A: "I did. . . . With Rekha Basu, with Audrey at a lunch date."  Q: "Other than this lunch -- we'll talk about the lunch -- any other specific instances you can remember, sitting here today, where you specifically looked someone in the eye and said 'fraud?'"). |