**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

THE STATE OF NEW YORK *EX REL* VINOD
KHURANA and THE CITY OF NEW YORK *EX REL*
VINOD KHURANA,

                             Plaintiffs,

              v.

SPHERION CORP. (N/K/A SFN GROUP, INC.),

                           Defendant.

Case No. 15-cv-06605-JFK

---

**RELATOR'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO
FILE PROPOSED THIRD AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.  PRELIMINARY STATEMENT ........................................................................................ 1

II. ARGUMENT.................................................................................................................... 2

     A.  Khurana's Disclosures Were Voluntarily Provided to the Government.................. 2

     B.  The TAC Strengthens Khurana's Vicarious Liability Claims ................................ 5

     C.  Spherion's Arguments Do Not Defeat Khurana's Quality Assurance
         Claim......................................................................................................................... 9

     D.  Spherion's Arguments Do Not Defeat the Conflict of Interest Claims ................ 11

     E.  The TAC Alleges Submission of False Claims with Sufficient Detail................. 12

     F.  Whether Khurana Is Authorized to Pursue Claims Under NYC FCA
         Does Not Affect Viability of TAC........................................................................... 14

III. CONCLUSION............................................................................................................... 14

## TABLE OF AUTHORITIES

**Cases**                                                                                                                            **Page**

*Fox v. Standard Oil Co. of N.J.*,
    294 U.S. 87 (1935) ................................................................................................................. 3

*Harsco Corp. v. Segui*,
    91 F.3d 337 (2d Cir. 1996) .................................................................................................. 12

*Pfizer, Inc. v. Stryker Corp.*,
    No. 02 Civ. 8613 (LAK), 2003 WL 21660339 (S.D.N.Y. July 15, 2003) ....................... 12

*Strom ex rel. United States v. Scios, Inc.*,
    676 F. Supp. 2d 884 (N.D. Cal. 2009) ............................................................................... 13

*United States ex rel. Bilotta v. Novartis Pharms. Corp.*,
    50 F. Supp. 3d 497 (S.D.N.Y. 2014) ................................................................................... 3

*United States ex rel. Estate of Botnick v. Cathedral Healthcare Sys., Inc.*,
    352 F. Supp. 2d 530 (D.N.J. 2005) ...................................................................................... 3

*United States ex rel. Kester v. Novartis Pharms. Corp.*,
    23 F. Supp. 3d 242 (S.D.N.Y. 2014) .................................................................................. 14

*United States ex rel. King v. Hillcrest Health Ctr., Inc.*,
    264 F.3d 1271 (10th Cir. 2001) ........................................................................................... 4

*United States ex rel. Mastej v. Health Mgmt. Assocs.*,
    591 Fed. App'x 693 (11th Cir. 2014) ................................................................................. 13

*United States ex rel. Vinod Khurana v. Spherion Corp.*,
    No. 15 Civ. 6605 (JFK), 2016 U.S. Dist. LEXIS 156572
    (S.D.N.Y. Nov. 10, 2016) ..........................................................................................*passim*

*Wood ex rel. United States v. Applied Research Assocs., Inc.*,
    328 F. App'x 744 (2d Cir. 2009) ....................................................................................... 14

**Statutes**

N.Y.C. ADMIN. CODE § 7-802(6) ............................................................................................ 3

N.Y. CLS St Fin § 190(2)(f) ................................................................................................... 14

N.Y. FIN. LAW § 188, *et seq.* .................................................................................................. 3

**Other Sources**

A. Scalia, B. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ........................... 3

I.      PRELIMINARY STATEMENT

Relator Vinod Khurana's proposed Third Amended Complaint ("TAC") cures the deficiencies of the Second Amended Complaint ("SAC") identified by the Court in its November 10, 2016 order (*United States ex rel. Vinod Khurana v. Spherion Corp.*, No. 15 Civ. 6605 (JFK), 2016 U.S. Dist. LEXIS 156572 (S.D.N.Y. Nov. 10, 2016) [ECF No. 70], the "Order") dismissing the SAC.  Central to the TAC's enhanced allegations is the fact that (1) Khurana is, in fact, the undisputed first person to publicly disclose and provide the City of New York (the "City") with information about the illicit kickback relationship between Mark Mazer and DA Solutions before any other source had done so (TAC ¶¶81-86) and (2) Mark Mazer's kickback fraud was part of a larger fraud, initiated by SAIC's Gerald Denault, that began in 2003 (TAC ¶¶15-20).  As to the second point, this larger fraud involved "delaying the deployment and implementation" of CityTime in order to maximize the amount of kickbacks and billable hours received by Denault and Mazer.  TAC ¶¶17, 25.  As such, Khurana's disclosures to multiple government agencies from 2004 through 2011 concerning the delays in CityTime's development render him an original source with respect to the kickback fraud.

Neither the City nor Defendant Spherion Corp. ("Spherion") dispute the plausibility of these allegations, or the theory that fraudulently delaying CityTime's implementation was an integral part of the kickback scheme.  Rather, the City uses its opposition brief ("City Opp.") as an opportunity to file what is effectively a surreply against Khurana's pending motion for a relator's share with respect to the governments' settlement with SAIC.  City Opp. at 2.  In doing so, the City ignores alleged facts specific to Spherion's, as opposed, to SAIC's role in the fraud, such as, Spherion's complete failure to provide QA services. *See* City Opp. at 2 n. 1.[1]

---

[1]  It is unusual that the City would take a position against Khurana when he is trying to recover money for the City.  Indeed, it also raises questions about whether the City is trying to influence the Court's assessment of the Relator in

Spherion's opposition brief ("Spherion Opp.") does not dispute that the TAC plausibly alleges a larger fraud beginning in 2003 consisting of delaying the implementation of CityTime. Spherion asserts the TAC's enhanced allegations should be disregarded because Khurana never disclosed Denault's involvement.  Spherion Opp. at 2.  However, the importance of the TAC's enhanced allegations is not that they encompass new disclosures by Khurana, but that they give greater context to Khurana's disclosures already alleged in the SAC, and allow the Court to consider Khurana's disclosures concerning delays and load-testing at CityTime as being disclosures of the kickback scheme for purposes of determining that Khurana is an original source.

## II.    ARGUMENT

Neither Spherion nor the City claims that the TAC is untimely, offered in bad faith, or prejudicial to their interests.  Their only objection to the amendment is their assertion that the TAC is futile, because it does not cure the deficiencies identified by the Court in its dismissal of the SAC.  City Opp. at 1; Spherion Opp. at 1-2.  However, Relator's opening brief explains how each of the deficiencies identified by the Court has been remedied by the TAC.  Nothing in Spherion and the City's opposition briefs succeeds in invalidating the effectiveness of these new allegations.

### A.    Khurana's Disclosures Were Voluntarily Provided to the Government

As an initial matter, the City argues that Khurana's April 2010 commentaries on the *New York Daily News* website and his 2004-2005 disclosures to FISA and OPA cannot be considered disclosures to the government under the New York City False Claims Act ("NYC FCA"), and

---

hopes that a negative opinion might carry over to the relator's share dispute.  *See* ECF Nos. 47-58.  Despite the City's briefing against the TAC, this motion addresses a different question.  The motion for relator's share is about Khurana's entitlement to a relator's share of the government's recovery against SAIC.  The TAC seeks only a recovery from Spherion.

the New York False Claims Act ("NYS FCA") because they were not disclosed to the "appropriate government officials" City Opp. at 4-5.

The NYS FCA requires the source to inform "state or a local government", N.Y. FIN. LAW § 188(7), defined broadly to include "any New York county, city, town, village, school district . . ." § 188(6).[2]  Rather than refer to these clear statutory definitions in the paragraph adjacent to that for "original source" in the statutes, the City refers to irrelevant requirements for filing qui tam complaints.  Making the original disclosures to the City, and later filing a proper *qui tam* suit are two entirely separate steps.  To graft one onto the other violates the clear meaning of the above statutory definitions.  *See Fox v. Standard Oil Co. of N.J.*, 294 U.S. 87, 96, (1935) ("There would be little use in such a glossary if we were free in despite of it to choose a meaning for ourselves."); A. Scalia, B. Garner, *Reading Law: The Interpretation of Legal Texts*, 225 (2012) ("Definition sections . . . are to be carefully followed.")

Requiring whistleblowers to disclose their information to only the "appropriate government officials" (City Opp. at I.b.) would mean that whistleblowers must "lawyer-up" to ensure that they are meeting this requirement, a requirement not stated clearly by statute, before anything is even disclosed to the government.  This new procedural hurdle would exclude otherwise qualified whistleblowers; it is contrary to FCA policy[3] and would slow and discourage disclosure of fraud to the government.

Khurana made his 2004 disclosures to Susan Amodeo - not "any one of the hundreds of thousands of government employees" but rather a supervisor at FISA, the very agency that was

---

[2]  Likewise, the NYC FCA states an original source need only inform "the city" N.Y.C. ADMIN. CODE § 7-802(6), defining "city" broadly to mean "the city of New York, and any city agency, department, division or bureau . . ." § 7-802(1).

[3]  *See United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 546 (S.D.N.Y. 2014) (citing *United States ex rel. Estate of Botnick v. Cathedral Healthcare Sys., Inc.*, 352 F. Supp. 2d 530, 532 (D.N.J. 2005) ("the [Supreme Court], as well as legislative history indicat[e] a strong intent . . . to create incentives for relators . . . to come forward.")).

3

being defrauded by Mazer and Berger at the time.  City Opp. at 5; TAC ¶¶36-41.  With respect to

the *Daily News* commentaries in 2010, Khurana wrote them with the purpose of informing the

government,[4] and they achieved that objective, informing multiple relevant high level

government officials of, among other things, the kickback relationship.   TAC ¶¶82-85 (City

Comptroller investigator, OPA head Joel Bondy, DOI and AUSAs, as well as FISA senior

management including, again, Ms. Amodeo).  Khurana's chosen means of communication was

actually better calculated to inform the government than filing his complaint with DOI in 2009,[5]

as the open letter format of internet comments got his disclosures into the hands of multiple

agencies at one stroke. *Id*.  Whether by phone, letter, email, posted comments, carrier pigeon or

smoke signal, a message intentionally sent **and effectively received** should be all that is

necessary to satisfy the FCAs' requirement that a relator "voluntarily disclose" information to

the government.  Holding that Khurana informed the government, here, places no "onus on the

government to search the internet".  City Opp. at 3.  Had the government not read the comments,

Khurana would then have no basis to allege his comments informed the government.

The City's reliance on *United States ex rel. King v. Hillcrest Health Ctr., Inc.*, 264 F.3d

1271 (10th Cir. 2001), is unavailing.  There, the relator's attorney had not provided  the identity

of the relator or the names of the alleged perpetrators, or even the name of the health center

where the Medicaid fraud had taken place.  *Id* at 1277, 1280-81.  Here Khurana's *Daily News*

---

[4]  "I will if called in . . . by the FBI or the Manhattan Attorneys Office testify" . . . "I would like to suggest that the comptroller's office contact the FISA director and senior managers." Affirmation of David E. Kovel ("Kovel Aff.") [ECF No. 51], Ex. G at 1-2.

[5]   The City criticizes Khurana for being apathetic in not answering DOI's email response to his February 1, 2009 DOI complaint.  The opposite is true.  The DOI did not respond to Khurana's DOI complaint until six weeks after the complaint was filed, on March 11, 2009, and only after DOI had been prompted by the Office of the Mayor on March 4, 2009 after it had received a separate complaint about the CityTime fraud from Khurana.  Affidavit of Matthew Befort ("Befort Aff.") [ECF No. 52] (submitted with the City's Opposition to Khurana's Motion for a Relator Share), Ex. 2-4.  The DOI email was perfunctory.  Moreover, DOI possessed Khurana's full name, address, and phone number, but failed to make any further effort to reach Khurana beyond its email, *id*, Ex. 2 while Khurana continued to attempt to get the government's attention by his *Daily News* commentary.

posts  identified the subject of the fraud, CityTime, the wrongdoers by name, Mazer and D[A]

Solutions, and offered to testify if contacted by investigators.   Kovel Aff., Ex. G at 1-2.

Moreover, the City had Khurana's name and contact information from his 2009 DOI complaint.

ECF No. 52, Befort Aff., Ex. 2.

**B.      The TAC Strengthens Khurana's Vicarious Liability Claims**

The TAC clearly alleges that an integral part of Mazer and Denault's fraud was "delaying

the deployment and implementation of the Project" in order to "extract more billable hours and

kickbacks through their scheme."  TAC ¶¶17, 25.  To that end, beginning in 2004 Mazer "was

actively concealing from the City, that CityTime was woefully behind schedule, and was failing

to achieve its objectives."  TAC ¶20.  Thus, when Khurana disclosed to FISA supervisor, Susan

Amodeo, that CityTime could handle a maximum load of 20 users, no more than 1% of its

proposed pilot stage capacity and that Mazer and Berger "knew the project was going to fail"

Khurana was disclosing an integral part of Mazer's kickback scheme to the government.  TAC

¶¶35-39.

Because the TAC now links the concealed delay of CityTime's deployment to Mazer's

kickback scheme, the Court's finding that Khurana's 2004 FISA disclosures dealt only with

"load tests" and not with kickbacks is no longer necessarily true.   However, the City and

Spherion ignore this newly alleged fact, and claim that the TAC makes no allegations of new

disclosures that were not alleged in the SAC and considered by the Court.  While the disclosures

of load test results and Mazer and Berger's admission that CityTime was a failure are not new to

the TAC, they were disregarded in the Court's decision because they occurred before the 2005

fraud start date alleged in the SAC, and because there was no connection alleged between the lies

about CityTime's progress and the kickback scheme.  Order at 33.  The TAC remedies both of

these issues and allows the Court to consider these disclosures as part of the kickback scheme. TAC ¶¶15-20.  Importantly, neither the City nor Spherion argue that it is incorrect to consider the delay and deceit about CityTime as part of the kickback scheme.  Indeed, the City has taken that very position in its March 2012 petition to the U.S. stating "Denault and others conspired to defraud the City by among other things, artificially delaying the deployment and implementation of the Project."  Declaration of Sabita Krishnan ("Krishnan Decl.") [ECF No. 53], Ex. P at 1.  It is this part of the scheme that Khurana provided to the government starting in 2004.

The City and Spherion make the same mistake with respect to the enhanced allegations about the early 2009 DOI complaint and iReport.  Both focus on the fact that the Court has already reviewed the full text of the DOI complaint.  Neither the City nor Spherion address the fact that the DOI complaint's isolated allegations, not quoted in the SAC, are not only directly quoted in the TAC, but are also connected to the larger fraud to delay and conceal CityTime's progress from the City.  In particular, the DOI Complaint and iReport alleged that Mazer and Berger told employees, "not to 'bad' mouth the project" even though they "KNEW very well this [CityTime] was going to be a complete failure."  TAC ¶77. The iReport also identified the "obscene featherbedding of consultant positions with overly generous hourly rates." *Id.* at ¶78. For the City and Spherion's arguments to succeed, the Court must adopt their myopic view of the fraud as limited to an isolated kickback scheme and having nothing to do with intentionally delaying CityTime and hiding this fact from the City.

Khurana's enhanced allegations about his meetings with DOI in December 2010 are not futile amendments as they achieve two useful purposes.  They further support Khurana's status as an original source, and second, discredit the City's own characterization of its investigation and Khurana's contribution to it.  The City's position in this litigation has been that "[n]one of

6

the 'information' Khurana provided was relevant." City's Br. in Opp. to Relator's Share [ECF No. 50], at 25.  This position is clearly contravened by emails and testimony obtained during discovery, and now alleged in the TAC.  The allegations reflect that the City took Khurana's disclosures seriously, found them "very helpful" involving "some interesting things."  DOI head of investigation, John Kantor called for a second interview with Khurana, at which Khurana disclosed that SAIC's Fayerman knew that DA Solutions was managed by Mazer's wife."  This was considered relevant, in fact DOI investigators termed it an "important recollection".[6] Khurana was also instrumental in convincing additional witnesses to step forward.  As argued more fully in Khurana's relator's share reply brief, his iReport "kicked the door open" for workers "to speak about CityTime corruption" including SAIC employee Hayden Hsiung and at least five others.  ECF No. 54 at 5, 7.

In sum, contemporaneous DOI communications paint a different picture from what the City now argues.  This dissonance should color the Court's confidence in the City's ability, in self-serving hindsight, to correctly evaluate Khurana's contributions to the CityTime investigation.[7]

Beyond mere relevance, Khurana's meetings with DOI materially added to the publicly disclosed CityTime allegations.  The City incorrectly argues that the Court has already decided that information sufficient to alert the government to the "general fraud" (i.e., the fraud to delay CityTime) was already publicly disclosed, and thus Khurana's, load test and related disclosures

---

[6]   And the City only appears to have decided that the information provided by Khurana was not useful when it became aware that he had filed a whistleblower complaint.  Relator's Reply in Support of Motion for Relator's Share [ECF No. 54], at 7 (Noting that after Mr. Kantor sought a second interview with Khurana it was then cancelled when it was learned Khurana was a whistleblower because: "He is clearly seeking some sort of payday"). *Id.*; *see also* Declaration of David E. Kovel in Further Support of Plaintiff-Relator's Motion for Relator's Share [ECF No. 55], Ex. A-8.

[7] This is the same City that claims that DOI had been investigating CityTime since 2005.   ECF No. 50 at 3.  The "investigation began in 2005", simply means a complaint was assigned a "tracking number." Befort Aff. ¶4 n.3.

to the DOI were not materially additive.  City Opp. at 6 (citing *Khurana*, 2016 U.S. Dist. LEXIS 156572, at \*37).  This Court's Order did not address the fraud-to-delay allegations which appear in the TAC.  The decision dismissing the SAC clearly broke the SAC's allegations into four theories of liability, 1) kickback fraud; 2) failure to provide QA services; 3) failure to disclose conflicts of interest; and 4) false billing practices.  Order at 18-19.  None of these categories encompassed the overarching fraud to delay CityTime.  The City claims the Criminal Complaint [Kovel Aff. Ex. N (the "Criminal Complt.")] already publicly disclosed a scheme to defraud the City into extending the project (City Opp. at 9), but does not cite to where this allegation might be found.  This is not sufficient grounds to assert futility.

Even if the Criminal Complt. alleged that Mazer and Berger were "prolonging the project", which it did not, it still  would not have disclosed that they were doing so fraudulently, by, for instance, fudging test results or falsely claiming to be performance testing, when "the application [was] not ready for performance testing".  TAC ¶40.  Rather, the Criminal Complt. disclosed kickbacks and overbilling; a scheme entirely consistent with the undisclosed, intentionally incompetent software development.

The City, in seeking to diminish Khurana's contributions, tries to compartmentalize the fraud into tidbits.  The City argues that Khurana may have disclosed that Mazer and Berger were hiding that CityTime was not performing well, but not that they were intentionally delaying its deployment and implementation. City Opp. at 10. Yet these are but two integral aspects of the same fraud, just as the delaying of CityTime was an integral part of the kickback fraud.  TAC ¶25.  Mazer and Berger could not have continued to delay CityTime for years without deceiving the City about the lack of progress being made.  Mazer and Berger would have no incentive to lie to the City about CityTime's progress absent the kickback scheme.  As Spherion consultants,

tasked with quality assurance, they would have been lauded for promptly reporting the system's failures, whereas SAIC, tasked with CityTime's actual development, would have been the one harmed by these disclosures.

Moreover, Khurana's 2009 DOI Complaint and iReport both actually did disclose that Mazer and Berger were purposefully delaying the project, that they, had "EVERY objective to continue the project into 2010 and beyond." Order at 16.  In both Khurana's December 2010 and February 2011 interviews with DOI, he disclosed numerous instances of completely unqualified consultants being hired for CityTime, by Mazer, DA Solutions, and SAIC, which he characterized to DOI as "circumstances that led [him] to believe that there was corruption, kickbacks etc." Krishnan Decl., Ex. R at 8; *see also* Krishnan Decl., Ex. S at 1-3.

C.      **Spherion's Arguments Do Not Defeat Khurana's Quality Assurance Claim**

The City does not oppose the existence of a valid Quality Assurance ("QA") claim,[8] that Spherion did not provide bona fide QA services because it delegated that responsibility to Mazer, Berger, and SAIC, "who could not be expected to evaluate their own performance, had a conflict of interest as defined by the QA contract, and were actively working to delay implementation of CityTime for their own benefit."  TAC ¶60.

Spherion opposes the QA claim, arguing: 1) that it is merely a claim for breach of contract; 2) Spherion's role as QA contractor was "widely known before Khurana filed this suit" (Spherion Opp. at 7-8); and 3) it is implausible, especially in light of the Comptroller's Audit Report, that no QA services were provided to the City.

---

[8] "The City does not take any position with respect to the remainder of Khurana's motion" City Opp. at 2 n. 1

The Court's decision on the SAC has already held that a factually false claim for services never provided or incorrectly described is not a mere breach of contract, but an "archetypal FCA claim."  Order at 35.  If no bona fide QA services were provided, an FCA claim is alleged.

Though Spherion's role as QA contractor may have been "widely known", its failure to provide QA services was not public (indeed Spherion still finds it implausible) until at least the September 28, 2010 Office of the Comptroller's Audit Report.

While Spherion claims that the Audit Report establishes that they did provide QA services, (Spherion Opp. at 11), the Audit's findings support Khurana's claim that, at least during his employment at Spherion, no bona fide QA services were provided.  According to the Audit:

- The last documented deliverable review provided to OPA by Spherion was dated July 3, 2001.  Affidavit of Mark J. Hyland ("Hyland Aff.") [ECF No. 23], Ex. 22 (Comptroller's Audit) at 7.

- OPA could not provide any contractually required quality assurance reports between July 2001 and May 2008, making it difficult to determine "to what extent the project was being monitored by Spherion."  *Id.* 14.

- Between July 2001 and May 2008, "there appears to be a significant lack of documentation regarding oversight of this project".  *Id.* Audit at 14.

- Spherion conducted only 1 of 28 "ongoing deliverable reviews" required by Amendment I of the QA contract.  *Id.*at 10.

- Spherion did not provide any of the four contracted for "phase reviews and certifications" for CityTime.  *Id.*at 11.

Though Spherion is correct that "Khurana himself alleges that he provided quality assurance services" (Spherion Opp. at 11), his most crucial work in which he reported that there were intentional failures in the software never went outside of Spherion.  Indeed, Mazer and Berger's interventions rendered any actual efforts at bona fide QA work completely ineffective.  TAC ¶37 (Berger "directed Relator not to mention his concerns to anyone at FISA".  TAC ¶37.  In fact,

10

Berger would tell the City that QA work was being done when it was not.  TAC ¶41 (Berger

emails City, FISA, that performance test was being implemented by Khurana, when in fact it was

not).  Khurana was removed from testing by Berger and relegated to marginal program writing

functions, while he was replaced with SAIC employee Jeff Boldia.  TAC ¶47.  Khurana, and

other Spherion employees were terminated when they attempted to provide the benefit of their

QA services to the City. *See* TAC ¶¶67, 71 (Khurana transferred and eventually terminated for

documenting system failures, informing FISA of poor CityTime performance); TAC ¶51 (Arthur

Donnelly terminated for informing OPA of poor CityTime performance); TAC ¶73 (Sanjay Arya

terminated after informing OPA of CityTime's poor performance).

      As alleged, Spherion's most important responsibility was "to perform all work and

services necessary and required to be performed, prepared, and/or furnished to help ensure the

timely and successful completion of the CityTime project.  Spherion shall advise OPA of

significant requirements that the Developer knows or reasonably should have known should be

addressed or included in Deliverables."  TAC ¶29 (quoting QA contract).  This responsibility

was completely disregarded.  Thus, Spherion's conduct in billing for QA time worked by its

employees, without providing the City the result of that QA work, constitutes a factually false

claim.

      **D.**      **Spherion's Arguments Do Not Defeat the Conflict of Interest Claims**

      Spherion claims that the TAC's new allegations about Spherion's express false

certifications are mere repetitions of those dismissed in the Court's Order.  Spherion Opp. at 12.

However, the fact that Spherion made the express certification multiple times, with each contract

amendment, after it had known that Mazer had a conflict of interest (TAC ¶65) is a new

allegation which was not addressed in the Court's order.  Under New York law, where "a party

warrants and represents a present existing fact, there simply is no reason why it should not have a remedy in contract for breach of the warranty and a remedy in tort for deliberate, fraudulent misrepresentation . . ." *Pfizer, Inc. v. Stryker Corp.*, No. 02 Civ. 8613 (LAK), 2003 WL 21660339, at *1 (S.D.N.Y. July 15, 2003) (citing cases).  Had Spherion only executed the initial contract, its representation and warranty that its employees had no conflict of interest would, as the Court ruled on the SAC, have been only a breach of a contractual promise.  Because, as alleged in the TAC, Spherion recertified its compliance with the Conflict of Interest provision with each contract amendment after it knew of Mazer's and Berger's conflicts (TAC ¶65) Spherion's conduct falls under the category of fraud.  *Harsco Corp. v. Segui*, 91 F.3d 337, 344 (2d Cir. 1996) (reviewing purchase agreement including "fourteen pages of representations, any of which, if fraudulent, can be the basis of a fraud action against the sellers.")

  **E.**  **The TAC Alleges Submission of False Claims with Sufficient Detail**

   The Court dismissed the SAC's false billing claims for failing to meet Rule 9(b)'s requirements of alleging the who, what, when, where, and how of Spherion submitted the alleged false claims stemming from the false billing scheme.  Order at 42.  Notably, the Court did not dismiss any of the other three theories of liability on this basis (vicarious liability, QA services, and conflict of interest claims).  Spherion requests that the Court deny the motion to amend with respect to the false billing claims on the same grounds, and although it is unclear, implies that Khurana's QA and conflict of interest claims suffer the same infirmity.  Spherion Opp. at 13.

   The TAC amends none of the allegations related to the false billing scheme and so there is no basis for denying the TAC's amendments on the basis of the false billing scheme allegations.  With respect to the QA and conflict of interest claims, the TAC satisfies Rule 9(b)'s requirements.  The QA and conflict of interest claims are not dependent upon the content of

individual requests for payment from Spherion to the City.  The fact that, from at least 2005, Spherion provided no bona fide QA services, and that its employees possessed disqualifying conflicts of interest, renders all of Spherion's CityTime's claims for payment from the date of the first 2005 contract amendment (in which Spherion recertified its lack of conflicted employees) fraudulent for FCA purposes.  The Comptroller's Audit's statement that the City paid Spherion in excess of $48.2 million for its work on CityTime suffices to establish the existence of Spherion's claims for payment.  Hyland Aff., Ex. 22 at 1.

Moreover, in the Criminal Complt., the government alleges that invoices were submitted by Spherion to the City for Mazer, beginning in 2004 and include a January 15, 2010 invoice for 150 hours worked by Mazer on CityTime between November 29, 2009 and December 26, 2009, at a rate of $210 per hour for a total of $31,500.  Criminal Complt. at 10.  A January 15, 2010 invoice for Scott Berger billed 146.5 hours at a rate of $178.50 per hour for a total of $26,150.25. *Id*.

Pleading specific submissions of individual false claims is important only when it is the content of the bill that renders the claim false.  *United States ex rel. Mastej v. Health Mgmt. Assocs.*, 591 Fed. App'x 693, 708 (11th Cir. 2014) ("[T]he billing code, or what was charged for that service are not the underlying fraudulent acts.").  In such an instance, alleging specific false claim submissions is not necessary: a "plaintiff must satisfy Rule 9(b) with respect to the circumstances of the fraud he alleges—but not as to matters that have no relevance to the fraudulent acts." *Id*. at 709; *see also Strom ex rel. United States v. Scios, Inc*., 676 F. Supp. 2d 884, 894 (N.D. Cal. 2009) ("[S]pecifics of the claims themselves are somewhat less important.

Instead, the case concerns the marketing activities of Defendants and whether they acted in reckless disregard of the truth.").[9]

### F.     Whether Khurana Is Authorized to Pursue Claims Under NYC FCA Does Not Affect Viability of TAC

Spherion claims that Khurana's NYC FCA claims fail because NYC's corporate counsel has not authorized this suit.  Importantly, New York City has not requested denial to amend the complaint on these grounds, despite moving to deny portions of the amendment on other grounds.

But even if Khurana does not have capacity to litigate this suit under the NYC FCA, § 7-804(b), (e), as Spherion asserts, Plaintiff clearly has standing to bring this suit through NYS FCA, under which neither State nor City approval is required.  N.Y. CLS St Fin § 190(2)(f).  The NYS FCA authorizes suit on behalf of local governments, including New York City.  *Id*. at § 190(2)(a) ("Any person may bring a qui tam civil action for a violation of section one hundred eighty-nine of this article on behalf of the person and the people of the state of New York or a local government.")

Because Khurana is authorized to bring suit on behalf of the City, he is authorized to allege claims for violation of NYC FCA.  Even if Khurana did not have standing to assert NYC FCA claims, his NYS FCA claims would survive, and the filing of the TAC would not be futile.

## III.    CONCLUSION

Plaintiff respectfully requests that the Court grant his motion to amend the Complaint.

---

[9] Spherion's reliance on *Wood ex rel. United States v. Applied Research Assocs., Inc.*, 328 F. App'x 744 (2d Cir. 2009), is misplaced.  An FCA case in which the plaintiff claimed fraud against a government contractor for not considering the possibility that the collapse of the World Trade Towers was caused by the government's use of "directed energy weapons" (*id*. at 749), it, in the understated words of *United States ex rel. Kester v. Novartis Pharmaceuticals Corporation*, 23 F. Supp. 3d 242, 256-57 (S.D.N.Y. 2014), "lacks precedential value".

Dated: February 13, 2017

**KIRBY McINERNEY LLP**

By: _____

David Kovel (dkovel@kmllp.com)
David Bishop (dbishop@kmllp.com)
825 Third Avenue, 16th Floor
New York, NY  10022
Tel: (212) 371-6600
Fax: (212) 751-2540

**JAMES, HOYER, NEWCOMER
AND SMILJANICH, P.A.**
Jillian Estes
One Urban Centre, Suite 550
4830 West Kennedy Blvd.
Tampa, FL  33609
Tel: (813) 397-2300
Fax: (813) 397-2310
