UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                                   :

NEW YORK ex rel. VINOD KHURANA, et al.,     :
                                                   :

                      Plaintiffs,                  :

                                                   :                   15-CV-6605 (JMF)

             -v-                         :

                                                     :       FINDINGS OF FACT AND

SPHERION CORP. (N/K/A SFN GROUP, INC.),     :       CONCLUSIONS OF LAW

                                                     :

                     Defendant.          :

                                                     :
----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       In about 1998, New York City (the "City") launched an ambitious project to create an

automated timekeeping system for all of its agencies called CityTime.  By any reasonable

standard, the project was a fiasco, taking many years longer and costing around ten times more

than initially projected.  In December 2010, one (though surely not the only) reason for these

problems became clear when several people who worked on the project through contractors hired

by the City were arrested and charged with participating in a kickback scheme.

       Spherion Corporation ("Spherion"), Defendant here, was one of the contractors hired by

the City in connection with the CityTime project.  Plaintiff Vinod Khurana worked on the project

from August 2004 until his termination in June 2007.  In 2011, after the kickback scheme came

to light, Khurana brought *qui tam* claims in New York State court under the New York False

Claims Act ("NYS FCA"), N.Y. State Fin. Law §§ 187, *et seq.*, and the New York City False

Claims Act ("NYC FCA"), N.Y.C. Admin. Code §§ 7-801, *et seq.*, as well as retaliation claims

pursuant to both statutes.  In 2015, after it was unsealed, the case was removed to this Court

based on the Court's diversity jurisdiction.  ECF No. 1.  In 2016, the Honorable John F. Keenan,

to whom the case was initially assigned, dismissed Khurana's *qui tam* claims.  *See New York ex*

*rel. Khurana v. Spherion Corp.*, No. 15-CV-6605 (JFK), 2016 WL 6652735 (S.D.N.Y. Nov. 10, 2016) ("*Khurana I*"). In November 2020, the Court held a bench trial on Khurana's remaining retaliation claims. With the parties' consent, the trial was conducted remotely because of the COVID-19 pandemic conditions. *See* ECF No. 239. Direct testimony was taken largely by affidavit.

For the reasons that follow, the Court finds, by a preponderance of the evidence, that Spherion did not retaliate against Khurana in violation of either the NYS FCA or NYC FCA. Khurana certainly raised his fair share of concerns about the beleaguered CityTime project when he was employed at Spherion, but it was only later — after the fraud came to light — that he tried to recast them in ways that would implicate the FCA statutes. At most, the evidence shows that Khurana engaged in only one instance of activity "protected" by the FCA statutes, and Khurana failed to prove that his termination was because of that activity. Moreover, Spherion proved that Khurana's termination was due to legitimate, non-retaliatory reasons. Accordingly, and for the reasons that follow, Spherion is entitled to judgment.

## FINDINGS OF FACT

Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court will begin with its findings of fact based on the testimony and exhibits at trial.[1] Before doing so, however, the Court addresses two preliminary matters that have significant bearing on the findings of fact: witness credibility and whether an adverse inference should be drawn based on the invocation by one witness of the Fifth Amendment privilege against self-incrimination.

---

[1] The Court ruled on most of the parties' objections to testimony and exhibits at trial. To the extent that the Court cites in this Opinion to any evidence to which a party objected, the objection is overruled. The Court need not and does not resolve the remaining objections.

## A. Preliminary Matters

### 1. Witness Credibility

The Court is prepared to, and does, credit most of the testimony given at trial, with one prominent exception: The Court declines to credit Khurana's testimony in the absence of independent corroborating evidence. The Court reaches that conclusion based on both Khurana's prior record and on his testimony at trial, including his demeanor. On the former front, the record reveals several instances in which Khurana exaggerated, or outright lied, about his role on the CityTime project. For instance, just days after being terminated from the project, Khurana wrote to Rekha Basu, his former supervisor, informing her that he planned to use her as a reference for an upcoming job interview and requesting that she — if asked by the interviewer about the reason for his departure from CityTime — lie and inform the interviewer that he had a three-year contract that had expired. PX-87, at 2.[2] Further, in a December 22, 2010 interview with the New York City Department of Investigation ("DOI"), Khurana claimed that in 2007, after he was terminated by Spherion and before he began his next job, he had "made a report" to DOI about the need to investigate CityTime. DX-38, at 6; *see* Tr. 451-55. But that claim was false. *See* Tr. 432-33.[3] Along similar lines, in November 2013, he told a recruiter (from Spherion — then doing business as Randstad Technologies — no less) that he had been called as

---

[2]     "PX-[Number]" refers to a Plaintiff's Exhibit; "DX-[Number]" refers to a Defendant's Exhibit; "Tr. [Number]" refers to a page or pages of the trial transcript; "[Name] Aff." refers to trial testimony submitted by affidavit; and "[Name] Dep." refers to a deposition admitted into evidence in part.

[3]     Making matters worse, on cross-examination, Khurana implicitly denied having made the claim about an earlier report to DOI, stating in reference to DOI's account of the interview that that they "may have misunderstood" and that he "would not lie to the DOI." Tr. 452. He was then impeached with his deposition testimony, in which he had admitted that DOI's account of the interview was accurate. *See* Tr. 453-54.

a witness at a six-week trial concerning CityTime earlier that year.  *See* DX-71.  That claim was

also false.  *See* Tr. 422.  Separate and apart from these incidents, during his employment at

Spherion, Khurana adopted the practice of emailing himself (at his personal email address) to

make a contemporaneous record of events he found problematic.  Tr. 290-91.  Conspicuously,

however, there is no such record of several critical incidents for which the only evidence offered

at trial was his testimony (in some instances, testimony that was contradicted by other

witnesses).  The lack of a contemporaneous record for these incidents is striking and casts doubt

on whether they happened as Khurana now claims or happened at all.

   Meanwhile, at trial, Khurana's testimony under oath was revealed to be exaggerated, if

not outright false, in several important respects.  To provide a few examples:

- On cross-examination, Khurana testified that, following his transfer to a new unit at
  Spherion in November 2006, he was not allowed to bill overtime.  *See* Tr. 376.  When
  confronted with the fact that in his own affidavit he had affirmed that he "was able to bill
  for overtime," Khurana Aff. ¶ 25, Khurana modified his testimony to state that, following
  his transfer, he was allowed to bill overtime for a few months, but not at all after
  February 2007, *see* Tr. 377-78.  This too proved to be false.  When confronted with pay
  records, Khurana admitted that he billed overtime until at least May 2007.  *See* Tr. 378-
  79.

- When asked on cross-examination about a record documenting his attempt to "friend"
  Michael Siller — the former inspector general of DOI and a trial witness — and other
  DOI employees on the social media platform LinkedIn, Khurana initially testified that it
  was sent "[b]y mistake possibly."  Tr. 476; *see also* DX-57.  When confronted with the
  fact that he had sought to friend multiple DOI personnel, Khurana conceded that it had
  been intentional and that he "just . . . liked to make connections with people in various
  professions" and "thought it would be nice to have somebody who was a detective, who
  was an attorney for the City of New York."  Tr. 476-77.

- Plaintiff's Exhibit 24, a chain of emails, included the following: "The whole thing was
  beginning to sound like a 'coverup' . . . and one reason why I sent this email to my
  personal [C]omcast email in case I would need it one day.  Today, it came in handy."
  PX-24, at 5; *see* Tr. 322-24.  On cross-examination and when questioned by the Court,
  Khurana unambiguously testified that he had written those words "to [him]self" in 2005.
  Tr. 324-26.  Later, however, he forced to admit that he had written those words in 2011,
  not 2005.  *See* Tr. 465-67.

- On cross-examination, Khurana denied having ever said, in reference to the CityTime project in 2007, that no one was more talented on the project than he. *See* Tr. 365. He was promptly impeached with his deposition testimony, in which he was asked if "anyone involved in this project was as talented" as he, to which he answered: "Not as talented as me." Tr. 365-66. He then testified: "OK. I do believe I was the most talented person on that team with the experience I had." Tr. 366.

- In his affidavit, Khurana wrote that, "in early May 2007, approximately one month before I was fired, I had lunch with Mss. Basu and Ella and told them that I thought the project was an exercise in 'waste' and 'abuse.'" Khurana Aff. ¶ 81. On cross-examination, however, Khurana admitted that he did not actually use the quoted words "waste" and "abuse" (or "fraud") — and indeed, never put those words in writing at all. Tr. 409-12.

Separate and apart from this pattern of untruths, key aspects of Khurana's testimony were expressly contradicted by the testimony of others — most notably, Howard Cohen, a former Spherion account executive, *see, e.g.*, Tr. 259-64, whose testimony the Court found credible.

In short, there are compelling reasons to doubt the veracity of Khurana's testimony and, absent corroboration by independent evidence, the Court generally declines to credit it.

### 2. Adverse Inference for Invocation of the Fifth Amendment

As discussed in further detail below, one of the central figures — perhaps the central figure — in the CityTime fraud was Mark Mazer. On April 28, 2014, following his conviction by a jury of various offenses relating to the fraud, Mazer was sentenced to twenty years' imprisonment. *See* Judgment, *United States v. Mazer*, No. 11-CR-121 (GBD), ECF No. 366 (S.D.N.Y. Apr. 19, 2014). Thereafter, the Second Circuit affirmed his conviction on direct appeal, *see United States v. Mazer*, 631 F. App'x 57 (2d Cir. 2015) (summary order), and, on January 23, 2017, the Supreme Court denied his petition for the writ of certiorari, *see Mazer v. United States*, 137 S. Ct. 827 (2017). Nearly two years later, on December 18, 2018, Khurana's counsel took Mazer's deposition at FCI Allenwood, where Mazer was detained. Mazer, who was not represented by counsel, refused to answer every substantive question posed to him, invoking the Fifth Amendment privilege against self-incrimination. Khurana argues that the

Court should draw an adverse inference against Spherion on the basis of Mazer's invocation. *See* ECF No. 202 ("Pl.'s Br."), at 88-93; ECF No. 205, at 29-39; *see also* ECF No. 249 ("Pl.'s Supp. Br."). The issue is significant because Mazer is also central to Khurana's claim; indeed, Khurana's principal theory is that Mazer, acting as an agent or employee of Spherion, retaliated against him to help conceal the fraud.

In a civil bench trial, the court may indeed, under some circumstances, draw an adverse inference from the refusal of a non-party witness to testify on Fifth Amendment grounds. *See, e.g.*, *LiButti v. United States*, 107 F.3d 110, 121-24 (2d Cir. 1997); *see also, e.g.*, *CF 135 Flat LLC v. Triadou SPV N.A.*, No. 15-CV-5345 (AJN), 2016 WL 5945912, at \*4 n.7 (S.D.N.Y. June 24, 2016) ("Courts also draw missing witness adverse inferences in connection with bench trials." (citing cases)). Before such an inference may be drawn, however, "it is necessary to determine whether there was a valid basis for the witness' invocation of the privilege." *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 633 (E.D. Va. 2006); *accord Prime Media Grp., LLC v. Acer Am. Corp.*, No. 12-CV-5020 (BLF), 2015 WL 527836, at \*4 (N.D. Cal. Feb. 6, 2015); *United States v. Sommerstedt*, No. 2:06-CV-273 (BES) (GWF), 2008 WL 11388580, at \*9 (D. Nev. July 31, 2008); *Lehtonen v. Gateway Cos.,* No. 2:04-CV-625 (KJD) (GWF), 2007 WL 9733695, at \*4 (D. Nev. May 7, 2007). This is necessary "to ensure" that the parties and the court "are not deprived of relevant evidence and to prevent the mischief and unfairness that might flow from an invalid invocation of the privilege." *Custer Battles*, 415 F. Supp. 2d at 633. "To avoid this unfairness," the burden is on the party who seeks an adverse inference to "demonstrate that [the witness's] privilege was validly asserted." *Id.*

Khurana fails to carry this burden with respect to Mazer's testimony. First and foremost, Mazer's assertion of the privilege was invalid because his conviction became final before he was

deposed.  As the Second Circuit has held, where a person has "been convicted and sentenced with respect to the crime of which he was asked to speak, he ha[s] no right to refuse to answer on the ground of self-incrimination."  *McCall v. Pataki*, 232 F.3d 321, 323 (2d Cir. 2000); *see Mitchell v. United States*, 526 U.S. 314, 326 (1999) ("[A]s a general rule, . . . where there can be no further incrimination, there is no basis for the assertion of the privilege.  We conclude that principle applies to cases in which the sentence has been fixed and the judgment of conviction has become final.").  Wisely, Khurana does not dispute that well-established proposition.  Instead, invoking the dual-sovereignty doctrine, he contends that Mazer's invocation was proper because he could still be prosecuted "by New York State for the same conduct upon which his federal conviction was based."  Pl.'s Supp. Br. 2-3 (citing, e.g., *Gamble v. United States*, 139 S. Ct. 1960, 1964 (2019)).  But that is incorrect.  With exceptions not relevant here, New York law prohibits the prosecution of a defendant "based upon the same act or criminal transaction" that formed the basis of an earlier federal prosecution.  N.Y. Crim. Proc. Law § 40.20(2); *see People v. Rivera*, 60 N.Y.2d 110, 114 (1983) (stating that the statute supersedes the dual-sovereignty doctrine, which would otherwise permit a state prosecution after a federal prosecution); *see also People v. Manafort*, 131 N.Y.S.3d 135, 135 (1st Dep't 2020) (affirming dismissal of an indictment where the defendant had been convicted of federal charges "involv[ing] the same fraud, against the same victims").  Thus, Mazer faced no prospect of prosecution for violations of state law.[4]

---

[4]     There is some authority for the proposition that where a sentenced defendant has filed a collateral attack on his conviction, as was the case for Mazer, he may have a valid privilege.  *See, e.g.*, *Sec. & Exch. Comm'n v. Pence*, 323 F.R.D. 179, 189 (S.D.N.Y. 2017).  But Khurana does not press that argument — even though the Court alerted him to it when ordering supplemental briefing on whether Mazer properly invoked the privilege, *see* Tr. 762 — and thus has forfeited it.  *See, e.g.*, *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132-33 (2d Cir. 2008) (per curiam).  In any event, the proposition is far from settled.  *See, e.g.*, *Wilson v. Doss*, 856 F. Supp.

Second, even if Mazer was not categorically precluded from invoking the Fifth Amendment by virtue of his conviction, his assertion of the privilege was plainly overbroad. It is well established that "blanket assertion[s]" of the Fifth Amendment privilege are impermissible. *United States v. Bowe*, 698 F.2d 560, 566 (2d Cir. 1983); *accord In re Gorsoan Ltd.*, 435 F. Supp. 3d 589, 606 (S.D.N.Y. 2020). Instead, where a witness asserts the privilege, a reviewing court must "undertake a particularized inquiry to determine whether the [Fifth Amendment] assertion was founded on a reasonable fear of prosecution as to each of the posed questions." *Id.* (internal quotation marks omitted) (quoting *Pence*, 323 F.R.D. at 188). Here, Mazer asserted the privilege in response to every substantive question that Khurana's lawyer posed to him, including questions that are important for this case — relating, for instance, to Mazer's role at Spherion and his relationship with Khurana — but were not likely to "elicit incriminatory answers." *Bowe*, 698 F.2d at 566. To the extent that Khurana asks the Court to draw an adverse inference based on Mazer's refusal to answer such questions — he is somewhat imprecise with respect to what inferences he believes the Court should draw — he fails to demonstrate that the assertion was proper.

Significantly, Khurana was not without recourse when Mazer improperly refused to answer any questions on the basis of the Fifth Amendment: "Clearly, he could and should have timely moved to compel [Mazer's] testimony" and thereby obtained a court order requiring

---

2d 1231, 1233 (M.D. Ala. 2012) ("That a successful habeas claim would have the same *effect* as a successful direct appeal in state court does not mean that [the witness's] pending habeas action amounts to a pending appeal [for purposes of the Fifth Amendment privilege]."); 1 MᶜCᴏʀᴍɪᴄᴋ ᴏɴ Eᴠɪᴅᴇɴᴄᴇ § 121 (Robert P. Mosteller et al. eds., 8th ed. 2020) ("Collateral attack is generally available at any time, so regarding the risk of retrial after a successful attack of this sort as preserving protection would dramatically expand the protection of the privilege."). In any event, as discussed below, to the extent Khurana wanted to press the point, it was incumbent upon him to do so by way of a motion to compel while discovery was ongoing, not to wait until trial.

Mazer to answer his questions. *Lehtonen*, 2007 WL 9733695, at *4; *see id.* at *2 (noting that "the proper procedure" is to make "a motion to compel the witnesses' testimony" before making "a motion for adverse inferences"); *Prime Media Grp.*, 2015 WL 527836, at *3 (observing the "the proper remedy" for an "improper invocation" of the Fifth Amendment is not an adverse inference, but rather "an order to compel responses . . . at the time of the deposition"). Khurana failed to take that relatively simple step. Instead, he made the fatal error of accepting Mazer's (uncounseled) assertion that his refusal to answer was properly grounded in the Constitution, even though the law is clear that a witness's "say-so" is not sufficient in itself and that "[i]t is for the court to say whether his silence is justified." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). It is immaterial whether Khurana did so based on an ignorance of the law or based on a strategic calculation that his chances of obtaining a valuable adverse inference were greater than his chances of compelling useful testimony. Either way, having accepted Mazer's own improper "say-so," he cannot now be heard to complain, let alone claim entitlement to an adverse inference. *See, e.g.*, *Prime Media Grp.*, 2015 WL 527836, at *3-5 (refusing to grant an adverse inference instruction where the party seeking it had failed to file a motion to compel the testimony of a witness who improperly invoked her privilege against self-incrimination).[5]

---

[5]      The Court does not mean to suggest that a motion to compel is a necessary prerequisite to obtaining an adverse inference in all cases. But insofar as the burden is on the party that seeks an adverse inference to demonstrate that the privilege assertion is valid, and there is a mechanism to challenge an improper assertion of the privilege during discovery, a party proceeds at its peril if it accepts a witness's "say-so" during discovery and does not avail itself of the opportunity to test the assertion through a motion to compel. If the trial court later determines that the assertion was improper, as the Court does here, the party seeking the inference is out of luck.

**B. Findings of Fact**

With that, the Court turns to its findings of fact.

**1. CityTime**

As noted, in approximately 1998, the City commenced a software development project, known as CityTime, to automate the City's payroll and timekeeping functions across all City agencies, boards, and commissions — encompassing about 180,000 City employees in total. *See* ECF No. 201-1 ("Joint Stip."), ¶ 6. The New York City Office of Payroll Administration ("OPA") — headed at the time by Joel Bondy — was the City agency responsible for overseeing the CityTime project. *Id.* ¶¶ 8-9. The City hired a web of contractors to build out the program. As of 2000, the primary contractor was Science Applications International Corporation ("SAIC"). *Id.* ¶¶ 13-14. SAIC subcontracted, in turn, with Technodyne LLC ("Technodyne") to provide staffing services on the project. *Id.* ¶ 19. Technodyne itself hired additional subcontractors — D.A. Solutions, Inc. ("DA Solutions") and Prime View, Inc. ("Prime View") — to help with additional staffing services. *Id.* ¶¶ 20-21. Finally, to the extent relevant here, in 2001, OPA itself hired Spherion (then known as Spherion Atlantic Enterprises, LLC), a technology recruiting and staffing company, as a contractor to provide, among other things, quality assurance services for the CityTime project. *Id.* ¶¶ 3-4, 22; Cohen Aff. ¶ 7. Spherion was also responsible for hiring, staffing, and paying various consultants, known as "Subject Matter Experts" ("SMEs"), for the project. Joint Stip. ¶¶ 23-24; Tr. 95.

By any reasonable measure, the CityTime project was a fiasco. Although the project was initially slated to be completed by June 2010 and to serve a total of eighty-one City agencies and 180,000 City employees, only fifty-eight agencies and approximately 58,000 City employees were using the system by that date. DX-36, at 1. And although the project was initially

projected to cost the City approximately $63 million, as of September 2010, when the City

Comptroller issued an audit of the project, it had already cost the City $628 million.  *Id.*

Notably, CityTime's problems were no secret.  Indeed, the project's poor progression, and a

steady supply of technical problems with the application itself during its development, were

openly recognized and discussed by representatives from OPA and the contractors during OPA

Steering Committee Meetings.  Cohen Aff. ¶¶ 55-58; Tr. 229.  In fact, as early as 2003, the City

contemplated scrapping the project altogether.  Roach Aff. ¶ 16.

   **2. The Kickback Scheme and Federal Prosecution**

      As it turns out, CityTime's problems were not limited to standard delays and cost

overruns; the project was also plagued by fraud.  In or about 2003, Gerard Denault, the project

manager at SAIC, and Carl Bell, chief systems engineer at SAIC, recommended that SAIC

award a no-bid preferred vendor contract to Technodyne to provide staffing for the CityTime

project.  PX-62 ¶ 12; Bell Aff. ¶ 28.  In return, Technodyne and its owners agreed to pay

kickbacks to Denault and Bell; specifically, they agreed to pay Denault and Bell five dollars each

for every hour worked by every consultant hired for the CityTime project by or through

Technodyne.  PX-62 ¶ 13; Bell Aff. ¶ 28; Joint Stip. ¶ 19.  The kickback scheme grew in 2005,

when Mazer became involved.  In particular, Mazer and Denault arranged for Technodyne to

hire DA Solutions and Prime View as additional subcontractors.  PX-62 ¶ 14.  In return, the

owner of DA Solutions (who was also Mazer's uncle) and the owner of Prime View agreed to

pay kickbacks to Mazer, including at one point eighty percent or more of Prime View's profits

on the CityTime project.  PX-62 ¶ 14.  Technodyne also agreed to pay Denault an additional two

dollars for every hour billed by DA Solutions and Prime View.  PX-62 ¶ 15.  The scheme was

significantly advanced in 2006 when SAIC amended its contract with the City to change from a

"fixed price" structure, whereby SAIC would pay for cost overruns, to a "fixed price level of effort" structure, whereby the City would be responsible for cost overruns.  PX-62 ¶¶ 16-17; Bell Aff. ¶ 37; DX-36, at 13.

As early as 2005, the City began receiving complaints regarding the CityTime project, and DOI launched several investigations.  Siller Aff. ¶ 5.  As part of those investigations, DOI interviewed more than ninety witnesses and issued more than 200 subpoenas.  *Id.*  In late November 2010, DOI referred the CityTime project to the United States Attorney's Office for the Southern District of New York (the "USAO"), and the two offices conducted a joint investigation of the project.  *Id.* ¶ 6.  In December 2010, the USAO unsealed a criminal complaint charging Mazer, Scott Berger (another Spherion SME), and others with conspiring to commit wire fraud and money laundering in connection with the CityTime project.  Joint Stip. ¶ 44; Siller Aff. ¶ 8; PX-61.  Shortly thereafter, Bondy was suspended without pay; he then resigned.  Joint Stip. ¶¶ 9, 45.  On June 17, 2011, the USAO filed a Superseding Indictment adding charges against Denault, Technodyne, and others.  Joint Stip. ¶ 46; PX-62.[6]  To the extent relevant here, the Superseding Indictment charged Mazer and Denault with causing Technodyne to steer work to DA Solutions and Prime View in return for kickbacks.  Joint Stip. ¶ 48. Spherion was not charged.

In total, three people — including Mazer and Denault — were convicted by a jury after trial.  Joint Stip. ¶¶ 49-50; Siller Aff. ¶ 3.  Five others pleaded guilty to charges relating to the fraud, including Bell, who pleaded guilty pursuant to a cooperation agreement and testified at the trial.  Siller Aff. ¶ 3; Bell Aff. ¶¶ 9-10.  Mazer was convicted of wire fraud, bribery, conspiracy to violate the Travel Act, and money laundering conspiracy.  Joint Stip. ¶ 50.  He was eventually

---

[6]     Berger died before the grand jury returned the Superseding Indictment.  Joint Stip. ¶ 47.

sentenced to twenty years' imprisonment.  Joint Stip. ¶ 51; PX-68, at 1-3.  SAIC, for its part,

entered into a deferred prosecution agreement with the government on March 8, 2012, pursuant

to which the company agreed to forfeit roughly $500 million in payments that it had received in

connection with the CityTime project and to set up a compliance program and independent

monitor.  Joint Stip. ¶ 52; PX-63 ¶¶ 14-15.  All told, the CityTime kickback scheme appears to

have cost the City hundreds of millions of dollars.  PX-62 ¶¶ 1, 10.

   **3.  Khurana's Work on CityTime**

   As noted, Spherion was hired by OPA to provide quality assurance services for the

CityTime project.  In 2004, Spherion hired Khurana as an SME to do performance testing for the

project.  Joint Stip. ¶¶ 23, 31.  Khurana is a Canadian citizen and was authorized to work in the

United States.  *Id*. ¶¶ 1-2.  He began working for Spherion on August 2, 2004, and was paid

throughout his approximately three years on the contract as an hourly consultant.  *Id*. ¶¶ 5, 23,

31; Cohen Aff. ¶ 51.  Upon joining the CityTime project, Khurana's first assignment was with

the automation testing group.  Joint Stip. ¶ 34; Khurana Aff. ¶ 14.

   From the start, Khurana was not shy about sharing his opinions when it came to areas that

he thought needed improvement.  A few weeks into the job, on August 25, 2004, Khurana was

asked to opine on Bell's preferred software tool, called Empirix; Khurana dismissed it as a waste

of money and poorly suited for the CityTime project.  PX-3, at 1; Rizzi Aff. ¶ 27.  Additionally,

during his initial months of employment on the project, Khurana wrote a report explaining why

CityTime would benefit from load performance testing in addition to automation testing.

Khurana Aff. ¶ 15; PX-71.

   In November 2004, Khurana was reassigned to be a load performance tester, work he did

alone until April 2005.  Khurana Aff. ¶¶ 17-18; Joint Stip. ¶ 34.  As a load performance tester

doing quality assurance work, Khurana was tasked with finding performance problems in the CityTime application; his responsibilities included gathering and writing scripts, executing the scripts, analyzing the results, and presenting them.  Cohen Aff. ¶¶ 41, 43-44; Roach Aff. ¶ 28; Khurana Aff. ¶ 44.  Despite Khurana's reassignment to be a load performance tester, he continued to refer to himself as an "automation specialist" in his email signature, in his LinkedIn profile, and on his resume; he did so throughout his time on the CityTime project.  Tr. 310-11.

Khurana remained in the load performance testing group until January 2007.  Khurana Aff. ¶ 19.  During his time as a load performance tester, his supervisor was Berger.  Joint Stip. ¶ 36; Khurana Aff. ¶ 20.  Around this time, automation testing — which was Khurana's initial assignment — was reassigned altogether from Spherion to SAIC.  Khurana Aff. ¶ 16.

In November 2004, Khurana conducted a "smoke test," a type of load performance test, which the CityTime application failed.  *Id.* ¶¶ 26, 30.  Andres Rios, a Technodyne consultant, was later instructed by Denault, Mazer, and Bell to change the results to show compliance.  Rios Aff. ¶ 23.

In April 2005, most of Khurana's load performance testing responsibilities were reassigned to Jeff Boldia, an SAIC employee.  Khurana Aff. ¶¶ 19, 44; Joint Stip. ¶ 15.  Shortly after Boldia joined as a load performance tester, Khurana's access to load performance testing software and results were restricted.  Khurana Aff. ¶ 43; Bell Aff. ¶ 56.  Bell testified that this was done because Khurana was suspected to have been sharing data with the City's Financial Information Services Agency ("FISA").  Bell Aff. ¶ 56.

In July 2005, Khurana reported CityTime's poor performance in the form of an email, informing — among others — Mazer and Berger that the application could run up to only seventy-five concurrent users.  DX-72; Khurana Aff. ¶ 52.  This finding was disputed by Mazer,

who believed that the application could support 150 users.  PX-19, at 1; Khurana Aff. ¶ 52.  In response to Khurana's email, Bill Mahoney — from SAIC — explained that the test was not "sanctioned"; he warned Khurana that he did "not want to see anything published unless it" came from either Boldia or Mahoney.  DX-72.

Around September 2005, Khurana — suspicious of misconduct in the CityTime project — began forwarding to his personal email address all emails he received that he believed documented or evidenced misconduct.  Tr. 290-91.

In October or November 2006, Berger tasked Khurana with training two new load performance testers: Prashant Sundaram, a DA Solutions employee, and Abu Hasan, a Prime View employee.  Khurana Aff. ¶ 65.  Khurana believed that Sundaram was not competent to be a performance tester.  *Id.* ¶ 66.  He further suspected Hasan to be improperly billing time by taking care of personal tasks during billed hours.  *Id.*

In November 2006, Sarah Gurjal, a senior project manager for the CityTime project at the OPA, Joint Stip. ¶ 10, and Bondy approved a decision to terminate Khurana, DX-19, at 1.  In explaining this decision, Cohen described in an email a "history of difficulties [with Khurana], including a lack of political sensitivity," and most recently an "incident" in which Khurana had been "critical of other team members."  *Id.*  There is some ambiguity as to who made the decision to terminate Khurana in November 2006.  Although Cohen communicated with Khurana about his employment, Khurana Aff. ¶ 70; *see also* PX-40, at 1; PX-44, it is clear that Cohen himself was merely a coordinator and not the ultimate decisionmaker regarding such staffing decisions.  Instead, the Court is prepared to find, and does find, that the decision to terminate Khurana was made by some combination of OPA (including Bondy and Gurjal) and Mazer.

In a November 26, 2006 email, Cohen stated that he had "been informed by Mark Mazer that OPA wants to replace" Khurana.  PX-40, at 2.  In the same email, he stated that the decision to replace Khurana was "approved" by Bondy and Gurjal from OPA, *id.*, though this approval was conveyed to Cohen secondhand by Mazer, Tr. 200.  Cohen testified that while he had no independent recollection of the decisions in Khurana's case, normally he would get the approval of Bondy and Gurjal in making staffing decisions, Tr. 196, as they were the "ultimate decision-makers on personnel issues related to SMEs," Cohen Aff. ¶ 90; *see also* PX-28 (email from Gurjal to Bondy with subject line "Approval of Personnel Actions").  But because of Mazer's relationship with Bondy and role on the project, Cohen also viewed Mazer as his client — even though he was being paid by Spherion.  Tr. 199.

Khurana was not removed in November 2006 after all.  Instead, after the decision to remove Khurana was approved, Cohen sought to give Khurana a "second chance" to avoid having to recruit a new SME from scratch and to protect Khurana's recruiter, whose revenue was tied to Khurana's continuing employment.  Tr. 198; Cohen Aff. ¶ 98.  Cohen obtained approval to reassign Khurana to the automation testing team instead of terminating him.  Cohen Aff. ¶ 99; PX-43.  Still, Mazer asked Cohen to have "a very direct conversation with [Khurana] about having the right attitude and being a team player."  DX-22.

Khurana started working for the automation testing group in January 2007.  Khurana Aff. ¶ 72; Joint Stip. ¶ 39.  Khurana was replaced on the load performance team by Sanjay Arya, another Spherion employee.  Khurana Aff. ¶ 22; Arya Aff. ¶ 11.  In his new role, Khurana's supervisor was Mahesh Sharma, a Spherion consultant, Joint Stip. ¶ 33, and the team lead was Basu, who worked for DA Solutions, *id.* ¶¶ 41-42.  Shortly thereafter, Khurana reported to Sharma, Basu, and a number of others that he had encountered a significant functional testing

problem while writing automation testing scripts.  Khurana Aff. ¶ 82; Arya Aff. ¶ 23; PX-52.  In response, Constantin Stanca — from SAIC — explained that there was "a reason" for this apparent failure, an explanation that Khurana agreed would "make[] life simpler."  PX-52; *see also* Tr. 361 (Khurana conceding that "[t]here could have been requirements that" he was "unaware of").

Finally, on June 22, 2007, Spherion terminated Khurana's employment.  Joint Stip. ¶ 43; Khurana Aff. ¶ 84; Tr. 60.[7]  Again, there is ambiguity as to who made the actual decision to terminate Khurana.  Cohen testified that the decision was made by OPA, and specifically approved by Gurjal and Bondy.  Cohen Aff. ¶¶ 107, 113.  Again, however, the Court is prepared to find that some combination of OPA (including Bondy and Gurjal) and Mazer were involved in the decision to finally terminate Khurana.  In an email written the day before Khurana's termination, Cohen wrote that "OPA has stated [that] they no longer require [Khurana's] services," also citing — "as per Mark Mazer" — attendance and personality issues.  DX-31.

### 4.  Spherion's Concerns About Khurana

The record reflects that Khurana's supervisors at Spherion harbored several concerns about him during his tenure with the company.

*First*, on several occasions in and before 2006, Khurana failed to submit his time sheets in a prompt manner.  Spherion consultants like Khurana were expected to submit time sheets every Monday morning.  Stack Aff. ¶ 7.  Failing to submit time sheets in a timely manner caused

---

[7]    At times, Spherion has suggested that Khurana was not "terminated" on June 22, 2007, because he remained eligible to receive other work assignments.  ECF No. 200 ("Def.'s Br."), at 30-31; Stack. Aff. ¶ 31.  Although there may be some technical truth to that claim, the Court has no trouble finding that he was terminated as an effective matter.  Indeed, elsewhere in Spherion's briefing and at trial, it did not seriously contest that he was fired on that date.  At a minimum, there is no dispute that Khurana was terminated from the CityTime project.

problems as the time sheets were necessary for Spherion to submit invoices to, and get paid by, the City. *Id.* ¶ 11.  In July 2006, Khurana failed to submit three weeks' worth of time sheets and was not responsive to requests from Paula Stack — Spherion's financial administrator — to remedy the issue, resulting in Stack's decision to stop paying Khurana until he submitted his time sheets. *Id.* ¶¶ 19-20.  But while Khurana was a repeat offender when it came to submitting times sheets late, Tr. 706, he was not alone; in one email from Stack to what appears to be the full CityTime team, she criticizes by name six consultants who failed to submit status reports, not including Khurana, PX-49.  Nor is there any evidence in the record that Khurana submitted late time sheets after July 2006.  Tr. 694-95.

*Second*, after Khurana was reassigned to the automation testing team in 2007, he arrived late to work on several occasions.  Khurana Aff. ¶ 79; Cohen Aff. ¶ 105.  Sharma reminded Khurana by email on January 27, 2007, of the automation group's working hours, and instructed Khurana to notify Basu — the automation group team lead — about planned late arrivals. Khurana Aff. ¶ 78.  On May 31, 2007, Sharma sent another email to Khurana complaining that he had arrived late in the prior weeks. *Id.* ¶ 83.  In his testimony, Khurana claimed that his late arrivals were a consequence of a directive from Berger to the Spherion automation testing group not to bill overtime. *Id.* ¶¶ 74, 79.  According to Khurana, because he would work late, he would come in late the following day so as to count the previous day's hours in the following day's billing. *Id.*

*Third*, on multiple occasions, Khurana criticized other team members because he thought that they were less qualified than he.  Indeed, Khurana testified that he believed that he was the most talented person working on the CityTime project.  Tr. 366.  He further believed that the CityTime personnel who initially interviewed him in 2004 — including Sharma — were not

sufficiently qualified to interview automation professionals like himself.  Tr. 297, 300.  During

an interview with DOI in February 2011, Khurana stated that he did not believe that Bell was

"qualified enough to develop a framework to produce deliverables."  DX-55, at 3; Tr. 470.  In

the same interview, he said that other consultants were also unqualified.  DX-55, at 3.  He also

did not believe that Sharma was qualified enough to "grasp" load testing.  DX-40, at 2; Tr. 456.

And he testified that he believed that Sundaram was "incompetent," an opinion he shared with

others.  Khurana Aff. ¶¶ 66-68; *see also* Tr. 517; DX-55, at 3.  In a November 2006 email,

Cohen cited a recent "incident" involving Khurana "being critical of other team members" as a

reason for the first decision to terminate him.  PX-40, at 2.  Shortly after his reassignment in

2007, however, Khurana made one of his team members cry after criticizing the coding

framework that she had designed.  Tr. 363-64.  In a June 2007 email, Cohen also cited "issues"

with Khurana's "ability to work with others" as a reason for his final termination.  DX-31.

*Fourth*, Khurana's managers complained that he did not respect the proper chain of

command and inappropriately communicated directly with City personnel about CityTime

performance-related issues.  There was a complex dynamic between the CityTime contractors

and their "clients," City agencies.  Roach Aff. ¶ 32.  Indeed, Bell testified that it was "a gross

understatement" to say that there "was often political tension between the different" City

agencies at the time.  Tr. 527.  Consultants were thus expected to be "savvy" in their

communications.  Roach Aff. ¶ 32.  In particular, Spherion considered it important that its

employees use discretion when communicating with FISA, one of the agencies slated to be an

end-user of the CityTime application.  *Id.* ¶¶ 29-32.  As a consultant, Khurana was expected to

communicate his findings regarding the CityTime application's performance through his

superiors before speaking directly to agencies such as FISA.  *Id.* ¶¶ 30, 32.  By his own

admission, however, Khurana frequently reported CityTime's poor performance to FISA and OPA employees directly.  Khurana Aff. ¶¶ 48, 54.

In particular, he would communicate with Susan Rizzi (who was known as Susan Amodeo at the time), a FISA official who worked on the CityTime project until 2005 and one of the few people involved in the project whom Khurana trusted.  Khurana Aff. ¶¶ 55, 57; Rizzi Aff. ¶¶ 1-2, 27-30; Joint Stip. ¶ 12; Tr. 371.  Several people involved in the CityTime project objected to Khurana's communications.  Around May 2005, Sherif Sirageldin — a SAIC project manager — instructed Khurana not to share information about the load test results with FISA personnel.  Khurana Aff. ¶ 47.  That same month, Sirageldin complained to Berger that Khurana "provides information to [the] client," which "typically lead[s] no[]where good," adding that while Khurana had defended his "dissemination as being honest," Sirageldin believed the information to be incomplete.  DX-4, at 1.  In the same email, Sirageldin complained that Khurana prematurely identified features as defects and recommended that Khurana's direct interaction with City agencies be limited.  *Id.* at 2.  Soon thereafter, Berger similarly instructed Khurana that unauthorized communications between Khurana and FISA would not be tolerated. Khurana Aff. ¶ 47.  On November 27, 2006, Cohen wrote that he had had "numerous conversations" with Khurana about his not being "sensitive to the politics" and "not ruffling feathers."  DX-20, at 1; Tr. 179-83.  Indeed, Khurana's "lack of political sensitivity" was cited by Cohen as one reason for OPA's aborted November 2006 decision to terminate Khurana's contract.  DX-19.

## 5.  Events After Khurana's Termination

Three days after being terminated, on June 25, 2007, Khurana wrote an email to Basu, his supervisor, in which he stated that he "d[id] not take . . . personally what happened" and that,

"[t]o a large degree," he was "glad" that he had been terminated because "Wall Street is where

[he] belong[ed]."  PX-87, at 3; *see also* Tr. 413-15.  Less than two months later, in August 2007,

he began a job at Morgan Stanley.  Tr. 415; Khurana Aff. ¶ 128.

There is no evidence that Khurana took steps to report any alleged wrongdoing associated

with the CityTime project for more than nineteen months after his departure from Spherion.  *See*

Tr. 432-33.  On January 31, 2009, however, he anonymously posted a report on the CNN iReport

website that there was "[w]aste" and "abuse" at the CityTime project; that the project was a

"total waste" that would fail to accomplish its goal; and that Mazer, Berger, and Bondy were

seeking to enrich themselves at taxpayer expense.  PX-58, at 1-2; *see* Tr. 433.  The next day,

Khurana filed a similar complaint via a DOI online form and encouraged DOI to open an

investigation into CityTime.  DX-34, at 1.  In response to the complaint, DOI emailed Khurana

on March 11, 2009.  DX-35, at 4-5.  But Khurana did not respond to the email; indeed, he did not

communicate with DOI again for another twenty-one months.  *Id.*; Tr. 442-43.

Following the arrests of Mazer, Berger, and other CityTime employees in December

2010, *see* Siller Aff. ¶ 8; Joint Stip. ¶ 44, Khurana once again reached out to DOI on December

22, 2010, Tr. 444-45; DX-38, at 1.  At his request, DOI personnel interviewed him the same day.

Tr. 445; Siller Aff. ¶ 27; DX-38, at 1.  In that interview, Khurana repeated his observation that

the CityTime project had been substantially underperforming during his time on the project and

that he had reported his concerns to others, including Mazer and Berger.  DX-38.  Khurana also

reported to DOI that Berger had instructed him not to inform others of his test results.  *Id.*

Between January 9 and 13, 2011, Khurana sent a series of emails to DOI further

describing his work on the CityTime project.  DX-40 to -47.  In these emails, Khurana detailed

some of CityTime's performance failures and alleged both "timesheet abuse," DX-42, at 1, and

that certain SAIC employees had fraudulently billed time to the project, DX-44.  Notably, however, Khurana stated that he "d[id] not believe anyone from Spherion was involved in this scheme."  *Id.*  In another email, Khurana stated that in his "last conversation" with Cohen before his termination, he had advised that he planned to sue the City over his termination.  DX-43.

Thereafter, Khurana retained counsel and, with that counsel, sat for another interview with DOI on February 22, 2011.  Tr. 468-69; DX-52; DX-55.  In that interview, Khurana stated that "waste, fraud, and abuse" had occurred on the CityTime project in the form of data misrepresentation and improper billing.  DX-55, at 1.  On March 31, 2011, Khurana filed this lawsuit under seal in New York State court.  ECF No. 1-1; ECF No. 1, ¶ 1.  Later, in June 2011, Khurana tried to add three DOI officials to his LinkedIn network.  DX-57; Tr. 476-77.

Between January and November 2014, Khurana sent messages to Cohen via LinkedIn's private messaging service.  DX-60 to -62; *see also* Cohen Aff. ¶¶ 114-17.  Khurana invited Cohen to join the "class action" lawsuit his counsel had filed, DX-62, and promised him fifteen percent of the net amount that they recovered, DX-61.  Cohen was not interested and blocked Khurana's phone number.  Cohen Aff. ¶ 117.

## CONCLUSIONS OF LAW

The Court previously dismissed Khurana's *qui tam* claims under the NYS FCA and NYC FCA.  *See Khurana I*, 2016 WL 6652735.  But that does not doom his retaliation claims under these laws.  *See, e.g.*, *Hayes v. Dep't of Educ.*, 20 F. Supp. 3d 438, 443 (S.D.N.Y. 2014) (observing that the plaintiff's FCA retaliation claim could proceed "irrespective of the fate of [his] FCA *qui tam* claim"); *see also Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 416 & n.1 (2005) (noting that "a well-pleaded retaliation complaint need not allege that the defendant submitted a false claim" and that many courts have

"properly recognized that proving a violation of [the false claims statute] is not an element of a [retaliation] cause of action").[8]  To prevail on his retaliation claims under the NYS FCA and NYC FCA, however, Khurana must prove, by a preponderance of the evidence, three elements: (1) that he engaged in activity protected by the statutes; (2) that Spherion knew of that activity; and (3) that Spherion retaliated against him because of that conduct.  *Khurana II*, 2020 WL 918740, at \*2; *see also United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017); *Landfield v. Tamares Real Estate Holdings, Inc.*, 976 N.Y.S.2d 381, 382 (1st Dep't 2013).

For the reasons that follow, the Court concludes that Khurana has failed to prove these elements.  At most, he identifies one instance that could even remotely qualify as "protected activity," and he fails to prove that it was the reason for any adverse employment action.

## A.  Protected Activity

To satisfy the first element, a plaintiff must prove that he engaged in conduct that is protected by the FCA statutes.  "Protected conduct under the NYS FCA is interpreted broadly and encompasses two kinds of conduct: (1) lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under the FCA, and (2) other efforts to stop one

---

[8]     Although Khurana's claims are brought solely under state and city law, "courts regularly look to federal law when interpreting the NYS FCA and NYC FCA" because those statutes were modeled on the federal False Claims Act.  *Khurana I*, 2016 WL 6652735, at \*8; *see also New York ex rel. Khurana v. Spherion Corp.*, No. 15-CV-6605 (JMF), 2020 WL 918740, at \*2 n.2 (S.D.N.Y. Feb. 26, 2020) ("*Khurana II*"); *accord United States ex rel. Assocs. Against Outlier Fraud v. Huron Consulting Grp., Inc.*, 929 F. Supp. 2d 245, 256 (S.D.N.Y. 2013) ("[T]he New York False Claims Act . . . is nearly identical to the [federal False Claims Act] in all material respects."), *aff'd sub nom. Assocs. Against Outlier Fraud v. Huron Consulting Grp., Inc.*, 567 F. App'x 44 (2d Cir. 2014) (summary order); *State ex rel. Willcox v. Credit Suisse Sec. (USA) LLC*, 36 N.Y.S.3d 89, 90 n.2 (1st Dep't 2016) ("The New York False Claims Act follows the federal False Claims Act and therefore it is appropriate to look toward federal law when interpreting the New York act." (internal quotation marks and alterations omitted)).

or more violations of the FCA." *Khurana I*, 2016 WL 6652735, at *17 (internal quotation marks and alterations omitted).[9]  Although the types of activity protected are broad, "the employee's purpose must not be detached from the [FCA] in order for the employee to receive the FCA's whistle blower protections." *Garcia v. Aspira of N.Y., Inc*., No. 07-CV-5600 (PKC), 2011 WL 1458155, at *4 (S.D.N.Y. Apr. 13, 2011) (internal quotation marks omitted).  Thus, "[e]ven under the broadest reading of the 'in furtherance of an FCA action,' an employee's activities that are not related to exposing or deterring fraud[] are not whistle blowing as envisioned in the paradigm *qui tam* FCA action." *Id.* (internal quotation marks omitted).  By contrast, an employee can show efforts to stop one or more violations of the FCA "even if the employee's actions were not necessarily in furtherance of an FCA claim." *Swanson v. Battery Park City Auth*., No. 15-CV-6938 (JPO), 2016 WL 3198309, at *3 (S.D.N.Y. June 8, 2016) (internal quotation marks omitted).

"Courts have generally concluded that conduct in furtherance of an action under the FCA will be interpreted as conduct that was calculated to, or reasonably could lead to a viable FCA action." *Khurana I*, 2016 WL 6652735, at *17 (internal quotation marks, alterations, and emphasis omitted).  To be clear, "[i]t is not 'necessary for [the employee] to "know" that the investigation he was pursuing could lead to a False Claims Act suit.'"  *Swanson*, 2016 WL

---

[9]     Through amendments that became effective on August 27, 2010, the NYS FCA's retaliation provisions were expanded to include the second category of protected conduct; as with other 2010 amendments to the NYS FCA, this amendment applies retroactively to Khurana's claims.  *Id.* at *17 n.4.  By contrast, the retaliation provision of the NYC FCA protects only employees who are retaliated against "because of lawful acts of [the] employee in furtherance of a civil enforcement action brought under [the NYC FCA], including the investigation, initiation, testimony, or assistance in connection with, a civil enforcement action commenced or to be commenced under [the NYC FCA]."  N.Y.C. Admin. Code § 7-805(a)(3).  By its terms, the NYC FCA — unlike the NYS FCA — does not extend to the second category of protected activity.  *See Khurana I*, 2016 WL 6652735, at *18.

3198309, at *3 (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 741 (D.C. Cir. 1998)).  At the same time, "a plaintiff 'is required to show a "good faith basis," or "objectively reasonable basis," for believing that he or she was investigating matters in support of a viable FCA case.'"  *Id.* (quoting *United States ex rel. Sasaki v. N.Y. Univ. Med. Ctr.*, No. 05-CV-6163 (LMM) (MBP), 2012 WL 220219, at *12 (S.D.N.Y. Jan. 25, 2012), *aff'd sub nom. ABC v. NYU Hosps. Ctr.*, 629 F. App'x 46 (2d Cir. 2015) (summary order)).  Thus, the test has both a subjective and an objective component.  Specifically, to prove that he engaged in a "protected activity," an FCA plaintiff must show that "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government."  *Ortiz v. Todres & Co.*, No. 15-CV-1506 (LGS), 2019 WL 1207856, at *4 (S.D.N.Y. Mar. 14, 2019) (quoting *Lawrence v. Int'l Bus. Mach. Corp.*, No. 12-CV-8433 (DLC), 2017 WL 3278917, at *6 (S.D.N.Y. Aug. 1, 2017)); *see also Koshy v. Regeneron Pharm., Inc.*, No. 17-CV-7781 (VB), 2019 WL 6895563, at *6 (S.D.N.Y. Dec. 18, 2019).

There is little or no evidence that Khurana engaged in anything that would qualify as a protected activity while employed on the CityTime project.  Notably, although Khurana began documenting "whatever misconduct" he saw in September 2005, he could not identify a single document from his time on the project in which he used the words "fraud," "waste," "abuse," "false claims," "false billing," "bribery," or the like.  Tr. 290-93, 357-58.  Nor, despite his efforts to create a contemporaneous record, did he document the conversations that he now points to as evidence of fraud and impropriety or, more to the point, as evidence that he reported them to Cohen and others.  Tr. 352-53.  On top of that, Cohen testified credibly that Khurana never reported to him any knowledge of fraud within the CityTime project, false claims to the City,

kickbacks, or the like.  Cohen Aff. ¶ 72; Tr. 259-65, 278.  Indeed, Cohen testified that he first learned about the kickback scheme when Mazer and others were arrested in 2010.  Cohen Aff. ¶ 73.  Along similar lines, Tom Roach, then the area managing director for Spherion, testified that he did not recall Khurana ever informing him that there was fraud or anything improper going on at the CityTime project and never heard indirectly that Khurana had reported anything of the sort.  Roach Aff. ¶¶ 2, 38-39; Tr. 83-85.  Even Rizzi — whom Khurana called as a witness at trial and to whom Khurana said he confided while working on the project, Khurana Aff. ¶¶ 33, 35-37 — testified that she has no recollection of Khurana telling her at the time about any misconduct or impropriety and that, had he done so, she would have reported it to her supervisor. Tr. 575-77.  Strikingly, Rizzi acknowledged that a few years after Khurana's departure from Spherion, she did not even remember who he was.  Tr. 571-73.

To be sure, while working at Spherion, Khurana did raise various concerns about technical aspects of the CityTime program and test results.  *See, e.g.*, Khurana Aff. ¶¶ 26, 30-31, 52, 82; PX-52; DX-72; *see also New York ex rel. Khurana v. Spherion Corp.*, No. 15-CV-6605 (JFK), 2017 WL 1437204, at *5 (S.D.N.Y. Apr. 21, 2017) (finding, based on the pleadings, that Khurana's "disclosures to FISA related only to load test results and CityTime's performance" and not to fraudulent schemes).  But he was not alone in doing so; indeed, CityTime's problems were widely known and discussed.  *See, e.g.*, Cohen Aff. ¶¶ 55-58; Tr. 229.  And even more significant, identifying such problems was the essence of Khurana's job as a load tester and quality assurance employee and thus, as a matter of law, such reports did not qualify as "protected activity" within the meaning of the NYS or NYC FCA.  *See, e.g.*, *Faldetta v. Lockheed Martin Corp.*, No. 98-CV-2614 (RCC), 2000 WL 1682759, at *12 (S.D.N.Y. Nov. 9, 2000) (noting that where a plaintiff "engaged in conduct that ordinarily falls within the context

of his job responsibilities," it does not qualify as "protected activity"); *accord Landfield v. Tamares Real Estate Holdings, Inc*., 976 N.Y.S.2d 381, 382 (1st Dep't 2013).  Notably, it was not until 2009 — two years after he left Spherion — that Khurana began to use words like "waste" and "abuse" in connection with the CityTime project, Khurana Aff. ¶¶ 121-22; PX-58; PX-59; DX-34; Tr. 432-33, 435-39, and not until after the arrests of Mazer and Berger that he started speaking of fraud, DX-42, DX-44, DX-55.  Even then, he explicitly told DOI that he did not believe that anyone from Spherion — the sole Defendant here — had been involved in the scheme.  DX-44.[10]

At a more granular level, Khurana points to several categories of activity that he argues are "protected" for purposes of the false claims statutes.  *See* Pl.'s Br. ¶ 188; ECF No. 247-1 ("Pl.'s Chart").  With only one possible exception, the Court concludes that none of them qualify as protected activity.  *First*, Khurana points to several instances when he informed others about developmental bugs in the CityTime application, along with more general reporting on the application's poor performance and frequent failures.  *See, e.g.*, Khurana Aff. ¶¶ 26, 30-31 (Khurana conducted a "smoke test" of the application in November 2004 and reported that it failed the test); PX-19 (Khurana informed Mazer, Berger, and others in July 2005 that the application could only run up to seventy-five concurrent users); PX-52 (Khurana informed Sharma, Basu, Arya, and others that the CityTime program had a significant design issue).  Khurana testified about other instances in which he allegedly reported developmental issues regarding the CityTime application to others.  *See, e.g.*, Khurana Aff. ¶¶ 34, 63, 75-76.  But, in

---

[10]     Khurana does not — and, indeed, logically could not — claim that Spherion retaliated against him based on his reports of fraud *after* his employment ended.

light of the Court's concerns about Khurana's credibility and the lack of any corroboration for these reports, the Court declines to credit Khurana's testimony on that score.

In any event, these activities are not protected conduct under the FCA statutes. To be protected, conduct must be specifically "related to exposing or deterring fraud." *Garcia*, 2011 WL 1458155, at *4 (internal quotation marks omitted). These reports about the application's performance issues were not related to exposing or deterring fraud and could not reasonably have led to a viable FCA action. This conclusion is bolstered by the fact that Khurana was hired precisely to identify performance problems with the CityTime application. Cohen Aff. ¶¶ 41, 43-44; Roach Aff. ¶ 28; Khurana Aff. ¶ 44. As noted, when otherwise protected activity constitutes part of an FCA plaintiff's normal job responsibilities, the plaintiff must demonstrate that his activity "went beyond the performance of his normal job responsibilities so as to overcome the presumption that he was merely acting in accordance with his employment obligations." *Landfield*, 976 N.Y.S.2d at 382. Where, as here, the plaintiff "engaged in conduct that ordinarily falls within the context of his job responsibilities," *Faldetta*, 2000 WL 1682759, at *12, the plaintiff fails to establish that such conduct is protected under the FCA statutes.

*Second*, Khurana points to several instances in which he allegedly complained to others that the CityTime project was a "waste" and that the project should thus be "scrapped." *See, e.g.*, Khurana Aff. ¶¶ 31, 33-34, 37, 54, 61, 81. Yet the only evidence that Khurana complained about the project being wasteful during his term of employment comes from his own testimony, which — as noted — the Court is unwilling to credit absent corroboration. No documentary evidence of such complaints exists. Tr. 292. And, in fact, there are affirmative reasons to doubt Khurana's testimony on this front. For example, even though he testified that he "voice[d his] concerns" regarding CityTime's "wastefulness" to Rizzi, Khurana Aff. ¶ 33, Rizzi failed to

28

corroborate his claims of such reports.  Additionally, although Khurana claims to have met for lunch with Basu approximately one month before being terminated and complained then that CityTime was "an exercise in 'waste' and 'abuse,'" *id.* ¶ 81, Khurana conspicuously failed to raise such complaints in an email sent to Basu a mere three days after he was terminated, *see* PX-87.  Basu, for her part, testified during a deposition that she did not recall Khurana ever criticizing the CityTime project.  Basu Dep. 48.  And Cohen — to whom Khurana claims to have raised concerns, Khurana Aff. ¶ 33-34, 61 — denied having had any such communication.  Tr. 260.

In any event, even if the Court were to credit Khurana's testimony on this front, he still failed to demonstrate that he had "an objectively reasonable basis for believing that" by raising such complaints, "he was investigating matters that could have led to a viable FCA claim." *Sasaki*, 2012 WL 220219, at *12.  Khurana's "generalized concerns" that the CityTime project was wasteful — concerns that were widely shared and voiced by others, Cohen Aff. ¶¶ 55-58, Tr. 229 — are not sufficient to constitute protected conduct.  *Dhaliwal v. Salix Pharm., Ltd.*, 752 F. App'x 99, 101 (2d Cir. 2019) (summary order).  That is, raising concerns about the best use of funds, or expressing disapproval of the way that funds are being spent, is not itself conduct that rises to the level of protected activity.  *See Liburd v. Bronx Leb. Hosp. Ctr.*, No. 07-CV-11316 (HB), 2009 WL 900739, at *10 (S.D.N.Y. Apr. 3, 2009), *aff'd* 372 Fed. App'x 137 (2d Cir. 2010) (summary order).  This category of activity, then, does not qualify as protected.

*Third*, Khurana points to instances in which he suspected that SAIC was reporting inaccurate test data to the City.  *See, e.g.*, Khurana Aff. ¶ 49 (Khurana "started having strong doubts that SAIC was reporting accurate load test results" because SAIC was dually responsible for creating and testing the code); *id.* ¶ 51 (Khurana had suspicions that the results being reported

to the City overstated CityTime's performance); *id.* ¶ 56 (Khurana once told Gurjal and Farhana Lokhandwala, both OPA employees, that SAIC was not reporting accurate CityTime performance).  Reporting on inaccuracies in data disclosures could conceivably qualify as protected activity, as there might have been a reasonable basis for Khurana to have believed that divulging inaccurate data was sufficiently connected to "exposing or deterring fraud" or that reporting on such inaccuracies could lead to a viable FCA claim.  *See Ortiz*, 2019 WL 1207856, at *4 (internal quotation marks omitted).  That is not the case here, though.

Indeed, the evidence is thin that upon suspecting that data was being recorded inaccurately, Khurana actually reported these suspicions in any specific way to City personnel. *See United States ex rel. Vallejo v. Investronica, Inc*., 2 F. Supp. 2d 330, 338 (W.D.N.Y. 1998) (dismissing a retaliation claim when plaintiff merely alleges that he "learned of [defendants'] allegedly false statements").  Khurana claims that in the spring and summer of 2005 he conversed with FISA and OPA personnel to inform them that regardless of what SAIC was reporting, the CityTime application could not support all FISA users, let alone users across the City.  Khurana Aff. ¶ 54.  But even fully crediting this testimony — which the Court is unwilling to do for the reasons discussed above — it does not demonstrate that Khurana reported to anyone that SAIC was actually conveying inaccurate data.  Khurana also points to a July 2005 email in which he reported that, according to his test results, only seventy-five users could concurrently use the application and Mazer, in response, stated that he was told the number was 150.  PX-19, at 1; Khurana Aff. ¶ 52.  Again, however, Khurana did not actually report that that data had been falsified or otherwise inaccurately reported in this exchange.  Furthermore, and tellingly, Rizzi — a FISA employee and one of Khurana's only confidantes on the CityTime project — could not testify to receiving specific information from Khurana that data being reported by SAIC was

inaccurate.  Tr. 576.  At most, Rizzi testified to having "feelings" and suspicions about others not giving her "straight information" and trusting Khurana to give her "correct information."  *Id.*; Rizzi Aff. ¶ 9.  That does not suffice.

*Fourth* and finally, Khurana points to instances in which he reported his belief that others on the CityTime project were improperly billing time, hiring contractors improperly, or otherwise unnecessarily prolonging contracts to enrich themselves.  He points to several such incidents, *see* Khurana Aff. ¶¶ 38, 63, 77, but given contradictory testimony by Cohen, *see* Tr. 259-61, and the lack of corroboration, the Court credits only one.  Specifically, in late 2006, Khurana was tasked with training Hasan and Sundaram, two new load performance testers. Khurana Aff. ¶ 65.  Khurana observed that Hasan was improperly billing time that he actually spent taking care of personal matters and that Sundaram did not have prior load testing experience or appropriate skills.  *Id.* ¶ 66; *see also* Arya Aff. ¶ 20 (Arya testifying that he also believed that Sundaram was "not competent to write . . . scripts").  Khurana claims that, in or about November 2006, he reported what he observed to Berger and others.  Tr. 516-17; Khurana Aff. ¶¶ 67-68.  And that claim is corroborated, to some extent, by a November 26, 2006, email in which Cohen reported a then-recent "incident" involving Khurana "being critical of other team members," PX-40, at 2, possibly referring to Hasan and Sundaram.  This incident is the one and only activity that could conceivably qualify as "protected," as it was arguably sufficiently connected to an "investigation . . . directed at exposing a fraud upon the government."  *Fisch v. New Heights Acad. Charter Sch.*, No. 12-CV-2033 (DLC), 2012 WL 4049959, at *5 (S.D.N.Y. Sept. 13, 2012) (internal quotation marks omitted).

**B.  Retaliation "Because of" the Protected Activity**

In the final analysis, the Court need not decide whether this one episode qualified as protected activity or whether Spherion had knowledge of it because, even if both were true, Khurana failed to prove that he was subjected to any adverse employment action as a result.[11] To satisfy the third element of a retaliation claim, Khurana had to prove that Spherion retaliated — *i.e.*, performed some adverse action — against him and that the retaliation was causally connected to his protected activity.  The NYS FCA defines retaliation as being "discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against in the terms and conditions of employment, or otherwise harmed or penalized . . . because of" protected activity.  N.Y. State Fin. Law § 191(1).  The NYC FCA adopts the definition of retaliation in N.Y. Labor Law § 740(1)(e), to wit, "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment," N.Y.C. Admin. Code § 7-805(a)(3).  The third element, therefore, requires proof of both adverse action and causation.  The Court will address each requirement in turn.

**1.  Adverse Actions Against Khurana**

Khurana identifies a slew of allegedly adverse actions, *see* Pl.'s Br. ¶ 215; Pl.'s Chart, but most of them predate Khurana's November 2006 report about Hasan and Sundaram — the one and only action that could qualify as protected — and, thus, are irrelevant as a matter of law. *See, e.g.*, *Dibble v. Regents of Univ. of Md. Sys*., 89 F.3d 828 (table), 1996 WL 350019, at *4, (4th Cir. June 26, 1996) (per curiam) (unpublished opinion) (holding, in a Title VII case, that

---

[11]     Nor does the Court need to resolve the parties' disagreement with respect to whether Berger and Mazer were agents of Spherion for purposes of Khurana's claims.  *Compare* Pl.'s Br. ¶ 171, *with* Def.'s Br. 13-14.  Even if they were, Khurana's claims fail for the reasons that follow.

because a decision adverse to the plaintiff was made *before* her complaints to her employer, she

could not provide evidence of a causal connection between her complaints and the adverse

employment decision); *Yerdon v. Teamsters Local 1149*, 886 F. Supp. 226, 232 (N.D.N.Y. 1995)

(finding, in a Title VII case, that an alleged retaliatory action "cannot be the basis for a . . .

retaliation claim because it took place prior to plaintiff's protected activity"), *aff'd sub nom.*

*Yerdon v. Henry*, 91 F.3d 370 (2d Cir. 1996).  Khurana alleges only two potential adverse actions

that post-date November 2006: his reassignment in January 2007 from the load testing group to

the automation testing group and his termination in June 2007.  Pl.'s Br. ¶ 215(f)-(g).[12]  The

Court need not dwell on the latter: Khurana's termination (whether it is viewed, as he would

have it, as termination from Spherion or, as Spherion would have it, termination only from the

CityTime project) plainly qualifies as adverse action.  *See* N.Y. State Fin. Law. § 191(1)

(creating a cause of action for employees "discharged" or "suspended" because of protected

activity); *Forkell v. Lott Assisted Living Corp.*, No. 10-CV-5765 (NRB), 2012 WL 1901199, at

*11 n.8 (S.D.N.Y. May 21, 2012).  ("[T]ermination clearly constitutes adverse action.").  Thus,

the only question is whether Khurana's reassignment qualifies.

The Court concludes that it does not.  To be sure, reassignment to a position with

"significantly diminished responsibilities" can constitute adverse employment action for

---

[12]     Khurana alleges other adverse employment actions following his November 2006 report,
such as Sharma's emails warning him not to be late.  *See* Pl.'s Chart 5.  It is doubtful that such
routine employment-related communications could qualify as adverse employment action.  *See*
*Dhaliwal v. Salix Pharm., Ltd.*, No. 15-CV-706 (DLC), 2019 WL 5067164, at *4 (S.D.N.Y. Oct.
9, 2019) ("[A]n adverse action 'must be materially adverse, which means it will have dissuaded a
reasonable worker from engaging in protected activity.'" (quoting *United States ex rel. Bias v.*
*Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 326 (5th Cir. 2016))), *vacated in part on other*
*grounds*, 752 F. App'x 99; *see also United States ex rel. Coffman v. City of Leavenworth*, 303 F.
Supp. 3d 1101, 1125 (D. Kan. 2018) (holding that the issuance of a memorandum
communicating employment expectations was not adverse employment action).

purposes of a retaliation claim. *Pitts v. Howard Univ.*, 111 F. Supp. 3d 9, 22 (D.D.C. 2015)

(internal quotation marks omitted) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761

(1998)).  But Khurana does not argue that working in the automation testing group entailed

significantly diminished responsibilities compared to working in the load testing group, and the

evidence suggests otherwise.  *See* Tr. 201-02.  Instead, Khurana contends that the reassignment

was a demotion for two reasons: because the automation testing position had less "prestige" and

because the new position came with reduced compensation as he was not allowed to bill for

overtime.  Khurana Aff. ¶ 72-73.  The first argument is supported by the testimony of Arya, Arya

Aff. ¶ 9, but it is belied by the weight of the evidence.  First, Cohen testified that, if anything,

load testing "may be a little more in demand" than automation testing.  Tr. 201.  And second,

Khurana's own conduct undermines his claim that the automation testing position was less

prestigious.  In particular, for the entire time that Khurana worked as a load tester, he identified

himself as an "automation specialist" in his email signature, on his LinkedIn profile, and on his

resume.  Tr. 310-11.  If anything, that conduct suggests that automation testing was more

prestigious.

Nor is the Court convinced by Khurana's argument that his compensation was materially

diminished in the automation testing group.  Khurana was paid the same hourly rate of $77 per

hour in both positions.  Tr. 389; *see also* Tr. 202-03.  Furthermore, as noted above, although

Khurana testified at trial that he did not bill any overtime after his reassignment, *see* Tr. 376, that

testimony was proved false by his own affidavit, *see* Khurana Aff. ¶ 25.  Khurana then modified

his testimony to claim that he was allowed to bill overtime only until February 2007, *see* Tr. 377-

78, but this too proved to be false as records indicated that Khurana billed overtime until at least

May 2007, *see* Tr. 378.  At best, Khurana contends, based on his rate of overtime pay during the

first half of 2007, that he would have been able to bill only 2,105 hours for the 2007 calendar year in his new position, as compared to the 2,268 he billed for the 2006 calendar year and the 2,168 he billed for the 2005 calendar year. Pl.'s Br. ¶ 267. But putting aside whether that difference would qualify as material, Khurana failed to prove that the difference was due to the reassignment as opposed to random noise or the vagaries of the business cycle. Notably, Khurana himself attributed the limits on overtime to a directive given in February 2007 — after he had been reassigned — and that directive applied to everyone in the automation testing group. *See* Khurana Aff. ¶ 73. Accordingly, the Court concludes that Khurana's reassignment from the load testing group to the automation testing group was not an adverse employment action.

## 2. "Because of" the Protected Activity

Thus, the question is whether Khurana proved by a preponderance of the evidence that his termination in June 2007 was "because of" his November 2006 report about Hasan and Sundaram. As a preliminary matter, the parties disagree about the legal standard that governs that question. Khurana cites authority suggesting that the appropriate standard is a mixed-motive standard, according to which he need only establish that the "retaliation was motivated 'at least in part' by [his] protected activity." *See, e.g.*, *Singletary v. Howard Univ.*, 939 F.3d 287, 293 (D.C. Cir. 2019) (quoting *Yesudian*, 153 F.3d at 736). Spherion, by contrast, argues that the applicable standard is "but-for" causation — a position this Court arguably endorsed in its opinion denying summary judgment on Khurana's retaliation claims. *See Khurana II*, 2020 WL 918740, at *3 (holding that "a reasonable jury could conclude that protected activity was a but-for cause of Khurana's termination").

Although the Second Circuit has not yet addressed this issue, several judges in this District have held that the but-for standard is the appropriate one. *See Malanga v. N.Y. Univ.*,

No. 14-CV-9681 (WHP), 2018 WL 333831, at *4 (S.D.N.Y. Jan. 9, 2018); *Dhaliwal*, 2017 WL 4083180, at *6; *Lawrence*, 2017 WL 3278917, at *7.  In so finding, they have relied on the Supreme Court's instruction — in the Title VII context — that the term "'because of' . . . typically imports, at a minimum, the traditional standard of but-for causation."  *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347, 360 (2013) (holding that Title VII retaliation claims "must be proved according to traditional principles of but-for causation, not the lessened [motivating-factor] causation test"); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (holding that the same phrase in the Age Discrimination in Employment Act imposes a but-for standard); *accord Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020) ("Th[e] ancient and simple 'but for' common law causation test . . . supplies the default or background rule against which Congress is normally presumed to have legislated when creating its own new causes of action." (internal quotation marks omitted)).  Several other courts of appeals have adopted the same position.  *See Nesbitt v. Candler County*, 945 F.3d 1355, 1359 (11th Cir. 2020); *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 78 (3d Cir. 2018); *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 333 (5th Cir. 2017); *see also United States ex rel. Strubbe v. Crawford Cty. Mem'l Hosp.*, 915 F.3d 1158, 1167 (8th Cir. 2019) (stating that a plaintiff must prove that "the retaliation was motivated solely by the plaintiff's protected activity" (internal quotation marks omitted)).  *But see Singletary*, 939 F.3d at 293; *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 518 (6th Cir. 2000).

        In light of this authority, the Court agrees that the but-for standard applies.  But either way, the evidence does not support a finding that Khurana's termination in June 2007 was caused by retaliation for his arguably protected activity in November 2006.  For one thing,

Khurana's efforts to prove causation are undermined by the passage of time between the alleged protected activity and his termination.  Given the glaring absence of direct evidence of causation, the passage of approximately seven months between Khurana's arguably protected activity and his termination defeats any inference of causation between the two.  *See, e.g.*, *Liburd*, 2009 WL 900739, at *11 (finding that passage of seven months was insufficient to infer causation); *see also West v. Timex Corp.*, 361 F. App'x 249, 251 (2d Cir. 2010) (summary order) (holding that the passage of a year between raising concerns and termination, along with evidence that the termination was for nonretaliatory reasons, could not support a finding of retaliation).  In fact, in the analogous Title VII context, "courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Rightnour v. Tiffany & Co.*, 354 F. Supp. 3d 511, 527 (S.D.N.Y. 2019) (internal quotation marks omitted).

Additionally, Spherion proved that Khurana's termination was due to "legitimate, non-retaliatory reason[s]" and Khurana failed to prove that these reasons were a pretext for retaliation.  *Liburd*, 372 F. App'x at 139.[13]  First, the evidence at trial proved that Khurana was terminated in part because he took his findings and concerns regarding CityTime's performance to City agencies — Spherion's clients — rather than sharing them with his supervisors within Spherion.  Roach Aff. ¶¶ 29-32; Cohen Aff. ¶¶ 67, 120.  Notably, Khurana's own evidence

---

[13]     The proposition that an employer can counter a claim of retaliation by proffering a legitimate, non-retaliatory reason for an adverse employment action and that the burden then shifts to the employee to prove that the reason is a pretext for retaliation traces back to the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See, e.g.*, *Plotzker v. Kips Bay Endoscopy Ctr., LLC*, No. 12-CV-9255 (GBD), 2017 WL 4326061, at *7 (S.D.N.Y. Sept. 8, 2017), *aff'd sub nom. Plotzker v. Kips Bay Anesthesia, P.C.*, 745 F. App'x 436 (2d Cir. 2018) (summary order).  The Second Circuit's summary order in *Liburd*, cited above, has been read as an "implicit[] endorse[ment] of the *McDonnell Douglas* framework" for FCA whistleblower claims.  *Forkell*, 2012 WL 1901199, at *10.

shows that he frequently side-stepped his supervisors to communicate the results of his

performance testing directly to City employees and otherwise criticize the CityTime project.  *See*

Rizzi Aff. ¶¶ 27-30; Khurana Aff. ¶¶ 55, 57; PX-16, at 1 (Sirageldin complaining that Khurana

provides information directly to the client).  These unsanctioned communications were

particularly problematic for Spherion because, as Khurana's own witness, Bell, confirmed,

relations with and among the City agencies were complicated.  Tr. 527; *see also* Roach Aff. ¶ 32.

Cohen testified credibly that Khurana's political insensitivities were a factor in his termination.

Cohen Aff. ¶¶ 64-68; Tr. 180, 182, 265-66.  That testimony is corroborated by contemporaneous

evidence indicating that Khurana had "a history of difficulties, including a lack of political

sensitivity."  PX-40, at 2; *see also* PX-43 (Cohen relating that Mazer had asked Cohen to speak

with Khurana "about having the right attitude and being a team player").

Khurana does not dispute that he bypassed his chain of command, but rather argues that

these sorts of communications are precisely the type of activity that the FCA statutes are

designed to protect.  *See* Pl.'s Br. ¶ 188(b).  If Khurana's external reporting qualified as protected

activity, there would be some appeal to that argument.  Employees whose jobs involve internal

reporting or compliance are required to do "something more" than their typical job

responsibilities to put their employers on notice of their protected activity.  *State ex rel. Banerjee

v. Moody's Corp.*, 50 N.Y.S.3d 28 (Table), 2016 WL 7252487, at *21 (Sup. Ct. 2016) (internal

quotation marks omitted), *aff'd sub nom. Anonymous v. Anonymous*, 83 N.Y.S.3d 472 (1st Dep't

2018).  The accusation of insubordination, the argument goes, "precisely demonstrates the point

in support of [the plaintiff's] claim — that he went outside the chain of command" to report.  *Id.*

at *24.  But this argument is inapplicable here.  The Court has already concluded that the type of

communications Khurana had with FISA and other City employees was not sufficiently related

to "exposing or deterring fraud upon the government" — the central concern of the FCA statutes — so as to qualify as protected activity. *Id.* at *20. Khurana's repeated flouting of the proper chain of command is therefore a legitimate, non-retaliatory ground for his termination.

Evidence presented at trial also confirmed another reason for Khurana's termination: that he had personality traits that made him difficult to work with. He consistently believed that many of his colleagues were incompetent, Tr. 297, 300, 456, 470; DX-55, at 3; DX-40, at 2, and testified that he believed, and still believes, that he was the most talented person working on the CityTime project, Tr. 366. Moreover, he shared his opinions — that he was the most talented person on the project and that others were unqualified — with others. Khurana Aff. ¶¶ 66-68; *see also* Tr. 366-67, 517, 22-23; DX-55, at 3. In 2007 — after his reassignment to the automation testing group — Khurana made one of his team members cry after criticizing the coding framework she had designed, which he believed could have been improved. Tr. 363. In a November 2006 email, Cohen cited a recent "incident" involving Khurana "being critical of other team members" as a reason for his contemplated termination. PX-40, at 2. And in fact, in a June 2007 email written the day before Khurana was terminated, Cohen also cited "issues" with Khurana's "ability to work with others" as a reason for his termination. DX-31. Khurana's inability to get along with his coworkers was another legitimate, non-retaliatory reason for his termination. *See, e.g.*, *Forkell*, 2012 WL 1901199, at *11 ("[I]t is beyond dispute that an employer may terminate an employee based on inappropriate comments, perceived insubordination, or disruptive behavior in the workplace.").[14]

---

[14]    Much of Khurana's focus at trial was on two other reasons Spherion proffered for his termination: his tardiness and his untimely submission of time sheets and status reports. *See, e.g.*, Tr. 145-55, 771-72. He did not — and could not — dispute that he committed these infractions, nor that he was reprimanded for them. *See, e.g.*, Stack Aff. ¶¶ 19-20; Khurana Aff. ¶¶ 74, 78-79, 83; Cohen Aff. ¶ 105; Tr. 382, 706. Instead, he tried to cast doubt on whether they

In short, Spherion proved that it had at least two legitimate reasons for Khurana's termination.  It follows that there was "no causal connection between [Khurana's] allegedly protected activities and [his] termination."  *Liburd*, 2009 WL 900739, at *11.

## CONCLUSION

In sum, Khurana's retaliation claims fail.  At most, he proved that he engaged in only one form of activity that qualified as "protected" under the FCA statutes: his November 2006 report about Hasan and Sundaram.  That one report aside, Khurana certainly raised his fair share of concerns about the beleaguered CityTime project.  But these concerns were well within the scope of his employment and did not concern fraud, false claims, or anything else covered by the FCA statutes.  It was only later, when the problems with the CityTime project became clearer and Mazer and others were arrested and charged with fraud, that Khurana sought to capitalize by retroactively casting his earlier complaints to be complaints about fraud, waste, and abuse.  In any event, Khurana failed to prove that his June 2007 termination was caused by retaliation for

---

actually justified his termination by, among other things, showing that other employees, who were not terminated, had committed the same infractions, PX-49; Pl.'s Br. ¶ 229; noting that there is no evidence that he submitted time sheets and status reports late after July 2006, Tr. 694-95; Pl.'s Br. ¶ 228; and pointing out that these reasons do not appear in Cohen's contemporaneous communications about his termination, DX-19; PX-40; Pl.'s Br. ¶ 226.  *But see* DX-31 (Cohen noting that "[t]here have been attendance . . . issues" with Khurana).  There is some force in these arguments, but they do not cast doubt on the other legitimate, non-retaliatory reasons Spherion had at the time for Khurana's termination.  And even assuming arguendo that Khurana proved that these reasons were pretextual — that is, that they would not, in themselves, have resulted in his termination — he did not prove that they were pretext *for* retaliation.  *See, e.g., McCollum v. Jacobs Eng'g Grp., Inc.*, 992 F. Supp. 2d 680, 688 (S.D. Miss. 2014) ("[T]o show pretext [for purposes of an FCA retaliation claim,] the employee must show *both* that the reason was false, *and* that retaliation was the real reason." (emphasis in original)); *see also, e.g., D'Andrea v. Nielsen*, 765 F. App'x 602, 607 (2d Cir. 2019) (summary order) (Title VII case) ("[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason." (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993))); *accord Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

his protected activity.  Accordingly, Spherion is entitled to judgment with respect to Khurana's

remaining claims of retaliation.  Thus, the Clerk of Court is directed to terminated ECF No. 199,

to enter judgment for Spherion, and to close this case.[15]

       SO ORDERED.

Dated: January 6, 2021
      New York, New York

_____
               JESSE M. FURMAN
           United States District Judge

---

[15]      The Court deferred hearing the testimony of Dr. Mark R. Killingsworth, Khurana's expert on damages, pending its decision on liability.  ECF No. 230.  In light of the Court's conclusion, the issue of damages is moot so there is obviously no need to reconvene for Dr. Killingsworth's testimony.